DUNCAN v STATE OF MICHIGAN

Docket Nos. 278652, 278858, and 278860. Submitted December 9, 2008, at Detroit. Decided June 11, 2009, at 9:00 a.m.

Christopher L. Duncan and seven other individuals brought an action in the Ingham Circuit Court against the state of Michigan and the Governor of Michigan, alleging denial of their state and federal constitutional rights to counsel and the effective assistance of counsel as a result of the court-appointed, indigent defense systems currently being employed in Berrien, Genesee, and Muskegon counties. Count I of the complaint, which pertains only to the Governor, alleged a Sixth Amendment violation of the right to effective or adequate representation and sought declaratory and injunctive relief for the constitutional violation under 42 USC 1983. Count II, also pertaining only to the Governor, alleged a Fourteenth Amendment violation of the right to due process and sought declaratory and injunctive relief under 42 USC 1983. Count III, which pertains to the state and the Governor, alleged a violation of the right to the effective assistance of counsel under Const 1963, art 1, § 20, and sought declaratory and injunctive relief. Count IV, which also pertains to the state and the Governor, alleged a violation of due process under Const 1963, art 1, § 17, and sought declaratory and injunctive relief. The plaintiffs moved for class action certification to include all present and future indigent defendants subject to felony prosecutions in the trial courts of the three counties who have been, are being, and will be denied their state and federal constitutional rights to counsel and the effective assistance of counsel as a result of the court-appointed, indigent defense systems currently being employed by the counties. The plaintiffs alleged that the defendants are legally responsible for securing and protecting the constitutional rights at issue and that the constitutionally deficient systems were the result of the defendants' inadequate funding and lack of fiscal and administrative oversight. They further alleged that the systemic constitutional deficiencies in regard to indigent representation continue to infect the judicial process and are directly attributable to the defendants' constitutional failures, which can and must be redressed by court action. The court, Laura Baird, J., granted the motion for class certification and denied the defendants' motions

for summary disposition that were based on the grounds of governmental immunity, justiciability doctrines, and other theories. The defendants appealed as of right the order denying summary disposition based on the asserted ground of governmental immunity and appealed by leave granted the orders denying summary disposition on the other grounds alleged and granting class certification. The appeals were consolidated.

The Court of Appeals *held*:

The defendants are not shielded by governmental immunity and are proper parties to this action. The trial court, not the Court of Claims, has jurisdiction in this case. The trial court has jurisdiction and authority in this action to order declaratory relief, prohibitory injunctive relief, and some level of mandatory injunctive relief, the full extent of which the Court of Appeals need not presently define. It can be stated that on the basis of the pleadings and at this juncture in the lawsuit, the plaintiffs have sufficiently alleged facts that, if true, establish standing, establish that the case is ripe for adjudication, and state claims upon which declaratory and injunctive relief can be awarded. The plaintiffs have alleged facts sufficient to survive a motion for summary disposition. The trial court properly granted the motion for class certification.

1. The Sixth Amendment safeguards the right to counsel at all critical stages of the criminal process for an accused who faces incarceration. A "critical stage of the proceedings" is any stage where the absence of counsel may harm a defendant's right to a fair trial and applies to preliminary proceedings where rights may be sacrificed or defenses lost.

2. The claims against the state are based solely on alleged violations of the Michigan Constitution. The lawsuit against the state is not a tort liability action for money damages. The state is not shielded by immunity granted by law in this suit seeking declaratory and injunctive relief for constitutional violations. The trial court properly concluded that governmental immunity is not available to the state.

3. MCL 691.1407(5) affords no immunity protection for the Governor because it concerns tort liability and this is not a tort liability action for money damages.

4. Any state law (statutory, constitutional, or common law) that can be read to exclude the Governor from being compelled to act, or otherwise subject to any type of injunction, is preempted when a suit for equitable relief is brought against the Governor pursuant to 42 USC 1983 for a violation of the federal constitution, regardless of the fact that the suit is litigated in a state court.

5. The entry of an order simply compelling the defendants to provide indigent defendants representation consistent with the state and federal constitutions would not necessarily mean that the state was being required by the court to appropriate funds to come into compliance. The defendants' arguments regarding who has the authority to appropriate funds from the state treasury are not ripe for review at this time.

6. The Court of Claims has neither exclusive nor concurrent jurisdiction over the claims in this case because there are no contract or tort claims. The trial court did not err in ruling that the case did not belong in the Court of Claims.

7. Even if the action could have been filed against the judiciary and the counties that administer the indigent criminal defense systems, it was not shown that the joinder of those parties was required. The defendants are not relieved of their constitutional duties or entitled to dismissal even if the judiciary and the counties should have been sued.

8. The two-part test in *Strickland v Washington*, 466 US 668 (1984), for a claim of ineffective assistance of counsel in a criminal case, which requires, first, that the defendant show that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense, that is, the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different, does not control this civil suit seeking prospective relief.

9. The criminal defendants in this action do not sustain harm, for purposes of justiciability analysis and the constitutional right to the effective assistance of counsel, simply because of their status as indigent defendants with court-appointed counsel subject to prosecutorial proceedings in a system with presumed existing deficiencies. There needs to be an instance of deficient performance or inadequate representation, that is, representation falling below an objective standard of reasonableness. Here, if the plaintiffs are to succeed, they must prove widespread and systemic constitutional violations that are actual or imminent, constituting the harm necessary to establish justiciability. The focus in addressing justiciability at this early stage of this case must be on the allegations in the complaint.

10. The right to any prospective injunctive relief concerns the question whether the harm sought to be avoided in the future is imminent. It can be shown that harm is imminent if the plaintiffs can show widespread and systemic instances of actual harm that

have occurred in the past under the current indigent defense systems employed by the counties, thereby making the action justiciable.

11. Injury or harm is shown in the context of a class action civil suit seeking prospective relief for widespread constitutional violations when court-appointed counsel's representation falls below an objective standard of reasonableness (deficient performance) and results in an unreliable verdict or unfair trial, when a criminal defendant is actually or constructively denied the assistance of counsel altogether at a critical stage in the proceedings, or when counsel's performance is deficient under circumstances in which prejudice would be presumed in a typical criminal case. Injury or harm is shown when court-appointed counsel's performance or representation is deficient relative to a critical stage in the proceedings and, absent a showing that it affected the reliability of a verdict, the deficient performance results in a detriment to a criminal defendant that is relevant and meaningful in some fashion, for example, unwarranted pretrial detention. When it is shown that court-appointed counsel's representation falls below an objective standard of reasonableness with respect to a critical stage in the proceedings, there has been an invasion of a legally protected interest and harm occurs. The plaintiffs must additionally show that instances of deficient performance and denial of counsel are widespread and systemic and that they are caused by weaknesses and problems in the court-appointed, indigent defense systems employed by the three counties that are attributable to and ultimately caused by the defendants' constitutional failures. If the aggregate of harm reaches such a level as to be pervasive and persistent (widespread and systemic), the case is justiciable and declaratory relief is appropriate, as well as injunctive relief to preclude future harm and constitutional violations that can reasonably be deemed imminent in light of the existing aggregate harm. The allegations in the plaintiffs' complaint are sufficient to establish the existence of a genuine case or controversy between the parties, reflecting a dispute that is real, not hypothetical.

12. Widespread and systemic instances of deficient performance caused by a poorly equipped appointed-counsel system will not cease and be cured with a case-by-case examination of individual criminal appeals, given that prejudice is generally required and often not established. Even though a criminal appeal may occasionally result in a new trial, it has no bearing on the eradication of continuing systemic constitutional deficiencies. Thus, there is no adequate legal remedy for the harm that the plaintiffs are attempting to prevent.

13. Justiciable harm or injury exists when there is an actual denial of counsel, when there is an overwhelmingly deficient performance by counsel equating to constructive denial of counsel, or when counsel with conflicting interests represents an indigent defendant. The plaintiffs' complaint contains allegations that fit within the categories of actual and constructive denial of counsel, as well as allegations that encompass other situations in which prejudice is presumed.

14. The allegations by the named plaintiffs include instances of representation by counsel that fell below an objective standard of reasonableness in regard to critical stages in the criminal proceedings.

15. The plaintiffs sufficiently alleged with regard to members of the class instances of deficient performance detrimental to indigent defendants. The allegations reflect widespread and systemic instances of violations of the right to counsel and the effective assistance of counsel. The plaintiffs have alleged a nexus or causal connection between the widespread and systemic deficiencies and the defendants. There are sufficient allegations of a causal connection between the injuries and the complained-of conduct, and the plaintiffs have also indicated that the injuries would be redressed by a favorable court decision granting the prayed-for equitable relief. The plaintiffs have alleged facts that, if true, establish standing, establish that the case is ripe for adjudication, and state claims upon which declaratory and injunctive relief can be awarded. The case is presently justiciable because a case or controversy exists.

16. The trial court did not err in determining that the plaintiffs satisfied the five factors that a court must consider in determining under MCR 3.501(A)(1) whether to certify a class. The class is sufficiently numerous to make joinder of each class member impractical. The allegations in the complaint satisfy the commonality requirement in regard to both the factual and the legal questions presented. The allegations in the complaint satisfy the typicality requirement. The allegations show that the representative parties will fairly and adequately assert and protect the interests of the class. The factors listed in MCR 3.501(A)(2), which are considered in determining whether the maintenance of the action as a class action will be superior to other available methods of adjudication in promoting the convenient administration of justice, weigh in favor of certification of the class.

Affirmed.

WHITBECK, J., dissenting, stated his disagreement with the majority's conclusions, and the rationale supporting those conclu-

sions, with respect to the named plaintiffs' claims and the appropriateness of the declaratory and injunctive relief that they seek. He further disagreed with the majority's conclusions, and the rationale supporting those conclusions, concerning class action certification.

The named plaintiffs cannot plausibly assert that the alleged failures by the state and the Governor have caused the alleged deficient performance at the local level because there is no way that they can possibly prove such causation.

Judge WHITBECK disagreed with the majority's conclusion that the named plaintiffs' claims are justiciable and stated that, in reaching that conclusion, the majority rendered a holding that, standing alone, the named plaintiffs' claims—despite their conjectural and hypothetical nature, despite their lack of showing that the inaction of the state and the Governor has caused the situation they describe, and despite their failure to show that a favorable decision will redress that situation—are sufficient per se to establish standing, ripeness, and, therefore, justiciability.

A finding of prejudice per se cannot be made because there can be no Sixth Amendment violation in the absence of prejudice at a particular trial. Sixth Amendment claims cannot be adjudicated apart from the circumstances of a particular case because prejudice is an essential element of any Sixth Amendment violation.

Injunctive relief may issue only when there is no adequate remedy at law, but a remedy does exist in this case. Under *Strickland,* if the named plaintiffs can show, postconviction, that their counsels' performance at critical stages of the proceeding was so deficient as to cause prejudice to them, they can seek judicial intervention and redress. The sweeping preconviction declaratory and injunctive relief that the named plaintiffs seek is inappropriate, and a proper respect for the basic concept of separation of powers requires that the judiciary decline to issue such relief.

The trial court erred by granting the motion for class certification because the named plaintiffs failed to show that they themselves have suffered or imminently will suffer an actual injury in that they did not establish that the actions or inactions of the state and the Governor have caused or will cause a denial of their Sixth Amendment rights, and because the purported class that they seek to represent—all indigent adult persons who rely or will rely on the counties to provide them with defense services in felony cases—failed to adequately identify a sufficiently numerous class by not identifying class members who have suffered actual injury and therefore have standing to sue.

Although the state and the Governor concede inadequacies in the current indigent criminal defense system, the trial court erred by denying the defendants' motion for summary disposition under MCR 2.116(C)(8) and, consequently, erred when it granted the motion for class certification. The orders of the trial court should be reversed and the case should be remanded for the entry of summary disposition in favor of the state and the Governor.

1. CONSTITUTIONAL LAW — RIGHT TO COUNSEL — APPOINTMENT OF COUNSEL.

The indigent are constitutionally entitled to be represented by counsel when prosecuted for a crime by the state; the state has an obligation to provide such defendants counsel when they lack the financial means to hire an attorney (US Const, Ams VI and XIV; Const 1963, art 1, § 20).

2. CONSTITUTIONAL LAW — RIGHT TO COUNSEL — WORDS AND PHRASES — CRITICAL STAGES.

The Sixth Amendment safeguards the right to counsel at all critical stages of the criminal process for an accused who faces incarceration; a critical stage is any stage where the absence of counsel may harm a defendant's right to a fair trial and applies to preliminary proceedings where rights may be sacrificed or defenses lost (US Const, Am VI).

3. GOVERNMENTAL IMMUNITY — CONSTITUTIONAL LAW — VIOLATIONS OF CONSTI-TUTION.

Governmental immunity is not available in a nontort action against the state where it is alleged that the state has violated a right conferred by the Michigan Constitution (MCL 691.1407[1]).

4. GOVERNMENTAL IMMUNITY — CONSTITUTIONAL LAW — VIOLATIONS OF CONSTI-TUTION — GOVERNOR.

Governmental immunity is not available in a nontort action against the Governor where it is alleged that the Governor has violated the Michigan Constitution (MCL 691.1407[5]).

5. ACTIONS — ACTIONS AGAINST GOVERNOR — INJUNCTIONS — EQUITY — CIVIL RIGHTS.

Any state law (statutory, constitutional, or common law) that excludes the Governor from being compelled to act, or otherwise subjected to any type of injunction, is preempted when a suit for equitable relief is brought against the Governor pursuant to 42 USC 1983 for violation of the federal constitution and regardless of the fact that the suit is litigated in a state court.

6. COURTS — COURT OF CLAIMS — JURISDICTION.

The Court of Claims has neither exclusive nor concurrent jurisdic-

tion over claims seeking declaratory relief against the state where
there are no contract or tort claims asserted (MCL 600.6419,
600.6419a).

7. CONSTITUTIONAL LAW — EFFECTIVE ASSISTANCE OF COUNSEL — INDIGENT
   DEFENDANTS.

   Criminal defendants do not sustain harm, for purposes of justicia-
   bility analysis and the constitutional right to the effective assis-
   tance of counsel, simply because of their status as indigent
   defendants with court-appointed counsel subject to prosecutorial
   proceedings in a system with presumed existing deficiencies in the
   system; there needs to be an instance of deficient performance or
   inadequate representation for harm to occur.

8. ACTIONS — CLASS ACTION — CERTIFICATION OF CLASS.

   A trial court, when evaluating a class certification motion, must
   accept as true the allegations made in support of the request for
   certification.

American Civil Liberties Union Fund of Michigan (by
*Michael J. Steinberg, Kary L. Moss,* and *Mark P.
Fancher), Mark Granzotto, P.C.* (by *Mark R. Granzotto),
Frank D. Eaman PLLC* (by *Frank D. Eaman), Cravath,
Swaine & Moore LLP* (by *Julie A. North* and *Elizabeth
Kennedy),* and American Civil Liberties Union Founda-
tion (by *Robin Dahlberg* and *Emily Chiang)* for the
plaintiffs.

*Michael A. Cox,* Attorney General, *B. Eric Restuccia,*
Solicitor General, and *Denise C. Barton, Margaret A.
Nelson, Ann M. Sherman,* and *Jason R. Evans,* Assis-
tant Attorneys General, for the defendants.

Before: MURPHY, P.J., and SAWYER and WHITBECK, JJ.

MURPHY, P.J. At its core, this case involves a claim
that the named plaintiffs, along with members of the
certified class, i.e., present and future indigent defen-
dants subject to felony prosecutions in the trial courts
of Berrien, Genesee, and Muskegon counties, have

been, are being, and will be denied their state and
federal constitutional rights to counsel and the effective
assistance of counsel, Const 1963, art 1, § 20, and US
Const, Am VI, directly as a result of the court-
appointed, indigent defense systems currently being
employed by those counties. According to plaintiffs,
even though the counties and the circuit court chief
judges have been statutorily delegated the duties asso-
ciated with providing representation for indigent crimi-
nal defendants, the state of Michigan and the Governor,
defendants in this suit, ultimately remain legally re-
sponsible for securing and protecting the constitutional
rights at issue. And plaintiffs assert that the constitu-
tionally deficient county systems were born out of and
created by defendants' inadequate funding and lack of
fiscal and administrative oversight. They further allege
that the systemic constitutional deficiencies in regard
to indigent representation continue to infect the judi-
cial process and are directly attributable to defendants'
constitutional failures, which can and must be re-
dressed by court action.

In Docket No. 278652, defendants appeal as of right
the trial court's order denying under MCR 2.116(C)(7)
their motion for summary disposition based on govern-
mental immunity. In Docket No. 278858, defendants
appeal by leave granted the trial court's order denying
their motion for summary disposition on numerous
theories, including various justiciability doctrines. Fi-
nally, in Docket No. 278860, defendants appeal by leave
granted the trial court's order granting class certifica-
tion. The appeals were consolidated.

We affirm, holding that defendants are not shielded
by governmental immunity, that defendants are proper
parties, that the trial court, not the Court of Claims, has
jurisdiction, and that the trial court has jurisdiction and

authority to order declaratory relief, prohibitory injunctive relief, and some level of mandatory injunctive relief, the full extent of which we need not presently define. We further hold that, on the basis of the pleadings and at this juncture in the lawsuit, plaintiffs have sufficiently alleged facts that, if true, establish standing, establish that the case is ripe for adjudication, and state claims upon which declaratory and injunctive relief can be awarded. Finally, we hold that the trial court properly granted the motion for class certification.

We preface our opinion by observing that the role of the judiciary in our tripartite system of government entails, in part, interpreting constitutional language, applying constitutional requirements to the given facts in a case, safeguarding constitutional rights, and halting unconstitutional conduct. For state and federal constitutional provisions to have any meaning, we may and must engage in this role even where litigation encompasses conduct by the executive and legislative branches. We cannot accept the proposition that the constitutional rights of our citizens, even those accused of crimes and too poor to afford counsel, are not deserving and worthy of any protection by the judiciary in a situation where the executive and legislative branches fail to comply with constitutional mandates and abdicate their constitutional responsibilities, either intentionally or neglectfully. If not by the courts, then by whom? We are not ruling that a constitutional failure has in fact occurred here, but it has been alleged and needs to be judicially addressed. This, however, does not mean that we may set public policy, make political judgments, or demand that more efficient or desirable means be utilized by the political branches in carrying out their constitutional obligations. But if a chosen path taken by the executive and legislative branches in an effort to satisfy their constitutional obligations alleg-

edly fails to meet minimum constitutional requirements, the judiciary must examine the allegations and adjudicate the dispute. The judiciary by so intervening is not acting with a lack of judicial modesty or in violation of the separation of powers; it is acting in accordance with its constitutional obligations, duties, and oaths of office. See *Boumediene v Bush*, 553 US __, __; 128 S Ct 2229, 2259; 171 L Ed 2d 41, 77 (2008); *Marbury v Madison*, 5 US (1 Cranch) 137, 177-180; 2 L Ed 60 (1803). Failing to do so results in the political branches' effectively deciding "what the law is," *Boumediene* and *Marbury, supra*, impinging on the judiciary's role in violation of the separation of powers. Judicial modesty does not equate to ignoring constitutional obligations. Constitutional compliance is our only concern; matters regarding the method and the manner by which the executive and legislative branches effectuate constitutional demands are not our concern, nor can they be, as long as the branches abide by the state and federal constitutions. In that same vein, and with respect to the particular issues raised in this action, concerns about costs and fiscal impact, concerns regarding which governmental entity or entities should bear the costs, and concerns about which governmental body or bodies should operate an indigent defense system cannot be allowed to prevail over constitutional compliance, despite any visceral reaction to the contrary. We take no position on the validity of plaintiffs' allegations and claims, nor are the underlying motivations of any party relevant. We simply and merely hold that plaintiffs have alleged facts sufficient to survive a motion for summary disposition.

## I. THE COMPLAINT

In a highly detailed complaint, plaintiffs allege that the indigent defense systems now in place in Berrien,

Genesee, and Muskegon counties are underfunded, poorly administered, and do not ensure that the participating defense attorneys have the necessary tools, time, and qualifications to adequately represent indigent defendants and to put the cases presented by prosecutors to the crucible of meaningful adversarial testing. Plaintiffs assert that the county systems are wholly lacking with respect to the following: client eligibility standards; attorney hiring, training, and retention programs; written performance and workload standards; the monitoring and supervision of appointed counsel; conflict of interest guidelines; and independence from the judiciary and prosecutorial offices. Plaintiffs claim harm in the form of improperly denied representation, wrongful convictions, unnecessary or prolonged pretrial detentions, factually unwarranted guilty pleas, lengthy pretrial delays, and the introduction of inadmissible evidence that could have been excluded had pretrial motions been filed. Plaintiffs claim further harm in the form of representation by counsel who have conflicts of interest, sentences that are harsher than warranted or legally unsound, and hearing and trial failures due to unprepared counsel and the lack of inquiry, investigation, investigatory tools, and access to expert witnesses. The complaint provides numerous examples in support of these contentions.

The complaint proceeds to provide specific instances of alleged deficient and inadequate performances by various court-appointed attorneys with respect to the eight named indigent plaintiffs. As an overview, these alleged instances include: counsel speaking with plaintiffs, for the first time, in holding cells for mere minutes before scheduled preliminary examinations while in full hearing range of other inmates; counsel advising plaintiffs to waive preliminary examinations without meaningful discussions of case-relevant matters; counsel

failing to provide plaintiffs with police reports; and coun-
sel generally neglecting throughout the entire course of
criminal proceedings to discuss with plaintiffs the accu-
racy and nature of the charges, the circumstances of the
purported crimes, and any potential defenses. Further
alleged instances include: counsel entering into plea ne-
gotiations without client input or approval; counsel per-
functorily advising plaintiffs to plead guilty as charged
absent meaningful investigation and inquiry; counsel im-
properly urging plaintiffs to admit facts when pleas were
taken; and counsel neither preparing for hearings and
trials nor engaging in any communications with plaintiffs
concerning trials. The complaint alleges that other indi-
gent defendants being prosecuted or who will be pros-
ecuted in the future face the same prospects of receiving
inadequate and ineffective assistance of counsel as that
received by the named plaintiffs.

With respect to all the named plaintiffs, as well as all
those persons fitting within the class, the complaint
alleges that the inadequacies and ineffectiveness of
counsel in handling indigent cases ultimately result
from failures by the state and the Governor to ad-
equately provide funding and fiscal and administrative
oversight. According to plaintiffs, it is the failures by
the state and the Governor that have caused, are
causing, and will continue to cause a denial of constitu-
tionally adequate legal representation within the sys-
tems employed by the counties. Count I of the com-
plaint, which pertains only to the Governor, alleges a
Sixth Amendment violation of the right to effective or
adequate representation and seeks declaratory and in-
junctive relief for the constitutional violation under 42
USC 1983. Count II of the complaint, which also per-
tains only to the Governor, alleges a Fourteenth Amend-
ment violation of the right to due process and seeks
declaratory and injunctive relief for the constitutional

violation under 42 USC 1983. Count III of the complaint, which pertains to the Governor and the state, alleges a violation of the right to the effective assistance of counsel under Const 1963, art 1, § 20, and seeks declaratory and injunctive relief. Count IV of the complaint, which also pertains to the state and the Governor, alleges a violation of due process under Const 1963, art 1, § 17, and seeks declaratory and injunctive relief.

In the prayer for relief, plaintiffs seek a court declaration that defendants' conduct, failure to act, and practices are unconstitutional and unlawful, consistent with the four alleged counts, and plaintiffs seek to enjoin defendants from subjecting class members to continuing unconstitutional practices. Plaintiffs also request an order requiring defendants "to provide indigent defense programs and representation consistent with the requirements of the United States and Michigan Constitutions."

## II. CLASS CERTIFICATION AND SUMMARY DISPOSITION

Pursuant to MCR 3.501(B), plaintiffs moved for class certification, contending that the class was sufficiently numerous to the extent that joinder would be impractical, that factual and legal issues raised by the named plaintiffs were common to, and typical of, prospective class members, that the named plaintiffs and prospective class members share or will share similar harms and constitutional deprivations, and that the named plaintiffs would fairly and adequately protect the interests of the class through maintenance of a class action, which would be superior to any other method of adjudication.

Defendants filed a motion for summary disposition pursuant to MCR 2.116(C)(4), (7), and (8). Defendants maintained that plaintiffs lacked standing, the case was

not ripe for adjudication, the trial court lacked jurisdiction on a variety of grounds, there was a failure to state a claim upon which declaratory and injunctive relief could be granted, the wrong parties were sued, and governmental immunity shielded defendants from liability. The nature of each particular argument will be discussed below in our analysis, given that defendants' arguments were renewed on appeal.

At a hearing in which the trial court addressed plaintiffs' motion for class certification as well as defendants' motion for summary disposition, the court granted class certification and rejected all the grounds raised by defendants in support of the summary disposition motion. We shall discuss the court's reasoning when we examine each of the appellate issues raised by defendants.

### III. ANALYSIS

#### A. STANDARDS OF REVIEW

This Court reviews de novo a trial court's decision on a motion for summary disposition. *Kreiner v Fischer*, 471 Mich 109, 129; 683 NW2d 611 (2004). Also reviewed de novo are issues of constitutional law, *Wayne Co v Hathcock*, 471 Mich 445, 455; 684 NW2d 765 (2004), statutory interpretation, *Feyz v Mercy Mem Hosp*, 475 Mich 663, 672; 719 NW2d 1 (2006), governmental immunity, *Bennett v Detroit Police Chief*, 274 Mich App 307, 310-311; 732 NW2d 164 (2007), jurisdiction, *Atchison v Atchison*, 256 Mich App 531, 534; 664 NW2d 249 (2003), and matters concerning justiciability, *Michigan Chiropractic Council v Comm'r of the Office of Financial & Ins Services*, 475 Mich 363, 369; 716 NW2d 561 (2006).

"A trial court's ruling regarding certification of a class is reviewed for clear error, meaning that the ruling

will be found clearly erroneous only where there is no
evidence to support it or there is evidence but this
Court is nevertheless 'left with a definite and firm
conviction that a mistake has been made.' " *Hill v City
of Warren*, 276 Mich App 299, 310; 740 NW2d 706
(2007), quoting *Zine v Chrysler Corp*, 236 Mich App
261, 270; 600 NW2d 384 (1999).

### B. UNDERLYING CONSTITUTIONAL PRINCIPLES

#### 1. THE RIGHT TO COUNSEL GENERALLY

"In all criminal prosecutions, the accused shall enjoy
the right to . . . have the Assistance of Counsel for his
defence." US Const, Am VI. The right to counsel under
the Sixth Amendment is made applicable to the states
pursuant to the Due Process Clause of the Fourteenth
Amendment. *People v Williams*, 470 Mich 634, 641; 683
NW2d 597 (2004), citing *Gideon v Wainwright*, 372 US
335; 83 S Ct 792; 9 L Ed 2d 799 (1963). Under the
Michigan Constitution, "[i]n every criminal prosecu-
tion, the accused shall have the right to . . . have the
assistance of counsel for his or her defense[.]" Const
1963, art 1, § 20. *Gideon* made clear that the indigent
are constitutionally entitled to be represented by coun-
sel when prosecuted for a crime by the state, even
though they lack the financial means to hire an attor-
ney, and that the state has an obligation to provide
them counsel. *Gideon, supra* at 344. We wholeheartedly
agree with the following wise sentiments articulated by
the United States Supreme Court in *Gideon*:

> The assistance of counsel is one of the safeguards of the
> Sixth Amendment deemed necessary to insure fundamen-
> tal human rights of life and liberty. . . . The Sixth Amend-
> ment stands as a constant admonition that if the constitu-
> tional safeguards it provides be lost, justice will not . . . be
> done.

. . . [R]eason and reflection require us to recognize that in our adversary system of criminal justice, any person haled into court, who is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is provided for him. This seems to us to be an obvious truth. Governments, both state and federal, quite properly spend vast sums of money to establish machinery to try defendants accused of crime. Lawyers to prosecute are everywhere deemed essential to protect the public's interest in an orderly society. Similarly, there are few defendants charged with crime, few indeed, who fail to hire the best lawyers they can get to prepare and present their defenses. That government hires lawyers to prosecute and defendants who have the money hire lawyers to defend are the strongest indications of the widespread belief that lawyers in criminal courts are necessities, not luxuries. The right of one charged with crime to counsel may not be deemed fundamental and essential to fair trials in some countries, but it is in ours. From the very beginning, our state and national constitutions and laws have laid great emphasis on procedural and substantive safeguards designed to assure fair trials before impartial tribunals in which every defendant stands equal before the law. This noble ideal cannot be realized if the poor man charged with crime has to face his accusers without a lawyer to assist him. [*Id.* at 343-344 (parenthesis, citations, and quotation marks omitted; second ellipsis added).]

2. THE RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL

The constitutional right to counsel encompasses the right to the *effective assistance* of counsel. *Strickland v Washington*, 466 US 668, 686; 104 S Ct 2052; 80 L Ed 2d 674 (1984). In *United States v Cronic*, 466 US 648, 654-656; 104 S Ct 2039; 80 L Ed 2d 657 (1984), the United States Supreme Court explained:

The special value of the right to the assistance of counsel explains why "[i]t has long been recognized that the right to counsel is the right to the effective assistance of counsel." The text of the Sixth Amendment itself suggests as

much. The Amendment requires not merely the provision of counsel to the accused, but "Assistance," which is to be "for his defence." Thus, "the core purpose of the counsel guarantee was to assure 'Assistance' at trial, when the accused was confronted with both the intricacies of the law and the advocacy of the public prosecutor." If no actual "Assistance" "for" the accused's "defence" is provided, then the constitutional guarantee has been violated. To hold otherwise "could convert the appointment of counsel into a sham and nothing more than a formal compliance with the Constitution's requirement that an accused be given the assistance of counsel. The Constitution's guarantee of assistance of counsel cannot be satisfied by mere formal appointment."

\* \* \*

The substance of the Constitution's guarantee of the effective assistance of counsel is illuminated by reference to its underlying purpose. "[T]ruth," Lord Eldon said, "is best discovered by powerful statements on both sides of the question." This dictum describes the unique strength of our system of criminal justice. "The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free." It is that "very premise" that underlies and gives meaning to the Sixth Amendment. It "is meant to assure fairness in the adversary criminal process." Unless the accused receives the effective assistance of counsel, "a serious risk of injustice infects the trial itself." [Citations omitted.]

### 3. THE RIGHT TO COUNSEL AT CRITICAL STAGES OF THE PROCEEDINGS, INCLUDING PRETRIAL STAGES

"The Sixth Amendment safeguards the right to counsel at all critical stages of the criminal process for an accused who faces incarceration." *Williams, supra* at 641. A critical stage of the proceedings is any stage

where the absence of counsel may harm a defendant's right to a fair trial and "applies to preliminary proceedings where rights may be sacrificed or defenses lost." *People v Green*, 260 Mich App 392, 399; 677 NW2d 363 (2004), overruled on other grounds by *People v Anstey*, 476 Mich 436, 447 n 9 (2006). Critical stages include, in part, the preliminary examination, *Coleman v Alabama*, 399 US 1, 9; 90 S Ct 1999; 26 L Ed 2d 387 (1970), a pretrial lineup, *People v Frazier*, 478 Mich 231, 249 n 20; 733 NW2d 713 (2007), and the entry of a plea, *People v Pubrat*, 451 Mich 589, 593-594; 548 NW2d 595 (1996). In *Maine v Moulton*, 474 US 159, 170; 106 S Ct 477; 88 L Ed 2d 481 (1985), the United States Supreme Court observed:

> [T]he Court has ... recognized that the assistance of counsel cannot be limited to participation in a trial; *to deprive a person of counsel during the period prior to trial may be more damaging than denial of counsel during the trial itself.* Recognizing that the right to the assistance of counsel is shaped by the need for the assistance of counsel, we have found that the right attaches at earlier, "critical" stages in the criminal justice process "where the results might well settle the accused's fate and reduce the trial itself to a mere formality." And, "[w]hatever else it may mean, the right to counsel granted by the Sixth and Fourteenth Amendments means at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him . . . ." This is because, after the initiation of adversary criminal proceedings, " 'the government has committed itself to prosecute, and . . . the adverse positions of government and defendant have solidified. It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law.' " [Citations omitted; emphasis and initial ellipsis added.]

When read together, the authorities cited above make abundantly clear that representation by counsel, and thus effective representation by counsel, is crucial in

serving to protect Sixth Amendment rights not only at trial but also during pretrial proceedings.

### 4. INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS IN CRIMINAL APPELLATE PROCEEDINGS

In the context of criminal cases and appeals, our Supreme Court in *People v Carbin*, 463 Mich 590, 599-600; 623 NW2d 884 (2001), enunciated the basic and well-established principles involving a claim of ineffective assistance of counsel:

> To justify reversal under either the federal or state constitutions, a convicted defendant must satisfy the two-part test articulated by the United States Supreme Court in *Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984). See *People v Pickens*, 446 Mich 298, 302-303; 521 NW2d 797 (1994). "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not performing as the 'counsel' guaranteed by the Sixth Amendment." *Strickland, supra* at 687. In so doing, the defendant must overcome a strong presumption that counsel's performance constituted sound trial strategy. *Id.* at 690. "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* at 687. To demonstrate prejudice, the defendant must show the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Because the defendant bears the burden of demonstrating both deficient performance and prejudice, the defendant necessarily bears the burden of establishing the factual predicate for his claim. See *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999).

Counsel's performance is deemed deficient or ineffective when the "representation [falls] below an objective standard of reasonableness." *Strickland, supra* at 688;

*People v Toma*, 462 Mich 281, 302; 613 NW2d 694 (2000). The two-part *Strickland* test, cited in *Carbin*, takes center stage in addressing the justiciability claims, where defendants vigorously argue for its application in this civil suit seeking declaratory and prospective injunctive relief. In our justiciability analysis, we will also explore the circumstances in which the prejudice prong of the *Strickland* test is inapplicable.

### C. DISCUSSION

#### 1. GOVERNMENTAL IMMUNITY

Defendants argue that governmental immunity bars plaintiffs' "tort" claims against the state because they do not come within an exception to the broad grant of immunity afforded by MCL 691.1407(1). Defendants also contend that absolute immunity bars plaintiffs' claims against the Governor under MCL 691.1407(5). The trial court ruled that governmental immunity is not available in a state court action alleging constitutional violations.

Under MCR 2.116(C)(7), summary disposition in favor of a defendant is proper when the plaintiff's claim is "barred because of . . . immunity granted by law . . . ." See *Odom v Wayne Co*, 482 Mich 459, 466; 760 NW2d 217 (2008). The moving party may submit affidavits, depositions, admissions, or other documentary evidence in support of the motion if substantively admissible. *Id.* The contents of the complaint must be accepted as true unless contradicted by the documentary evidence. *Id.*

#### a. THE STATE

The governmental tort liability act (GTLA), MCL 691.1401 *et seq.*, provides a broad grant of immunity

from "tort liability" to governmental agencies, absent the applicability of a statutory exception,[1] when they are engaged in the discharge or exercise of a governmental function. MCL 691.1407(1); *Maskery v Univ of Michigan Bd of Regents*, 468 Mich 609, 613; 664 NW2d 165 (2003); *Ross v Consumers Power Co (On Rehearing)*, 420 Mich 567, 595; 363 NW2d 641 (1984). The state of Michigan is a "governmental agency" entitled to immunity as granted under the GTLA. MCL 691.1401(c) and (d). An activity that is expressly or impliedly authorized or mandated by constitution, statute, local charter, ordinance, or other law constitutes a governmental function for purposes of the GTLA. *Maskery*, *supra* at 613-614, quoting MCL 691.1401(f). This Court gives the term "governmental function" a broad interpretation, but the statutory exceptions must be narrowly construed. *Maskery*, *supra* at 614. The "immunity protects the state not only from liability, but also from the great public expense of having to contest a trial." *Odom*, *supra* at 478. The party that seeks to impose liability on a governmental entity has the burden of pleading in avoidance of governmental immunity. *Mack v Detroit*, 467 Mich 186, 198; 649 NW2d 47 (2002).

Here, there can be no reasonable dispute that the state was engaged in a governmental function when it delegated the representation of indigent defendants to the various counties.[2] Moreover, it is the state that is

---

[1] The statutory exceptions to governmental immunity consist of the highway exception, MCL 691.1402, the proprietary-function exception, MCL 691.1413, the governmental-hospital exception, MCL 691.1407(4), the motor-vehicle exception, MCL 691.1405, the public-building exception, MCL 691.1406, and the sewage-disposal-system-event exception, MCL 691.1417(2). *Odom*, *supra* at 478 n 62.

[2] MCL 775.16 provides:

When a person charged with having committed a felony appears before a magistrate without counsel, and who has not waived

ultimately mandated to ensure that indigent defendants are provided their constitutional right to counsel. *Gideon, supra; Williams, supra* at 641.

Our Supreme Court has "observed that nontort causes of action are not barred by immunity *if* a plaintiff successfully pleads and establishes such a cause of action." *Borg-Warner Acceptance Corp v Dep't of State*, 433 Mich 16, 19; 444 NW2d 786 (1989) (emphasis in original). Further, in *Smith v Dep't of Pub Health*, 428 Mich 540, 544; 410 NW2d 749 (1987), aff'd sub nom *Will v Michigan Dep't of State Police*, 491 US 58 (1989), the Michigan Supreme Court held:

> [] Where it is alleged that the state, by virtue of custom or policy, has violated a right conferred by the Michigan Constitution, governmental immunity is not available in a state court action.
>
> [] A claim for damages against the state arising from violation by the state of the Michigan Constitution may be recognized in appropriate cases.

See also *Jones v Powell*, 462 Mich 329, 336; 612 NW2d 423 (2000).

State policies are at the forefront of this litigation. " 'Governmental immunity is not available in a state

---

examination on the charge upon which the person appears, the person shall be advised of his or her right to have counsel appointed for the examination. If the person states that he or she is unable to procure counsel, the magistrate shall notify the chief judge of the circuit court in the judicial district in which the offense is alleged to have occurred, or the chief judge of the recorder's court of the city of Detroit if the offense is alleged to have occurred in the city of Detroit. Upon proper showing, the chief judge shall appoint or direct the magistrate to appoint an attorney to conduct the accused's examination and to conduct the accused's defense. The attorney appointed by the court shall be entitled to receive from the county treasurer, on the certificate of the chief judge that the services have been rendered, the amount which the chief judge considers to be reasonable compensation for the services performed.

court action where it is alleged that the state has violated a right conferred by the Michigan Constitution.' " *Hinojosa v Dep't of Natural Resources*, 263 Mich App 537, 546-547; 688 NW2d 550 (2004), quoting *Burdette v Michigan*, 166 Mich App 406, 408; 421 NW2d 185 (1988). An action that establishes unconstitutional conduct "may not be limited except as provided by the Constitution because of the preeminence of the Constitution." *Hinojosa, supra* at 546, citing *Smith, supra* at 641 (opinion by BOYLE, J.). In *Smith, id.*, Justice BOYLE observed in her opinion concurring in part and dissenting in part:

> MCL 691.1407; MSA 3.996(107) does not, by its terms, declare immunity for unconstitutional acts by the state. The idea that our Legislature would indirectly seek to "approve" acts by the state which violate the state constitution by cloaking such behavior with statutory immunity is too far-fetched to infer from the language of MCL 691.1407; MSA 3.996(107). We would not ascribe such a result to our Legislature.

The *Burdette* panel reiterated those sentiments from *Smith* in addressing a due process challenge, further reasoning:

> Plaintiffs' claim alleged that defendant violated plaintiffs' due process rights under Const 1963, art 1, § 17. Plaintiffs have stated a prima facie claim. . . . [D]efendant cannot claim immunity where the plaintiff alleges that defendant has violated its own constitution. Constitutional rights serve to restrict government conduct. These rights would never serve this purpose if the state could use governmental immunity to avoid constitutional restrictions. [*Burdette, supra* at 408-409.]

The instant claims against the state are based solely on alleged violations of the Michigan Constitution and concern custom and policy matters with respect to the representation of indigent defendants. Moreover, plain-

tiffs' lawsuit against the state is not a "tort liability" action. Accordingly, the state is not shielded by immunity granted by law in this suit seeking declaratory and injunctive relief for constitutional violations. The state, however, characterizes plaintiffs' claims as "constitutional tort" claims for money damages and thus claims that governmental immunity bars the action. The state argues that plaintiffs are actually seeking appropriations or money from the state treasury, making plaintiffs' action one for money damages or monetary relief. A cause of action seeking money damages for a violation of state constitutional rights has been coined a "state constitutional tort action." See *Jones v Sherman*, 243 Mich App 611, 612; 625 NW2d 391 (2000). Typically, a constitutional tort claim arises when a governmental employee, exercising discretionary powers, violates constitutional rights personal to a plaintiff. *Reid v Michigan*, 239 Mich App 621, 629; 609 NW2d 215 (2000).

We initially note that, as indicated above, "[a] claim for damages against the state arising from violation by the state of the Michigan Constitution may be recognized in appropriate cases." *Smith, supra* at 544; see also *Powell, supra* at 336. Nevertheless, defendants inaccurately characterize plaintiffs' claims, where the gravamen of the lawsuit concerns the adequacy of representation for indigent defendants and prays for equitable relief; *this is not a tort liability action for money damages, nor do plaintiffs request an appropriation of state funds.* Plaintiffs seek a court declaration that defendants' practices are unconstitutional, seek to enjoin continuing unconstitutional practices, and seek to compel the state and the Governor to provide indigent defendants representation consistent with the state and federal constitutions. Assuming that the state would incur an unfavorable fiscal impact as the ultimate result of the proceedings, it does not magically

transform the case, for purposes of the GTLA, from an equitable action into a tort liability action seeking a money judgment or monetary relief. See, e.g., *Edelman v Jordan*, 415 US 651, 666-668; 94 S Ct 1347; 39 L Ed 2d 662 (1974) (a fiscal consequence to state treasuries resulting from compliance with equitable decrees, which by their terms are prospective in nature, is an ancillary effect and does not mean that a money judgment had been entered). The state has cited no convincing or even relevant authority making the GTLA applicable in this equitable action. Accordingly, the trial court properly concluded that governmental immunity is not available to the state.

b. THE GOVERNOR

With respect to the Governor, MCL 691.1407(5) provides:

> A judge, a legislator, and the elective or highest appointive executive official of all levels of government are immune from *tort liability* for injuries to persons or damages to property if he or she is acting within the scope of his or her judicial, legislative, or executive authority. [Emphasis added.]

"The executive power is vested in the governor," Const 1963, art 5, § 1; therefore, there can be no dispute that the Governor is the highest executive official in state government. Additionally, this lawsuit necessarily relates to duties within the scope of the Governor's executive authority, given that "[t]he governor shall take care that the laws be faithfully executed." Const 1963, art 5, § 8. Further, in regard to the scope of executive authority, this suit *potentially* affects issues of state funding, and Const 1963, art 5, § 18, provides that "[t]he governor shall submit to the legislature at a time fixed by law, a budget for the ensuing fiscal period

setting forth in detail, for all operating funds, the pro-
posed expenditures and estimated revenue of the state."
However, for the reasons stated earlier in this opinion
with respect to the state, this is not a tort liability action
seeking money damages. Accordingly, MCL 691.1407(5)
provides no immunity for the Governor.

### 2. JURISDICTION AND AUTHORITY TO ORDER VARIOUS FORMS OF INJUNCTIVE RELIEF

#### a. MANDAMUS AND THE GOVERNOR

Defendants argue, in cursory fashion, that the trial
court lacks jurisdiction to order injunctive relief with
respect to the Governor. On this issue, the trial court ruled
that Michigan law cannot immunize the Governor from
federal claims under preemption principles and that the
Governor is not immune from state law claims because
the suit does not entail tort liability. As is evident, the trial
court somewhat treaded on governmental immunity prin-
ciples discussed earlier in this opinion.

In support of their contention that injunctive relief
cannot issue against the Governor, defendants cite only
*Straus v Governor*, 459 Mich 526, 532-533; 592 NW2d
53 (1999), in which the Supreme Court, quoting and
adopting this Court's opinion in the case, stated:

"We would also note that, because a court at all times is
required to question sua sponte its own jurisdiction
(whether over a person, the subject matter of an action, or
the limits on the relief it may afford), we have some doubt
with respect to the propriety of injunctive relief against the
Governor. It is clear that separation of powers principles,
Const 1963, art 3, § 2, preclude mandatory injunctive relief,
mandamus, against the Governor. Whether similar reason-
ing also puts prohibitory injunctive relief beyond the com-
petence of the judiciary appears to be an open question that
need not be resolved in this case. We do note that the
Supreme Court has recently recognized that declaratory

relief normally will suffice to induce the legislative and executive branches, the principal members of which have taken oaths of fealty to the constitution identical to that taken by the judiciary, Const 1963, art 11, § 1, to conform their actions to constitutional requirements or confine them within constitutional limits. Only when declaratory relief has failed should the courts even begin to consider additional forms of relief in these situations. The need for utmost delicacy on the part of the judiciary, and respect for the unique office of Governor, [has been] recognized [by this Court]." [Citations omitted.]

In part, plaintiffs seek declaratory relief, and the quoted passage from *Straus* makes clear that the courts have the authority to issue a declaratory judgment against the Governor, which should be the first course of action before even contemplating injunctive relief. Plaintiffs also seek to enjoin continuing unconstitutional practices or, stated otherwise, prohibitory injunctive relief. Such a remedy could potentially entail a cessation of criminal prosecutions against indigent defendants absent constitutional compliance with the right to counsel. *Straus* indicated that the Court was not resolving the question whether the judiciary is constrained from ordering prohibitory injunctive relief against the Governor and, given that defendants do not present any additional arguments on the issue, we decline to find that the trial court lacks authority or jurisdiction to enjoin the Governor from continuing unconstitutional practices. In regard to the issue of mandatory injunctive relief (mandamus), plaintiffs do seek to compel the Governor to provide indigent defendants with representation that is consistent with the state and federal constitutions. As will be discussed later in this opinion, we believe that there may exist a basis to subject the Governor to a mandamus order under Michigan law in regard to state constitutional violations if this case reflects the existence of impediments to the ability of the judiciary to carry out its duties in compliance with

constitutional principles relative to indigent defendants being prosecuted in state courtrooms. However, we need not specifically answer the question because the Governor is also being sued for alleged federal constitutional violations under 42 USC 1983, which allows for mandatory injunctive relief.[3] A review of *Straus* reveals that it did not involve a claim brought under 42 USC 1983 alleging a violation of a federal constitutional right. 42 USC 1983 provides, in relevant part:

> Every *person* who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, *suit in equity,* or other proper proceeding for redress, except that in any action brought against a *judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted* unless a declaratory decree was violated or declaratory relief was unavailable. [Emphasis added.]

Even though a state official is a "person" in the literal sense, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office[, and,] [a]s such, it is no different from a suit against the State itself." *Will v Michigan Dep't of State Police*, 491 US 58, 71; 109

---

[3] "[T]he Michigan Constitution does not afford greater protection than federal precedent with regard to a defendant's right to counsel when it involves a claim of ineffective assistance of counsel." *Pickens, supra* at 302. Plaintiffs' request for mandamus-type relief encompasses, without distinction, both the alleged state and the alleged federal constitutional deprivations; therefore, considering that the federal constitutional rights parallel those under the Michigan Constitution, if there is a state violation, there would be a federal violation, implicating relief under 42 USC 1983.

S Ct 2304; 105 L Ed 2d 45 (1989) (citations omitted). However, "a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.' " *Will, supra* at 71 n 10, quoting *Kentucky v Graham,* 473 US 159, 167 n 14; 105 S Ct 3099; 87 L Ed 2d 114 (1985), and citing *Ex parte Young,* 209 US 123, 159-160; 28 S Ct 441; 52 L Ed 714 (1908); see also *Hafer v Melo,* 502 US 21, 27; 112 S Ct 358; 116 L Ed 2d 301 (1991). The suit against the Governor qualifies as an official-capacity suit, *id.* at 24, 27, and the action seeks equitable relief in the form of a declaratory judgment and an injunction, thereby providing prospective relief. The Governor can thus be sued for injunctive relief under 42 USC 1983, which makes clear that equitable relief is available for a federal constitutional violation and that, if there is any limitation on granting injunctive relief, the limitation pertains only to judicial officers. See *Van Orden v Perry,* 545 US 677; 125 S Ct 2854; 162 L Ed 2d 607 (2005) (Texas resident commenced § 1983 action against the governor and other state officials, seeking declaratory relief and an injunction that would require the removal of the Ten Commandments from the capitol on the basis of an Establishment Clause violation). There is no language in 42 USC 1983 suggesting that equitable relief in the form of a mandatory injunction or mandamus is not available against the Governor, or that there is a distinction to be made between prohibitory injunctive relief and mandatory injunctive relief.

In *Felder v Casey,* 487 US 131, 139; 108 S Ct 2302; 101 L Ed 2d 123 (1988), the United States Supreme Court made clear the broad reach of a § 1983 action, stating:

> Section 1983 creates a species of liability in favor of persons deprived of their federal civil rights by those wielding

state authority. As we have repeatedly emphasized, "the central objective of the Reconstruction-Era civil rights statutes . . . is to ensure that individuals whose federal constitutional or statutory rights are abridged may recover damages or secure injunctive relief." Thus, § 1983 provides "a uniquely federal remedy against incursions . . . upon rights secured by the Constitution and laws of the Nation," and is to be accorded "a sweep as broad as its language."

Any assessment of the applicability of a state law to federal civil rights litigation, therefore, must be made in light of the purpose and nature of the federal right. This is so whether the question of state-law applicability arises in § 1983 litigation brought in state courts, which possess concurrent jurisdiction over such actions, or in federal-court litigation, where, because the federal civil rights laws fail to provide certain rules of decision thought essential to the orderly adjudication of rights, courts are occasionally called upon to borrow state law. Accordingly, we have held that a state law that immunizes government conduct otherwise subject to suit under § 1983 is preempted, even where the federal civil rights litigation takes place in state court, because the application of the state immunity law would thwart the congressional remedy, which of course already provides certain immunities for state officials. [Citations omitted; ellipses in original.]

Accordingly, any state law (statutory, constitutional, or common law) that can be read to exclude the Governor from being compelled to act, or otherwise subjected to any type of injunction, is preempted when a suit for equitable relief is brought against the Governor pursuant to 42 USC 1983 for violation of the federal constitution, regardless of the fact that the suit is litigated in a state court.

### b. APPROPRIATIONS FROM THE STATE TREASURY

Defendants also argue that only the Legislature, as opposed to the trial court or any court, has the author-

ity or jurisdiction to appropriate funds from the state treasury. In support of their position, defendants rely on *Musselman v Governor*, 448 Mich 503; 533 NW2d 237 (1995). In *Musselman*, the plaintiffs, current and retired public school employees who were members of the Michigan Public School Employees' Retirement System, alleged that the state had failed to fund retirement health care benefits being earned by employees, thereby violating Const 1963, art 9, § 24. The plaintiffs sought a "writ of mandamus ordering the appropriate official to transfer funds from the school aid fund to the reserve for health benefits." *Musselman, supra* at 521. Our Supreme Court held that the state was constitutionally "obligated to prefund health care benefits under art 9, § 24." *Musselman, supra* at 524. The Court, however, denied mandamus, ruling that it had "no authority to order the Governor or the Legislature to appropriate funds[.]" *Id.* The *Musselman* Court reasoned:

> Given that the plaintiffs have failed to show that there is a pool of funds available to be transferred to the reserve for health benefits, the requested relief necessarily involves funds from the state treasury. The only defendant with authority to appropriate funds from the treasury is the Legislature. "No money shall be paid out of the state treasury except in pursuance of appropriations made by law." Const 1963, art 9, § 17.

> In this context, this Court lacks the power to require the Legislature to appropriate funds. This was the understanding of the drafters of art 9, § 24, who likewise did not contemplate that the prefunding requirement could be enforced by a court. They expected that the decision to comply rested ultimately with the Legislature, whom the people would have to trust[.] [*Musselman, supra* at 522.][4]

---

[4] The Supreme Court subsequently granted rehearing and issued *Musselman v Governor (On Rehearing)*, 450 Mich 574, 576-577; 545 NW2d 346 (1996), wherein the former majority of four in the case lost

It appears to us that equally problematic would be a court order directing the enactment of legislation or administrative rules, or the issuance of executive or administrative orders, in order to correct any constitutional deficiencies in the court-appointed, indigent defense systems. See Const 1963, art 4, § 1 ("The legislative power of the State of Michigan is vested in a senate and a house of representatives."); Const 1963, art 5, § 17 ("The governor shall communicate by message to the legislature at the beginning of each session and may at other times present to the legislature information as to the affairs of the state and recommend measures he considers necessary or desirable.").[5]

Here, again, plaintiffs seek a court declaration that defendants' practices are unconstitutional, seek to enjoin continuing unconstitutional practices, and seek to compel defendants to provide indigent defendants representation consistent with the state and federal constitutions. In the prayer for relief, plaintiffs are not expressly seeking an appropriation or transfer of state funds, nor expressly demanding the enactment of legislation. We acknowledge that plaintiffs allege that the systemic constitutional deficiencies have been caused by inadequate state funding and the lack of fiscal and

Chief Justice BRICKLEY, who decided that it was unnecessary to construe Const 1963, art 9, § 24, because mandamus could not ultimately issue to order the appropriation or transfer of funds. Thus, while there was no longer a majority regarding interpretation of Const 1963, art 9, § 24, there still remained a majority rejecting a mandamus remedy. See *Studier v Michigan Pub School Employees' Retirement Bd*, 472 Mich 642, 650-659; 698 NW2d 350 (2005) (discussing the *Musselman* cases and resolving the open issue regarding construction of Const 1963, art 9, § 24).

[5] "While strong arguments can be made that state funding would be a more desirable system of court financing, it is for the Legislature to determine whether to adopt such a system." *Grand Traverse Co v Michigan*, 450 Mich 457, 472; 538 NW2d 1 (1995).

administrative oversight. We further recognize that, should plaintiffs prevail, funding and legislation would seemingly appear to be the measures needed to be taken to correct constitutional violations. However, we are not prepared to rule on the issue whether the trial court has the authority to order appropriations, legislation, or comparable steps. It is unnecessary to do so at this juncture in the proceedings.

There is no dispute that declaratory relief is an available remedy falling within the trial court's jurisdiction and authority. As indicated in *Straus, supra* at 532, " '[o]nly when declaratory relief has failed should the courts even begin to consider additional forms of relief[.]' " (Citation omitted.) With respect to the state constitutional claims, which are the only claims brought against the state, should plaintiffs prevail, declaratory relief alone needs to be initially contemplated. And if the state takes corrective action without further need for intervention by the trial court, injunctive relief and the authority to issue constitutionally questionable forms of such relief would no longer be at issue. Additionally, while 42 USC 1983 does not place a limit on a court to first attempt resolution through a declaratory judgment alone, it is possible that upon entry of a declaratory judgment, the Governor would take corrective measures to comply with constitutional requirements.[6] Accordingly, the issue of injunctive relief may never come to fruition.

Furthermore, defendants do not argue that the trial court lacks authority or jurisdiction to enjoin them from continuing unconstitutional practices; therefore, there is the potential that constitutional compliance could occur through issuance of prohibitory injunctive relief,

---

[6] The trial court would necessarily enter a declaratory judgment before, or contemporaneously with, the entry of an order granting injunctive relief.

without reaching questions concerning mandatory injunctive relief or mandamus or compelling defendants to act by way of appropriations or legislation.

Additionally, other than defendants' argument that injunctive relief can never issue against the Governor, which argument we rejected earlier in this opinion, defendants do not contend that the judiciary lacks the authority or jurisdiction to enter an order compelling, in broad and general terms, compliance with constitutional mandates. Defendants' argument merely decries court intervention in the appropriation of funds from the state treasury. However, the entry of an order simply compelling the state and the Governor to provide indigent defendants representation consistent with the state and federal constitutions does not necessarily mean that the state is being required by the court to appropriate funds to come into compliance. Theoretically, there may be creative alternatives available to satisfy constitutional mandates concerning the right to counsel.

We can only speculate at this time regarding the measures ultimately needed to be taken in order to come into compliance with the state and federal constitutions, assuming plaintiffs establish their case.[7] Only

---

[7] The dissent indicates that this litigation will inevitably superimpose a statewide and state-funded system for the representation of indigent criminal defendants. There is, however, no certainty that this will occur, even if it may be a goal of plaintiffs. The dissent jumps ahead to an envisioned remedy, where plaintiffs have not proven, nor even tried their case yet, where legislative or congressional action on the issue, which has received much attention as of late, could conceivably occur before and regardless of this litigation, and where other avenues of constitutional compliance have not been explored, given the stage of the proceedings. Ultimately, and again assuming plaintiffs are successful, constitutional compliance could come in any variety or combination of forms. Our overriding concern is constitutionality, not the chosen path by which constitutional compliance is achieved.

when all other possibilities are exhausted and explored, as already discussed, do there arise issues regarding appropriations and legislation, the separation of powers, and the full extent of court jurisdiction and authority. Therefore, we find no need at this time for this Court to conclusively address the questions posed. That being said, we wish to make clear that nothing in this opinion should be read as foreclosing entry of an order granting the type of relief so vigorously challenged by defendants. We take that stand for two reasons. First, unlike in *Musselman*, federal constitutional violations are alleged here and brought pursuant to 42 USC 1983. In the context of federal law, and keeping in mind the broad reach of a § 1983 action, we note the following passage from the United States Supreme Court's decision in *Edelman, supra* at 667-668:

> As in most areas of the law, the difference between the type of relief barred by the Eleventh Amendment and that permitted under *Ex parte Young* will not in many instances be that between day and night. The injunction issued in *Ex parte Young* was not totally without effect on the State's revenues, since the state law which the Attorney General was enjoined from enforcing provided substantial monetary penalties against railroads which did not conform to its provisions. Later cases from this Court have authorized equitable relief which has probably had greater impact on state treasuries than did that awarded in *Ex parte Young*. In *Graham v. Richardson*, 403 U.S. 365 [91 S Ct 1848; 29 L Ed 2d 534] (1971), Arizona and Pennsylvania welfare officials were prohibited from denying welfare benefits to otherwise qualified recipients who were aliens. In *Goldberg v. Kelly*, 397 U.S. 254 [90 S Ct 1011; 25 L Ed 2d 287] (1970), New York City welfare officials were enjoined from following New York State procedures which authorized the termination of benefits paid to welfare recipients without prior hearing. *But the fiscal consequences to state treasuries in these cases were the necessary result of compliance with*

*decrees which by their terms were prospective in nature.*
State officials, in order to shape their official conduct to the
mandate of the Court's decrees, would more likely have to
spend money from the state treasury than if they had been
left free to pursue their previous course of conduct. Such an
ancillary effect on the state treasury is a permissible and
often an inevitable consequence of the principle announced
in *Ex parte Young, supra.* [Emphasis added.]

Our second reason for not accepting outright defendants' arguments is the Michigan Supreme Court's decision in *46th Circuit Trial Court v Crawford Co*, 476 Mich 131; 719 NW2d 553 (2006). The case involved "a conflict between the legislative branch's exercise of the 'legislative power' to appropriate and to tax, and the judicial branch's inherent power to compel sufficient appropriations to allow the judiciary to carry out its essential judicial functions." *Id.* at 134. The plaintiff trial court sought to compel "counties to appropriate funding for the enhanced pension and retiree health care plans it deem[ed] necessary to recruit and retain adequate staff to allow it to carry out its essential judicial functions." *Id.*

The Supreme Court indicated that the judiciary has the extraordinary and inherent power to compel funding, which power is derived from the separation of powers set forth in articles 4 through 6 and article 3, § 2, of the 1963 Michigan Constitution. *46th Circuit Trial Court, supra* at 140-141. The Court explained:

[J]ust as it is implicit in the separation of powers that
each branch of government is empowered to carry out the
entirety of its constitutional powers, and only these powers, it is also implicit that each branch must be allowed
adequate resources to carry out its powers. Although the
allocation of resources through the appropriations and
taxing authorities lies at the heart of the *legislative* power,
and thus belongs to the legislative branch, *in those rare
instances in which the legislature's allocation of resources*

*impacts the ability of the judicial branch to carry out its constitutional responsibilities, what is otherwise exclusively a part of the legislative power becomes, to that extent, a part of the judicial power.* . . .

In order for the judicial branch to carry out its constitutional responsibilities as envisioned by Const 1963, art 3, § 2, the judiciary cannot be totally beholden to legislative determinations regarding its budgets. While the people of this state have the right to appropriations and taxing decisions being made by their elected representatives in the legislative branch, *they also have the right to a judiciary that is funded sufficiently to carry out its constitutional responsibilities.*

Thus, the judiciary's "inherent power" to compel appropriations *sufficient to enable it to carry out its constitutional responsibilities* is a function of the separation of powers provided for in the Michigan Constitution. The "inherent power" does not constitute an exception to the separation of powers; rather, it is integral to the separation of powers itself. What *is* exceptional about the judiciary's "inherent power" is its distinctiveness from more traditional exercises of the judicial power, involving as it does determinations that directly implicate the appropriations power.

However, in order to accommodate this distinctive, and extraordinary, judicial power with the normal primacy of the legislative branch in determining levels of appropriations, the "inherent power" has always been sharply circumscribed. The "inherent power" contemplates only the power, when an impasse has arisen between the legislative and judicial branches, to determine levels of appropriation that are *"reasonable and necessary" to enable the judiciary to carry out its constitutional responsibilities.* However, levels of appropriation that are *optimally* required for the judiciary remain always determinations within the legislative power. [*46th Circuit Trial Court, supra* at 142-144 (emphasis added and in original).]

If indeed there exist systemic constitutional deficiencies in regard to the right to counsel and the right to the effective assistance of counsel, it is certainly arguable

that *46th Circuit Trial Court* lends authority for a court to order defendants to provide funding at a level that is constitutionally satisfactory. The state of Michigan has an obligation under *Gideon* to provide indigent defendants with court-appointed counsel, and the "state" is comprised of three branches, including the judiciary. Const 1963, art 3, § 2. Ultimately, it is the judiciary, on a daily basis, that is integrally involved with ensuring that, before prosecutions go forward, indigent defendants are provided counsel, without which the court could not carry out its constitutional responsibilities. *Musselman* did not entail the constitutional implications that arise here, which include the ability of the judicial branch to carry out its functions in a constitutionally sound manner.

In sum, we reiterate that we decline at this time to define the full extent of the trial court's equitable authority and jurisdiction beyond that recognized and accepted earlier in this opinion.[8]

### 3. JURISDICTION: COURT OF CLAIMS VERSUS THE CIRCUIT COURT

Defendants contend that the Court of Claims has exclusive jurisdiction over this case. The trial court determined that defendants had relied on cases involving tort claims for money damages in making this jurisdictional argument and, because plaintiffs are

---

[8] We have ruled that declaratory relief is available, and we have ruled that prohibitory injunctive relief is available, assuming establishment of plaintiffs' case, both remedies being requested by plaintiffs. It is true that we have not set boundaries with respect to mandatory injunctive relief; however, as already indicated, *Straus* dictates that restraint be exercised if and until declaratory relief fails to accomplish constitutional compliance. Moreover, our decision not to set the parameters relative to mandatory injunctive relief cannot serve as a basis to dismiss the action, given that other relief is available.

seeking prospective relief that is purely equitable, the case did not belong in the Court of Claims.

MCL 600.6419 provides in pertinent part:

> (1) Except as provided in [MCL 600.6419a] and [MCL 600.6440], the jurisdiction of the court of claims, as conferred upon it by this chapter, shall be exclusive. . . . The court has power and jurisdiction:
>
> (a) To hear and determine all claims and demands, liquidated and unliquidated, ex contractu and ex delicto, against the state and any of its departments, commissions, boards, institutions, arms, or agencies.
>
> \* \* \*
>
> (4) This chapter shall not deprive the circuit court of this state of jurisdiction over . . . proceedings for declaratory or equitable relief, or any other actions against state agencies based upon the statutes of this state in such case made and provided, which expressly confer jurisdiction thereof upon the circuit court . . . .

To interpret MCL 600.6419 correctly, it must be read in conjunction with MCL 600.6419a, which provides, in full:

> In addition to the powers and jurisdiction conferred upon the court of claims by section 6419, the court of claims has concurrent jurisdiction of any demand for equitable relief and any demand for a declaratory judgment when ancillary to a claim filed pursuant to section 6419. The jurisdiction conferred by this section is not intended to be exclusive of the jurisdiction of the circuit court over demands for declaratory and equitable relief conferred by [MCL 600.605].

In *Parkwood Ltd Dividend Housing Ass'n v State Housing Dev Auth*, 468 Mich 763, 775; 664 NW2d 185 (2003), our Supreme Court construed these provisions and held:

Today we hold that pursuant to the plain language of § 6419(1)(a), the Court of Claims has exclusive jurisdiction over complaints based on contract or tort that seek solely declaratory relief against the state or any state agency. We disavow any contrary statements found in our prior case law that have seemingly interpreted § 6419(1)(a) as granting the Court of Claims jurisdiction over claims for money damages only.

As we observed earlier in this opinion, plaintiffs' complaint is not based on tort, and it is indisputable that it is not based on contract. The *Parkwood* Court interpreted MCL 600.6419(4) "as maintaining the jurisdiction of the circuit court over those declaratory claims against the state *that do not involve contract or tort.*" *Parkwood, supra* at 774 (emphasis added). The Court further stated:

This jurisdiction of the circuit court is concurrent with the jurisdiction of the Court of Claims over such claims in the circumstances set out in § 6419a, see n 7. That is, when such a declaratory action is ancillary to another claim within the Court of Claims exclusive jurisdiction under § 6419, the circuit court and the Court of Claims have concurrent jurisdiction over the declaratory action. [*Parkwood, supra* at 774 n 10.]

Footnote 7 in *Parkwood, supra* at 772, referenced in the preceding quotation, provides:

We construe the enactment of § 6419a as having *added to* this jurisdiction by clarifying that the Court of Claims also has jurisdiction over *other* declaratory and equitable claims, specifically, those that relate neither to contract nor tort—over which the circuit court would otherwise have exclusive jurisdiction—when those claims are ancillary to a claim within the court's exclusive jurisdiction under § 6419. [Emphasis in original.]

Thus, the Court of Claims, while having exclusive jurisdiction over complaints based on contract or tort

that seek solely declaratory relief against the state, also has concurrent jurisdiction over complaints seeking declaratory and equitable relief not based on tort or contract if ancillary to a contract or tort claim. Because there is no contract or tort claim whatsoever here, the Court of Claims has neither exclusive nor concurrent jurisdiction. The trial court did not err by ruling that the instant case does not belong in the Court of Claims.

### 4. PROPER PARTIES TO THE LITIGATION

Defendants argue that the action should have been filed against the judiciary and the counties that administer the indigent criminal defense systems. The trial court found that even though defendants have essentially delegated their constitutional duties to the counties, it does not ultimately relieve defendants of their constitutional responsibilities.

Under MCL 775.16, a circuit court's chief judge is responsible for procuring representation for indigent defendants and county treasurers are obligated to pay reasonable compensation to appointed attorneys. *In re Recorder's Court Bar Ass'n v Wayne Circuit Court*, 443 Mich 110, 122; 503 NW2d 885 (1993). However, it would be erroneous to assume "that the statutory purpose underlying assigned counsels' right to reasonable compensation was to assure that indigent criminal defendants received effective assistance of counsel." *Id.* at 123. "Appointed counsel had a statutory right to reasonable compensation for services provided to criminal indigent defendants long before indigent criminal defendants had a right, statutory or otherwise, to appointed counsel." *Id.* at 123-124.

In *Frederick v Presque Isle Co Circuit Judge*, 439 Mich 1, 15; 476 NW2d 142 (1991), our Supreme Court stated that all courts are part of Michigan's one court of

justice under Const 1963, art 6, § 1; however, "the Legislature retains power over the county and may delegate to the local governments certain powers," which it did by enacting a statute that directs certain actions of chief judges and county treasurers, MCL 775.16. Thus, the counties do not have any independent constitutional obligation, apart from the state, to pay for the representation of indigent defendants. Rather, their obligations arise solely out of state statute and, as indicated in *In re Recorder's Court, supra* at 123-124, the purpose of the statute was not to secure the constitutional right to counsel. The counties could be sued for failure to comply with MCL 775.16; however, that is not the basis or thrust of the instant suit, nor do defendants cite any joinder rules or law requiring plaintiffs to include the counties as parties. Indeed, defendants themselves have not sought to join the counties as parties to the suit under the court rules, MCR 2.204 to 2.206. Regardless, we agree with the trial court's assessment that, even though the counties have been given responsibility for the operation and funding of trial courts through the Legislature's delegation powers, including payment of court-appointed counsel for indigent defendants, it does not relieve defendants of their constitutional duties under *Gideon*. Even were we to assume that the counties are necessary parties, it does not form a basis to dismiss the suit against defendants.

With respect to the judiciary, a circuit court's chief judge plays the main role in obtaining legal services for indigent defendants, as reflected in MCL 775.16. Additionally, MCR 8.123(B), which applies to all trial courts,[9] provides that the courts "must adopt a local administrative order that describes the court's procedures for

---

[9] MCR 8.123(A).

selecting, appointing, and compensating counsel who represent indigent parties in that court." An order must be submitted to the State Court Administrator for review, and the State Court Administrator must approve the plan "if its provisions will protect the integrity of the judiciary." MCR 8.123(C). Moreover, the judiciary is of course a branch of state government. See *Grand Traverse Co v Michigan*, 450 Mich 457, 473; 538 NW2d 1 (1995) ("courts have always been regarded as part of state government" despite county funding). Accordingly, the judiciary or the courts in the three counties could have been named as defendants in this action. However, again, defendants cite no joinder rules or laws that required plaintiffs to include the courts in the suit; it was a matter of choice for plaintiffs. And, once again, defendants are not somehow relieved of their constitutional duties and entitled to dismissal even if the courts were or should have been sued.

### 5. JUSTICIABILITY AND STATEMENT OF A CLAIM FOR DECLARATORY AND INJUNCTIVE RELIEF

Defendants argue that plaintiffs lack standing and that their claims are not ripe for adjudication because the preconviction ineffectiveness claims are too remote, speculative, and abstract to warrant the issuance of declaratory and injunctive relief. Defendants also contend that plaintiffs failed to state a claim on which relief may be granted, considering that they have an adequate remedy at law in the form of individual criminal appeals. Defendants rely chiefly on *Strickland* and its two-part test relative to claims of ineffective assistance of counsel. Defendants posit that the need to show injury or harm, relative to justiciability, necessarily equates to establishing deficient performance of counsel *and* satisfying the prejudice prong of an ineffective assistance claim typically applicable in criminal ap-

peals, which prejudice, and therefore justiciable harm, can *only* be based on the rendering of an unreliable verdict, compromising the right to a fair trial. Preconviction ineffectiveness, standing alone, is simply insufficient to establish a case. Stated differently, defendants assert that a Sixth Amendment violation does not occur until there is a deficient performance by counsel *and* prejudice arising out of an unfair trial. Therefore, in the context of this civil suit claiming a Sixth Amendment infringement, the injury or harm needed to make the case justiciable requires satisfaction of the same two elements, and that has not been shown.

The trial court found that plaintiffs had standing and that their claims were ripe for adjudication, rejecting the argument that convictions or the complete denial of counsel were necessary to litigate the case. With respect to *Strickland*, the court indicated that it was unsure whether *Strickland* had any application to plaintiffs' pretrial claims of inadequate representation; however, the court was of the opinion that it would not have to delve into the circumstances of each particular criminal case. Thus, the trial court concluded that plaintiffs had stated a claim on which relief could be granted.

### a. JUSTICIABILITY GENERALLY

Both the state and federal constitutions confer only "judicial power" on the courts, US Const, art III, § 1, and Const 1963, art 3, § 2, and the United States Constitution expressly provides that judicial power is limited to cases and controversies, US Const, art III, § 2. *Michigan Chiropractic, supra* at 369. In order to prevent the judiciary from usurping the power of coordinate branches of government, our Supreme Court and the federal courts have developed justiciability doctrines to ensure that lawsuits filed in the courts are

appropriate for judicial action, and these "include the doctrines of standing, ripeness, and mootness." *Id.* at 370-371. Federal courts have held that standing and mootness are constitutionally derived doctrines and jurisdictional in nature, given that failure to satisfy the elements of these doctrines implicates the constitutional authority of the courts to only exercise judicial power and to solely adjudicate actual cases or controversies. *Id.* at 371. Michigan caselaw has similarly viewed the justiciability doctrines as affecting judicial power, "the absence of which renders the judiciary constitutionally powerless to adjudicate [a] claim." *Id.* at 372.

In *Nat'l Wildlife Federation v Cleveland Cliffs Iron Co,* 471 Mich 608, 614-615; 684 NW2d 800 (2004), our Supreme Court explained the concept of "judicial power," stating:

> The "judicial power" has traditionally been defined by a combination of considerations: the existence of a real dispute, or case or controversy; the avoidance of deciding hypothetical questions; the plaintiff who has suffered real harm; the existence of genuinely adverse parties; the sufficient ripeness or maturity of a case; the eschewing of cases that are moot at any stage of their litigation; the ability to issue proper forms of effective relief to a party; the avoidance of political questions or other non-justiciable controversies; the avoidance of unnecessary constitutional issues; and the emphasis upon proscriptive as opposed to prescriptive decision making.

With respect to the proper exercise of the "judicial power," the most critical element is the mandate that there exist a genuine case or controversy between the parties, meaning that the dispute between the parties is real, not hypothetical. *Michigan Citizens for Water Conservation v Nestlé Waters North America Inc,* 479 Mich 280, 293; 737 NW2d 447 (2007).

### b. STANDING PRINCIPLES

On the doctrine of standing, the Supreme Court in *Michigan Citizens*, *supra* at 294-295, quoting *Nat'l Wildlife*, *supra* at 628-629, quoting *Lee v Macomb Co Bd of Comm'rs*, 464 Mich 726, 739; 629 NW2d 900 (2001), quoting *Lujan v Defenders of Wildlife*, 504 US 555, 560-561; 112 S Ct 2130; 119 L Ed 2d 351 (1992), stated that the following three elements must be proven:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result [of] the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. [Quotation marks and ellipses omitted.]

### c. RIPENESS PRINCIPLES

With regard to the doctrine of ripeness, it precludes the adjudication of hypothetical or contingent claims before an actual injury has been sustained, and an action is not ripe if it rests on contingent future events that may not occur as anticipated or may not occur at all. *Michigan Chiropractic*, *supra* at 371 n 14. Although standing and ripeness are both justiciability doctrines that assess pending claims to discern whether an actual or imminent injury in fact is present, they address different underlying concerns. *Id.* at 378-379. The standing doctrine "is designed to determine whether a particular party may properly litigate the asserted claim for relief." *Id.* at 379. On the other hand, the ripeness doctrine "does not focus on the suitability of

the party; rather, ripeness focuses on the *timing* of the action." *Id.* (emphasis in original).

### d. DECLARATORY RELIEF

With respect to declaratory judgment actions, MCR 2.605(A)(1), (C), and (F) respectively provide as follows:

> In a case of actual controversy within its jurisdiction, a Michigan court of record may declare the rights and other legal relations of an interested party seeking a declaratory judgment, whether or not other relief is or could be sought or granted.

> \* \* \*

> The existence of another adequate remedy does not preclude a judgment for declaratory relief in an appropriate case.

> \* \* \*

> Further necessary or proper relief based on a declaratory judgment may be granted, after reasonable notice and hearing, against a party whose rights have been determined by the declaratory judgment.

The "actual controversy" requirement found in MCR 2.605(A)(1) has been described as " 'a summary of justiciability as the necessary condition for judicial relief.' " *Associated Builders & Contractors v Dep't of Consumer & Industry Services Director*, 472 Mich 117, 125; 693 NW2d 374 (2005), quoting *Allstate Ins Co v Hayes*, 442 Mich 56, 66; 499 NW2d 743 (1993). A court cannot declare the obligations and rights of parties regarding an issue if the issue is not justiciable, meaning that it does not entail a genuine, live controversy between interested persons who are asserting adverse claims, which, if decided, can

affect existing legal relations. *Associated Builders, supra* at 125, quoting *Allstate Ins, supra* at 66.

### e. INJUNCTIVE RELIEF

Finally, in regard to injunctive relief, an injunction constitutes an extraordinary remedy that may be issued only when justice requires it, there is an absence of an adequate remedy at law, and there exists the danger of irreparable injury that is real and imminent. *Pontiac Fire Fighters Union Local 376 v City of Pontiac*, 482 Mich 1, 8; 753 NW2d 595 (2008).

### f. JUSTICIABILITY FRAMEWORK

In constructing the broad analytical framework for addressing the justiciability issues in connection with the particular allegations made by plaintiffs, we find guidance in *Lewis v Casey*, 518 US 343; 116 S Ct 2174; 135 L Ed 2d 606 (1996). In *Lewis*, the respondents were 22 inmates imprisoned in various facilities operated by the Arizona Department of Corrections (ADOC), and they filed a class action on behalf of all adult prisoners who were currently or will be incarcerated by the ADOC, alleging deprivations of their fundamental constitutional right of access to the courts. *Id.* at 346. The action was brought in reliance on *Bounds v Smith*, 430 US 817, 828; 97 S Ct 1491; 52 L Ed 2d 72 (1977), in which it was held that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." See *Lewis, supra* at 346. Following a three-month bench trial in *Lewis*, the federal district court ruled in favor of the respondents, concluding that the respondents had a constitutional

right of access to the courts that is meaningful, adequate, and effective, and that the ADOC's system failed to comply with these constitutional standards. The district court tailored an injunctive remedy that was sweeping in scope, ensuring that the ADOC would provide meaningful court access. The United States Court of Appeals for the Ninth Circuit affirmed, with minor exceptions related to the terms of the injunction. *Id.* at 346-348.

On certiorari granted, the petitioners argued that, in order to establish a *Bounds* violation, an inmate needed to show that any alleged inadequacy of a prison's law library facilities or legal assistance programs caused an actual injury, or in other words, " 'actual prejudice with respect to contemplated or existing litigation, such as the inability to meet a filing deadline or to present a claim.' " *Id.* at 348. The petitioners further argued that the district court failed to find sufficient instances of actual injury that would warrant systemwide relief. *Id.* The Supreme Court held:

> We agree that the success of respondents' systemic challenge was dependent on their ability to show widespread actual injury, and that the court's failure to identify anything more than isolated instances of actual injury renders its finding of a systemic *Bounds* violation invalid. [*Id.* at 349.]

The United States Supreme Court then proceeded to provide the underlying rationale and reasoning for its holding:

> The requirement that an inmate alleging a violation of *Bounds* must show actual injury derives ultimately from the doctrine of standing, a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches. It is the role of courts to provide relief to claimants, in individual or class actions, who have

suffered, or will imminently suffer, actual harm; it is not
the role of courts, but that of the political branches, to
shape the institutions of government in such fashion as to
comply with the laws and the Constitution. In the context
of the present case: It is for the courts to remedy past or
imminent official interference with individual inmates'
presentation of claims to the courts; it is for the political
branches of the State and Federal Governments to manage
prisons in such fashion that official interference with the
presentation of claims will not occur. Of course, the two
roles briefly and partially coincide when a court, in grant-
ing relief against actual harm that has been suffered, or
that will imminently be suffered, by a particular individual
or class of individuals, orders the alteration of an institu-
tional organization or procedure that causes the harm. But
the distinction between the two roles would be obliterated
if, to invoke intervention of the courts, no actual or
imminent harm were needed, but merely the status of
being subject to a governmental institution that was not
organized or managed properly. If—to take another ex-
ample from prison life—a healthy inmate who had suffered
no deprivation of needed medical treatment were able to
claim violation of his constitutional right to medical care
simply on the ground that the prison medical facilities were
inadequate, the essential distinction between judge and
executive would have disappeared: it would have become
the function of the courts to assure adequate medical care
in prisons. [*Id.* at 349-350 (citations omitted).]

We derive much from this passage. It indicates that
inmates do not sustain harm, for purposes of justicia-
bility analysis and the constitutional right of access to
the courts, simply because of their status as inmates in
the prison system and their exposure to the possibility
of being denied meaningful court access because of the
institution's lack of proper management and organiza-
tion. There needs to be interference with the presenta-
tion of a claim to the court, just as inmates must first be
ill and in need of prison medical treatment before being
able to claim deprivation of a constitutional right to

medical care. By analogy, here criminal defendants do not sustain harm, for purposes of justiciability analysis and the constitutional right to the effective assistance of counsel, simply because of their status as indigent defendants with court-appointed counsel subject to prosecutorial proceedings in a system with presumed existing deficiencies. There needs to be an instance of deficient performance or inadequate representation, i.e., "representation [falling] below an objective standard of reasonableness." *Strickland, supra* at 688; *Toma, supra* at 302. *Lewis* does not indicate that the harm must include, besides interference with the right of access to the courts, a showing that the inmate would have been successful in court had access been made available. This proposition is further reflected in the *Lewis* Court's subsequent observations with respect to actual harm:

> Because *Bounds* did not create an abstract, freestanding right to a law library or legal assistance, an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense. That would be the precise analog of the healthy inmate claiming constitutional violation because of the inadequacy of the prison infirmary. Insofar as the right vindicated by *Bounds* is concerned, "meaningful access to the courts is the touchstone," and the inmate therefore must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim. He might show, for example, that a complaint he prepared was dismissed for failure to satisfy some technical requirement which, because of deficiencies in the prison's legal assistance facilities, he could not have known. Or that he had suffered arguably actionable harm that he wished to bring before the courts, but was so stymied by inadequacies of the law library that he was unable even to file a complaint. [*Lewis, supra* at 351 (citation omitted).]

There is no suggestion in the two examples that the hypothetical inmate had to show that the dismissed or unfiled complaint would likely have resulted in a favorable court outcome following litigation; interference, by itself, with a person's attempt to access the court, if access is not sought frivolously, suffices to establish harm. See *id.* at 353.[10]

The *Lewis* Court went on to find that the district court had identified only two instances of actual injury, and the Court then turned to the issue whether those two injuries justified the remedy ordered by the district court. *Id.* at 357. The Court noted that the remedy has to be "limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Id.* The Court further explained that this principle is just as applicable with respect to class actions. *Id.* According to *Lewis*, standing is necessary in class actions and named plaintiffs representing the class must allege and show personal injury. *Id.* The *Lewis* Court concluded that there was a failure to show that the constitutional violations were systemwide; therefore, granting a remedy beyond what was necessary to provide relief to the two injured inmates was improper. *Id.* at 360. Nevertheless, the message that flows from *Lewis* is that in cases where systemwide constitutional violations are proven, prospective equitable relief to prevent further violations is a proper remedy.

The absence of widespread and systemic harm in *Lewis* was the downfall of the case presented by the inmate respondents. Here, if plaintiffs are to succeed,

---

[10] While we examine *Lewis* to provide a general framework, we are examining a different constitutional right and one that is expressly provided for in the state and federal constitutions. Our harm analysis later in this opinion is additionally shaped by caselaw directly addressing the same constitutional right at stake here.

they must prove widespread and systemic constitutional violations that are actual or imminent, constituting the harm necessary to establish justiciability. In addressing this appeal and the justiciability issues, we find that, on the basis of the posture of the lower court proceedings, our attention needs to be directed solely at the allegations in plaintiffs' complaint. In *Lewis, supra* at 357-358, the Supreme Court, quoting *Lujan, supra* at 561, made the following observations:

> The general allegations of the complaint in the present case may well have sufficed to claim injury by named plaintiffs, and hence standing to demand remediation, with respect to various alleged inadequacies in the prison system, including failure to provide adequate legal assistance to non-English-speaking inmates and lockdown prisoners. That point is irrelevant now, however, for we are beyond the pleading stage.
>
> "Since they are not mere pleading requirements, but rather an indispensable part of the plaintiff's case, each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation. At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim. In response to a summary judgment motion, however, the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be supported adequately by the evidence adduced at trial." [Alteration in original; citation and internal quotation marks omitted.]

Here, the justiciability and *Strickland* issues were raised under both MCR 2.116(C)(4) (summary disposition for lack of subject-matter jurisdiction) and MCR

2.116(C)(8) (summary disposition for failure to state a claim). "In reviewing a motion under MCR 2.116(C)(4), it is proper to consider the pleadings and any affidavits or other documentary evidence submitted by the parties to determine if there is a genuine issue of material fact." *Toaz v Dep't of Treasury*, 280 Mich App 457, 459; 760 NW2d 325 (2008); see also *Cork v Applebee's of Michigan, Inc*, 239 Mich App 311, 315; 608 NW2d 62 (2000) (Under MCR 2.116[C][4], "this Court must determine whether the pleadings demonstrate that the defendant was entitled to judgment as a matter of law, or whether the affidavits and other proofs show that there was no genuine issue of material fact."). MCR 2.116(C)(8) provides for summary disposition where "[t]he opposing party has failed to state a claim on which relief can be granted." A motion for summary disposition under MCR 2.116(C)(8) tests the legal sufficiency of a complaint. *Beaudrie v Henderson*, 465 Mich 124, 129; 631 NW2d 308 (2001). The trial court may only consider the pleadings in rendering its decision. *Id.* All factual allegations in the pleadings must be accepted as true. *Dolan v Continental Airlines/Continental Express*, 454 Mich 373, 380-381; 563 NW2d 23 (1997).

As opposed to the circumstances in *Lewis*, we are addressing matters of justiciability at a very early stage in the proceedings and not in the context of completed trial proceedings or a summary disposition motion involving the submission of documentary evidence. The lower court record reveals that defendants' justiciability-related arguments were set forth without reliance on documentary evidence. And the argument that plaintiffs failed to state a claim for declaratory and injunctive relief, which only implicated MCR 2.116(C)(8), couched defendants' entire *Strickland* analysis. Defendants did not engage in an effort to show an absence of a genuine factual dispute with respect to

whether plaintiffs' claims were justiciable; their argument was purely legal in nature and attacked the alleged inadequacy of the pleadings. Even though defendants could have taken a "documentary evidence" approach for purposes of MCR 2.116(C)(4), as indicated in *Toaz* and *Cork*, they chose not to do so, attempting instead to dispose of the case in quick fashion without being buried in the discovery process. Accordingly, the focus in addressing the justiciability issues under the principles articulated earlier in this opinion must be on the allegations in plaintiffs' highly detailed complaint.[11]

g. DEFINING JUSTICIABLE HARM FOR PURPOSES OF THIS SUIT

Plaintiffs seek a declaratory judgment and prohibitory and mandatory injunctions, which remedies are prospective in nature, in an effort to stop alleged ongoing constitutional violations and to prevent future violations. As we view it, plaintiffs would be entitled to declaratory relief, in the context of this case and assuming establishment of causation, if they can show widespread and systemic instances of actual harm. The right to any prospective injunctive relief tends to concern the question whether the harm sought to be avoided in the future is *imminent*, and we conclude that harm is

---

[11] In *Nat'l Wildlife, supra* at 631, our Supreme Court stated:

[A] plaintiff must include in the pleadings "general factual allegations" that injury will result from the defendant's conduct. If the defendant brings a motion for summary disposition, the plaintiff must further support the allegations of injury with documentation, just as he has to support the other allegations that make up his claim. Finally, when the matter comes to trial, the plaintiff must sufficiently support his claim, including allegations of injury, to meet his burden of proof.

While here there was a motion for summary disposition, it was confined by the parties to the pleadings and the allegations, and it was entertained by the trial court shortly after the filing of the complaint. The case was truly at a pleading-assessment level.

imminent if plaintiffs can show widespread and systemic instances of actual harm that have occurred in the past under the current indigent defense systems being employed by the counties. Accordingly, regardless of whether the focus is on declaratory relief or on injunctive relief, the proofs will require a showing of widespread and systemic instances of actual harm, thereby making the action justiciable.[12] The next step, therefore, is for us to define "harm" for purposes of this action.

We hold that, in the context of this class action civil suit seeking prospective relief for alleged widespread constitutional violations, injury or harm is shown when court-appointed counsel's representation falls below an objective standard of reasonableness (deficient performance) and results in an unreliable verdict or unfair trial, when a criminal defendant is actually or constructively denied the assistance of counsel altogether at a critical stage in the proceedings, or when counsel's performance is deficient under circumstances in which prejudice would be presumed in a typical criminal case. We further hold that injury or harm is shown when court-appointed counsel's performance or representation is deficient relative to a critical stage in the proceedings and, absent a showing that it affected the reliability of a verdict, the deficient performance results in a detriment to a criminal defendant that is relevant and meaningful in some fashion, e.g., unwarranted pretrial detention. Finally, we hold that, when it is shown that court-appointed counsel's representation falls below an objective standard of reasonableness with respect to a critical stage in the proceedings, there has been an invasion of a legally protected interest and

---

[12] Of course, plaintiffs are not precluded from introducing other evidence that has a tendency to show that future harm is imminent.

harm occurs. Plaintiffs must additionally show that instances of deficient performance and denial of counsel are widespread and systemic and that they are caused by weaknesses and problems in the court-appointed, indigent defense systems employed by the three counties, which are attributable to and ultimately caused by defendants' constitutional failures.[13] If the aggregate of harm reaches such a level as to be pervasive and persistent (widespread and systemic), the case is justiciable and declaratory relief is appropriate, as well as injunctive relief to preclude future harm and constitutional violations that can reasonably be deemed imminent in light of the existing aggregate of harm. See *Milliken v Bradley*, 433 US 267, 282; 97 S Ct 2749; 53 L Ed 2d 745 (1977) (remedies ordered by court, while usually not the province of the judiciary, were proper where designed to counter pervasive and persistent constitutional violations within the school system).

Plaintiffs will no doubt have a heavy burden to prove and establish their case, but for now we are only concerned with whether plaintiffs have sufficiently alleged supportive facts. While we leave it to the trial court to determine the parameters of what constitutes

---

[13] In its discussion of class action certification, the dissent states, "Unlike the majority, I am unwilling to presume that every alleged deficiency in every indigent criminal defendant's case is the result of the alleged deficiencies in the county indigent defense systems." *Post* at 394. We agree with the dissent that no presumption should exist, but are at a loss in regard to why the dissent concludes that we are making such a presumption. Throughout this opinion, we indicate that plaintiffs will have to establish a causal connection between the deficient performance and the indigent defense systems being employed. There will likely be occasions in which counsel for an indigent defendant acted below an objective standard of reasonableness, yet the deficient performance cannot be attributed to problems in an indigent defense system; some attorneys may be lacking in skills, and no amount of money, time, and resources will make a difference. Again, proving their case will be a monumental undertaking for plaintiffs.

"widespread," "systemic," or "pervasive" constitutional violations or harm, the court must take into consideration the level or degree of any shown harm, giving more weight to instances of deficient performance that resulted in unreliable verdicts and instances where the right to counsel was denied, with less weight being given where there is mere deficient performance. We find that the allegations in plaintiffs' complaint are sufficient to establish the existence of a genuine case or controversy between the parties, reflecting a dispute that is real, not hypothetical.

To summarize the approach to be taken on remand, plaintiffs must show the existence of widespread and systemic instances of actual or constructive denial of counsel and instances of deficient performance by counsel, which instances may have varied and relevant levels of egregiousness, all causally connected to defendants' conduct. Furthermore, because the proofs could be so wide ranging, it would reflect poor judgment on our part to set a numerical threshold with respect to the court's determination of whether the instances of harm, if shown, are sufficiently "widespread and systemic" to justify relief. The trial court is in a better position to first address this issue, subject of course to appellate review.

We glean from the dissenting opinion that our colleague is of the position that the only avenue, judiciary-wise, to address problems in the indigent defense systems employed by the three counties is through a standard criminal appeal as reflected in *Strickland*. The dissent also contends that a claim of ineffective assistance of counsel requires a conviction and deprival of a fair trial as reflected in an unreliable verdict, even in this civil class action suit, given the holding in *Strickland*. Because of the dissent's position, it is concluding

that we are necessarily making a finding of prejudice per se, and thereby a finding of justiciability per se, relative to the claims of preconviction ineffectiveness. Stated differently, the dissent finds that we are assuming that the individual plaintiffs and class members will be convicted, that defendants' actions caused the convictions, that the courts addressing the criminal cases will not correct any constitutional deficiencies, and that this action will redress their injuries. We are not making any such assumptions, and we respectfully conclude that the dissent simply fails to appreciate the nature and character of this civil action brought by a fluid class of plaintiffs that seeks a declaration of unconstitutionality and prospective, systemwide relief to prevent ongoing and future constitutional violations.

It is our view that *Strickland* and its many progeny, which demand deficient performance by counsel and, generally speaking, prejudice in order to entitle a criminal defendant to relief under the Sixth Amendment, have to be understood and viewed in context. The fundamental flaw in defendants' and the dissent's position on the justiciability issues is that the argument is grounded on principles intended to be applied in the context of postconviction criminal appeals that are not workable or appropriate to apply when addressing standing, ripeness, and related justiciability principles in this type of civil rights lawsuit. We cannot properly foist the framework of the criminal appellate process upon the justiciability analysis that governs this civil case simply because state and federal constitutional rights related to the right to counsel are implicated. We reject the argument that the need to show that this case is justiciable necessarily and solely equates to showing widespread instances of deficient performance accompanied by resulting prejudice in the form of an unreliable verdict that compromises the right to a fair trial.

It is entirely logical to generally place the decisive emphasis in a court opinion on the fairness of a trial and the reliability of a verdict when addressing a criminal appeal alleging ineffective assistance *because the appellant is seeking a remedy that vacates the verdict and remands the case for a new trial.* Indeed, it can instantly be gleaned from the opening paragraph in *Strickland* that it has little relevance here:

> This case requires us to consider the proper standards for judging a criminal defendant's contention that the Constitution requires a conviction or death sentence to be set aside because counsel's assistance at the trial or sentencing was ineffective. [*Strickland, supra* at 671.]

In the case sub judice seeking prospective relief to prevent future harm, we are not judging whether a conviction or sentence should be set aside because of the ineffective assistance of counsel. Applying the two-part test from *Strickland* here as an absolute requirement defies logic, where the allegations concern widespread, systemic instances of constitutionally inadequate representation and where the requested remedy in the form of prospective relief seeks to curb and halt continuing acts of deficient performance. What is essentially harmless-error analysis[14] is being confused with justiciability analysis in a case involving an altogether different remedy. The right to counsel must mean more than just the right to an outcome.

A simple hypothetical illustrates the inappropriateness of applying, solely, the two-part *Strickland* test and in taking a position that the only avenue of relief is a criminal appeal. Imagine that, in 100 percent of indi-

---

[14] Harmless-error analysis mirrors the analysis governing review of the prejudice prong of an ineffective assistance claim and also implicates a new trial remedy. See MCL 769.26; *People v Lukity*, 460 Mich 484, 495; 596 NW2d 607 (1999).

gent criminal cases being handled by court-appointed counsel, it could be proven that the proceedings were continuously infected with instances of deficient performance by counsel, yet the trial verdicts were all deemed reliable, assuming all cases went to trial. As is often the case, appellate courts affirm guilty verdicts despite inadequate representation and deficient performance because there existed strong and untainted evidence of guilt. In our scenario, under defendants' and the dissent's reasoning, court intervention in a class action suit such as the one filed here would not be permitted on justiciability grounds despite the constitutionally egregious circumstances. This is akin to taking a position that indigent defendants who are ostensibly guilty are unworthy or not deserving of counsel who will perform at or above an objective standard of reasonableness. The holding set forth in *Gideon* becomes empty and meaningless under such a rationale. Widespread and systemic instances of deficient performance caused by a poorly equipped appointed-counsel system will not cease and be cured with a case-by-case examination of individual criminal appeals, given that prejudice is generally required and often not established. Even though a criminal appeal may occasionally result in a new trial, it has no bearing on eradication of continuing systemic constitutional deficiencies. Thus, contrary to defendants' argument and the dissent's position, there is no adequate legal remedy for the harm that plaintiffs are attempting to prevent.[15]

Contrary to the dissent's contention, we are not engaging in any findings of prejudice, standing, or

---

[15] We are assuming, for purposes of this issue and in contemplation of the elements necessary to merit injunctive relief, that a criminal appeal constitutes a "legal remedy." Generally, "[a]ctual damages is a legal, rather than an equitable, remedy[.]" *Anzaldua v Band*, 457 Mich 530, 541; 578 NW2d 306 (1998).

justiciability per se. Rather, we are merely indicating that *if it is proven,* as alleged, that there have been widespread and systemic instances of deficient performance and denial of counsel, along with proof of the requisite causation, unconstitutionality can be declared and harm in ongoing and future criminal prosecutions of indigent defendants can be deemed imminent, thereby giving rise to a right to an equitable remedy. Concluding that an invasion of a legally protected interest is imminent will always carry with it some modicum of speculation; however, there is no caselaw of which we are aware that suggests that a showing of imminent harm is insufficient to permit judicial intervention. Indeed, the caselaw is to the contrary. See, e.g., *Michigan Citizens, supra* at 294-295. The dissent also fails to acknowledge that plaintiffs have alleged wrongful convictions.

We additionally find that defendants' and the dissent's position ignores the reality that harm can take many shapes and forms. Consistently with the concept of prejudice as employed in criminal appeals, we would agree that justiciable injury or harm is certainly indicated by a showing that there existed a reasonable probability that, but for an error by counsel, the result of a criminal proceeding would have been different. See *Carbin, supra* at 599-600. But injury or harm also occurs when there are instances of deficient performance by counsel at critical stages in the criminal proceedings that are detrimental to an indigent defendant in some relevant and meaningful fashion, even without neatly wrapping the justiciable harm around a verdict and trial. Such harm arises, for example, when there is an unnecessarily prolonged pretrial detention, a failure to file a dispositive motion, entry of a factually unwarranted guilty plea, or a legally unacceptable pre-

trial delay.[16] And as indicated earlier in this opinion, simply being deprived of the constitutional right to effective representation at a critical stage in the proceedings, in and of itself, gives rise to harm.

Further, even in criminal appeals there are situations in which the prejudice prong need not be satisfied. In *Strickland, supra* at 692, the United States Supreme Court stated that "[a]ctual or constructive denial of the assistance of counsel altogether is legally presumed to

---

[16] It is not difficult to conceive of scenarios in which a criminal defendant suffers a detriment or "harm" as a result of an attorney's deficient performance, absent consideration of any trial. Effective assistance of counsel at a preliminary examination potentially can result in a dismissal of the prosecutor's case, as opposed to the case's being bound over to the circuit court if counsel's performance was instead deficient. Effective assistance of counsel at a pretrial hearing potentially can result in the exclusion of a confession or an identification, leading to a *nolle prosequi* or dismissal, whereas a deficient performance by counsel, including a failure to even file a motion challenging the confession or identification, could leave the prosecution's case intact and strong. Effective assistance of counsel in plea negotiations potentially can produce a guilty plea on a warranted charge much less serious than the one initially brought by the prosecution that was factually unwarranted, but an ineffective attorney in comparable circumstances might have his or her client plead guilty of the more serious and overcharged offense. Effective assistance of counsel at a bail hearing might result in a defendant's being able to be released on bond before trial, whereas ineffective assistance at the same hearing could leave the defendant sitting in a jail cell pending trial. An effective attorney may win a dismissal of a prosecutor's case for failure by the state to provide a speedy trial to a defendant, as opposed to a situation involving ineffective representation, where the lawyer fails to recognize a speedy trial issue. These are but a few examples in which the effective assistance of counsel would either end the case before trial and conviction or otherwise benefit a defendant in some favorable fashion; deficient performance, on the other hand, results in a detriment to the defendant. Under a scenario in which an unfiled pretrial motion would have precluded a trial from taking place, a criminal defendant still suffers some level of harm or injury by having his or her life unnecessarily put on hold by the trial process even in a situation where the defendant proceeds to trial and is acquitted. Plaintiffs' complaint encompasses performance deficiencies during the pretrial stages mentioned in this footnote.

result in prejudice." The Court similarly observed in *Cronic* that constitutional error exists without a showing of prejudice when counsel is "prevented from assisting the accused during a critical stage of the proceeding." *Cronic, supra* at 659 n 25. The concept of constructive denial of counsel was explored in *Cronic*, wherein the Court stated that "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." *Id.* at 659. The *Strickland* Court made clear that where there is actual or constructive denial of counsel, "[p]rejudice . . . is so likely that case-by-case inquiry into prejudice is not worth the cost." *Strickland, supra* at 692. *Strickland* also provided "that prejudice is presumed when counsel is burdened by an actual conflict of interest." *Id.* Taking into consideration this precedent for the purpose of analyzing justiciability, it is reasonable to conclude that justiciable harm or injury exists when there is an actual denial of counsel, there is an overwhelmingly deficient performance by counsel equating to constructive denial of counsel, or when counsel with conflicting interests represents an indigent defendant. As will be detailed later in this opinion, plaintiffs' complaint contains allegations that fit within the categories of actual and constructive denial of counsel, as well as allegations that encompass other situations in which prejudice is presumed.

Our conclusion that the two-part test in *Strickland* should not control this litigation is generally consistent with caselaw from other jurisdictions addressing comparable suits.[17]

---

[17] In summarizing our position regarding the applicability and relevance of *Strickland*, we note the following points. We reject the

A case heavily cited on the topic at hand is *Luckey v Harris*, 860 F2d 1012 (CA 11, 1988). *Luckey* was an action commenced "on behalf of a bilateral class consisting of all indigent persons presently charged or who will be charged in the future with criminal offenses in the courts of Georgia and of all attorneys who represent or will represent indigent defendants in the Georgia courts[.]" *Id.* at 1013. The plaintiffs alleged systemic deficiencies with respect to the appointment of counsel for indigent defendants that resulted in deprivations of various constitutional rights, including the Sixth Amendment right to counsel. The alleged deficiencies included delays in the appointment of counsel, pressure on attorneys to enter guilty pleas or to hurry cases to trial, and inadequate resources. Relying on *Strickland*, the federal district court dismissed the action for, in part, failure to state a claim. *Id.* at 1013, 1016. The United States Court of Appeals for the Eleventh Circuit reversed, ruling:

> [The *Strickland*] standard is inappropriate for a civil suit seeking prospective relief. The [S]ixth [A]mendment protects rights that do not affect the outcome of a trial. Thus, deficiencies that do not meet the "ineffectiveness" standard may nonetheless violate a defendant's rights under the [S]ixth [A]mendment. In the post-trial context, such errors may be deemed harmless because they did not affect the outcome of the trial. Whether an accused has

conclusion that *Strickland* only allows for judicial intervention by way of a criminal appeal, and not the type of action pursued here, to address issues concerning the right to counsel and the effective assistance of counsel. We reject the conclusion that *Strickland* requires us to find that justiciability, for purposes of this action, can only be established by showing deficient performances, coupled with convictions that are unreliable or resulting from unfair trials. However, with respect to general underlying principles espoused in *Strickland*, and repeated in hundreds if not thousands of cases across the country, e.g., deficient performance equates to representation falling below an objective standard of reasonableness, we have no qualms.

been prejudiced by the denial of a right is an issue that relates to relief—whether the defendant is entitled to have his or her conviction overturned—rather than to the question of whether such a right exists and can be protected prospectively. . . .

Where a party seeks to overturn his or her conviction, powerful considerations warrant granting this relief only where that defendant has been prejudiced. The *Strickland* [C]ourt noted the following factors in favor of deferential scrutiny of a counsel's performance in the post-trial context: concerns for finality, concern that extensive post-trial burdens would discourage counsel from accepting cases, and concern for the independence of counsel. These considerations do not apply when only prospective relief is sought.

Prospective relief is designed to avoid future harm. Therefore, it can protect constitutional rights, even if the violation of these rights would not affect the outcome of a trial. [*Id.* at 1017 (citations omitted).]

We fully agree with the statements and observations made in this passage, and they mirror our thoughts voiced earlier in this opinion. Petitions for rehearing and suggestions of rehearing en banc were denied. *Luckey v Harris*, 896 F2d 479 (CA 11, 1989), cert den 495 US 957 (1990). Eventually, the plaintiffs' case was dismissed on unrelated abstention grounds. *Luckey v Miller*, 976 F2d 673 (CA 11, 1992).[18] Defendants and the

---

[18] The court, citing *Younger v Harris*, 401 US 37; 91 S Ct 746; 27 L Ed 2d 669 (1971), stated that "abstention from interference in state criminal proceedings served the vital consideration of comity between the state and national governments." *Luckey*, 976 F2d at 676. "Comity" is defined as "[c]ourtesy among political entities (as nations, states, or courts of different jurisdictions), involving esp. mutual recognition of legislative, executive, and judicial acts." Black's Law Dictionary (7th ed). The *Luckey* Court invoked abstention because of concerns regarding the possibility that, if relief were granted to the plaintiffs, the federal court would have to force the state to promulgate uniform standards related to prosecutions and that the federal court would have to review and interrupt

dissent here favor the approach twice rejected in the *Luckey* cases. We choose not to give weight to a dissenting judge's analysis that failed to convince a majority of judges on the Eleventh Circuit of its correctness.

In *Platt v State*, 664 NE2d 357, 362 (Ind App, 1996), a civil suit was brought seeking injunctive relief premised on the contention "that the system for providing legal counsel for indigents in Marion County lacks sufficient funds for pretrial investigation and preparation which inherently causes ineffective assistance of counsel at trial." The plaintiffs alleged that the public defender system violated the fundamental right to effective pretrial assistance of counsel under the Sixth Amendment. *Id.* The appellate court first cited principles from *Strickland* and *Cronic* and then ruled:

> Here, Platt seeks to enjoin the Marion County public defender system because it effectively denies indigents the effective assistance of counsel. However, a violation of a Sixth Amendment right will arise only after a defendant has shown he was prejudiced by an unfair trial. This prejudice is essential to a viable Sixth Amendment claim and will exhibit itself only upon a showing that the outcome of the proceeding was unreliable. Accordingly, the claims presented here are not reviewable under the Sixth Amendment as we have no proceeding and outcome from which to base our analysis. [*Id.* at 363 (citation omitted).]

This cursory analysis is flawed for all the reasons that we expressed earlier in this opinion. Moreover, the opinion is essentially silent with respect to any particular allegations of deficient performance and harm, and it indicates that the court was not presented with any criminal proceedings and outcomes. In the instant case,

---

ongoing state proceedings. *Luckey*, 976 F2d at 678-679. Thus, it was the potential of a federal court's intermeddling in state prosecution practices that served as the basis of the abstention ruling. Here, abstention issues have no relevance.

plaintiffs allege wrongful trial convictions, instances wherein prejudice would be presumed, and situations in which counsel was actually or constructively denied. We find *Platt* wholly unpersuasive.

There is also the case of *Kennedy v Carlson*, 544 NW2d 1 (Minn, 1996), in which a chief public defender brought suit. The Minnesota Supreme Court noted that the public defender claimed "that his clients have been exposed to the *possibility* of substandard legal representation[.]" *Id.* at 6 (emphasis added). The court, without any reference whatsoever to *Strickland* and its two-part test, stated:

> We note that appellants cite a number of decisions by other courts addressing the issue of public defense funding. In those cases where courts have found a constitutional violation due to systemic underfunding, the plaintiffs showed substantial evidence of serious problems throughout the indigent defense system. By comparison, Kennedy has shown no evidence that his clients actually have been prejudiced due to ineffective assistance of counsel. To the contrary, the evidence establishes that Kennedy's office is well-respected by trial judges, it is well-funded when compared to other public defender offices, and its attorneys have faced no claims of professional misconduct or malpractice. [*Id.* at 6-7.]

The Minnesota court then proceeded to cite several cases in which courts from other jurisdictions have adjudicated matters related to systemic constitutional deficiencies arising out of the right to effective counsel. *Id.* at 7-8. The court then ruled:

> The majority of the cases discussed above cite evidence of substandard representation by court appointed defense counsel, generally supplied by a particular defendant, as contributing to the court's decision to intervene. Kennedy, however, has not shown that his attorneys provide substandard assistance of counsel to their clients. . . .

In short, Kennedy's claims of constitutional violations are too speculative and hypothetical to support jurisdiction in this court. The district court did not find that Kennedy's staff had provided ineffective assistance to any particular client, nor did it find that Kennedy faced professional liability as a result of his office's substandard services. Nor do any of Kennedy's clients join him in attacking the statutory funding scheme at issue here by presenting evidence of inadequate assistance in particular cases. In light of Kennedy's failure to provide more substantial evidence of an "injury in fact" to himself or his clients, we hold that the district court erred in granting Kennedy's summary judgment motion. [*Id.* at 8.]

Here, we have a class of plaintiffs who have been, are being, or will be subjected to the court-appointed, indigent defense systems employed in Berrien, Muskegon, and Genesee counties. Further, we have extensive allegations of substandard representation and ineffective assistance of counsel. Thus, given the distinctions between *Kennedy* and the instant action, the ultimate holding in *Kennedy* is simply inapposite and its underlying discussion tends to support our ruling.

In *New York Co Lawyers' Ass'n v State*, 192 Misc 2d 424, 430-431; 745 NYS2d 376 (2002), the New York court rejected a *Strickland* approach, reasoning:

Prejudice, as an aspect of the *Strickland* test, is examined more generally under the State Constitution in the context of whether defendant received meaningful representation. (*See, People v. Hobot*, 84 N.Y.2d 1021, 1022, 646 N.E.2d 1102, 1103, 622 N.Y.S.2d 675, 676 (1995) (the test is whether counsel's errors seriously compromise a defendant's right to a fair trial). . . . The purpose is to ensure that a defendant has the assistance necessary to justify society's reliance on the outcome of the proceedings. Notably, New York is concerned as much with the integrity of the judicial process as with the issue of guilt or innocence,

and therefore this court finds the more taxing two-prong *Strickland* standard used to vacate criminal convictions inappropriate in a civil action that seeks prospective relief premised on evidence that the statutory monetary cap provisions and compensation rates currently subject children and indigent adults to a severe and unacceptable risk of ineffective assistance of counsel. This court further finds *Strickland*'s reliance on post-conviction review provides no guarantee that the indigent will receive adequate assistance of counsel under the New York Constitution in the context of this action. Accordingly, because the right to effective assistance of counsel in New York is much more than just the right to an outcome, threatened injury is enough to satisfy the prejudice element and obtain prospective injunctive relief to prevent further harm. [Citation omitted.]

In *Quitman Co v State*, 910 So 2d 1032 (Miss, 2005), the county itself commenced a civil action for declaratory and injunctive relief, alleging that by imposing an obligation on the county to fund the representation of indigent defendants, the state of Mississippi breached its constitutional duties to provide adequate representation for indigent criminal defendants. Consistent with our opinion, the Mississippi Supreme Court stated:

In [the first appeal], this Court held that the County would be entitled to the prospective statewide relief it seeks *if* it established the cost of an effective system of indigent criminal defense, the county's inability to fund such a system, and the failure of the existing system to provide indigent defendants in Quitman County with the tools of an adequate defense. The circuit judge ruled that the County failed to establish these facts.... The County asserts that "[t]he evidence at trial established each of these elements."

The State correctly points out that "[c]ommon sense suggests that if Quitman County claims there is widespread and pervasive ineffectiveness, the most probative evidence to support that claim would be testimony about

specific instances when the public defenders' performance fell below 'an objective standard of reasonableness' as measured by the professional norms." [Citing *Strickland.*] The State also asserts that the circuit judge expected to hear such testimony at trial since the County alleged in its complaint that requiring each county to pay for its own public defenders did not satisfy the constitutional requirements for effective assistance of counsel. The record reflects that no such evidence was presented at trial. . . . .

The County did not present any evidence on any one of the central factual allegations in its complaint, and the County did not try to show specific examples of when the public defenders' legal representation fell below the objective standard of professional reasonableness. [*Id.* at 1037 (emphasis in original).]

The Mississippi Supreme Court had allowed the case to go forward on the basis of the allegations in the complaint, *State v Quitman Co*, 807 So 2d 401 (Miss, 2001), which is all that we are doing, and our plaintiffs must ultimately prove their case to obtain relief, which the county in *Quitman* failed to accomplish.

We finally note *Benjamin v Fraser*, 264 F3d 175 (CA 2, 2001), which was a suit that involved the question whether pretrial detainees had demonstrated the existence of current and ongoing constitutional violations and the need for the continuation of prospective relief with respect to impediments to attorney-client jail visitations. The United States Court of Appeals for the Second Circuit stated that "[i]n considering burdens on the Sixth Amendment right to counsel, we have not previously required that an incarcerated plaintiff demonstrate 'actual injury' in order to have standing." *Id.* at 186. The court further asserted that "[i]t is not clear to us what 'actual injury' would even mean as applied to a pretrial detainee's right to counsel." *Id.* Read in context, the *Benjamin* court was simply indicating, consistently with our position, that a *Strickland*-like

prejudice requirement, arising out of a trial and conviction, is not applicable if the right to counsel has been violated.

Having set the analytical framework, including the appropriate standard for justiciable harm, we now move on to applying the allegations in plaintiffs' complaint to the framework.

### h. APPLICATION OF COMPLAINT ALLEGATIONS TO JUSTICIABILTY PRINCIPLES

#### (i) HARM AND THE NAMED PLAINTIFFS

Plaintiff Christopher L. Duncan alleges that he pleaded guilty of an overcharged crime that was factually unwarranted because of his attorney's inadequate representation. Plaintiff Billy Joe Burr, Jr., alleges that he had to endure a delay before an acceptable misdemeanor plea was offered to him, which only occurred after counsel advised him to plead guilty of the charged felony and after Burr demanded that counsel speak further to the prosecutor. Plaintiff Steven Connor alleges that there was a basis to suppress a search without a warrant that was ignored by counsel. Plaintiff Antonio Taylor alleges that there existed a valid defense predicated on forensic evidence and witness accounts had counsel bothered conducting an investigation and inquiry. Plaintiff Jose Davila alleges that counsel failed to discuss the charges with Davila, lied to the court about it, and failed to challenge a revision of the charges. Plaintiffs Jennifer O'Sullivan, Christopher Manies, and Brian Secrest allege that counsel had effectively gone missing in action, despite the fact that they faced serious charges and that hearings and trials were pending. A common thread that runs through all the allegations concerning the named

plaintiffs is the failure of counsel to converse with plaintiffs in a meaningful manner. The named plaintiffs allegedly experienced conduct that included: counsel speaking with plaintiffs, for the first time, in holding cells for mere minutes before scheduled preliminary examinations while in full hearing range of other inmates; counsel advising plaintiffs to waive preliminary examinations without meaningful discussions on case-relevant matters; counsel failing to provide plaintiffs with police reports; and counsel generally neglecting throughout the entire course of criminal proceedings to discuss with plaintiffs the accuracy and nature of the charges, the circumstances of the purported crimes, and any potential defenses. They further complain of the following: counsel entering into plea negotiations without client input or approval; counsel perfunctorily advising plaintiffs to plead guilty as charged absent meaningful investigation and inquiry; counsel improperly urging plaintiffs to admit facts when pleas were taken; and, counsel neither preparing for hearings and trials nor engaging in any communications with plaintiffs concerning trials. In sum, the allegations by the named plaintiffs include instances of representation by counsel that fell below an objective standard of reasonableness in regard to critical stages in the criminal proceedings.[19]

---

[19] We recognize that much has transpired in the criminal prosecutions related to the named plaintiffs since the filing of the instant complaint. In class actions, while there must be a case or controversy with respect to a named plaintiff at the time the complaint was filed in a case, the controversy may continue to exist "between a named defendant and a member of the class represented by the named plaintiff, even though the claim of the named plaintiff has become moot." *Sosna v Iowa*, 419 US 393, 402; 95 S Ct 553; 42 L Ed 2d 532 (1975). The overall case, however, must still present a case or controversy at the time of court review. *Id.* In

### (ii) HARM AND CLASS MEMBERS GENERALLY

Plaintiffs devote an entire section of the complaint to allegations of harm suffered by class members. Plaintiffs allege that class members "are detained unnecessarily or for prolonged periods of time before trial." As examples, they refer to contract defenders and counsel for indigents who rarely seek bail reductions, despite circumstances calling for reductions, and who fail to appear at court proceedings, resulting in frequent postponements and rescheduling. Plaintiffs refer to one class member who "was forced to sit in the county jail for months because an attorney he never met missed several consecutive court dates, including three scheduled circuit court hearings." These allegations include instances of deficient performance, which also resulted in the harm of unwarranted, unnecessary, and prolonged delays and detentions.

Plaintiffs next allege that class members are compelled into taking inappropriate pleas, often to the highest charged crimes, even "when they have meritorious defenses." Plaintiffs assert that counsel routinely encourage guilty pleas "without a proper factual basis for guilt" and absent "even a cursory investigation into potentially meritorious defenses." They further complain of counsel pressuring class members to take "open pleas," which promise no particular sentence and which "often result in punishment that is disproportionate to the facts of the case." Plaintiffs refer to one case in which counsel permitted a client to plead guilty of failure to pay restitution even though he had already paid restitution. Plaintiffs indicate that class members are so fearful that counsel will not adequately prepare

our discussion regarding class certification, we return to the issue of mootness and explain why the doctrine compels a conclusion that certification was proper.

for trial that they forgo their right to trial and plead guilty of factually unwarranted offenses. These allegations regarding pleas include instances of deficient performance that inflicted a detriment to indigent defendants.

Plaintiffs allege that indigent defendants who insist on going to trial are subjected to punitive charges or lengthy pretrial delays. As an example, plaintiffs refer to an indigent defendant who sat in the Muskegon County jail for 10 months before he finally pleaded guilty of various charges. Plaintiffs allege that the indigent defendant's court-appointed counsel "refused to enforce his right to a speedy trial and instead told the client that if he did not plead, the prosecutor would drop the charges against him before the speedy trial period ran and re-arraign him on the same charges." Plaintiffs contend that there had been no evidence connecting the defendant to the crime and that the defendant "had three alibi witnesses who would have testified that he was nowhere near the crime scene." Justiciable harm could be found from these allegations.

Plaintiffs additionally allege that class members face harsher sentences than warranted by the facts. They refer to a case in which a criminal defendant received a sentence of 12 to 24 months' imprisonment despite the fact that the plea agreement recommended no incarceration. Plaintiffs note that "[w]hen the sentence was imposed, [the defendant's] attorney said nothing. Instead, it was the prosecutor who reminded the court of its obligation to allow the client to withdraw her plea if the court did not intend to follow the plea agreement." Plaintiffs allege that "[a]n attorney in Genesee County told a client trying to decide whether to plead guilty to tampering with a parking meter that if he were convicted at trial, he would face a sentence of 15 years.

According to Michigan's sentencing guidelines, however, the sentencing range for the crime with which the client was charged was 0 to 34 months." Plaintiffs point to a Berrien County incident where a defendant was sentenced to 37 days in jail for an offense that had a 30-day statutory maximum; counsel said nothing, but the court clerk noticed the error. Plaintiffs also assert that "[c]ounsel . . . often fail to provide meaningful representation at sentencings," with "[s]ome attorneys offer[ing] information during sentencing proceedings that is detrimental to their clients' cases." Other attorneys, according to plaintiffs, "often fail to catch sentencing errors and do not read the pre-sentencing reports prior to the sentencing hearings." Plaintiffs further allege that inadequate representation results in indigent defendants' being improperly assessed fees, which they have no ability to pay, and they assert that failures by counsel to explore otherwise available alternatives to incarceration result in access being denied to alternatives such as drug treatment programs. These allegations include instances of deficient performance detrimental to indigent defendants.

Plaintiffs next maintain that "[c]ounsel are unable to file necessary motions for pre-trial suppression, discovery, [and] speedy trial, motions to quash circuit court bind-over, or motions in limine[, and] [t]hey often fail to challenge illegal identifications, illegal searches and seizures, or illegally obtained confessions." Plaintiffs complain that "some attorneys refuse to provide their clients with copies of court files and police records." These allegations include instances of deficient performance detrimental to indigent defendants.

With respect to trials, plaintiffs allege:

> Counsel cannot prepare adequately for court hearings and trial. Many do not call witnesses to testify on their

clients' behalf, do not call experts to challenge the prosecution, and do not perform meaningful cross-examinations. Others do not make opening or closing statements at trial. In fact, many do not put on any meaningful defense case at all.

Plaintiffs do allege that wrongful convictions have occurred, which suggests satisfaction of the *Strickland* prejudice requirement typically applicable in criminal appeals.

### (iii) PRESUMED PREJUDICE AND HARM

Plaintiffs allege that the three challenged court-appointed, indigent defense systems "fail[] to provide counsel to all eligible indigent defendants." Plaintiffs claim that "[s]ome members . . . must represent themselves because they are wrongfully denied defender services." In that same vein, plaintiffs allege that "indigent defendants who are constitutionally eligible for state-appointed counsel are denied counsel." As an example, plaintiffs contend that "[o]ne Berrien County judge . . . routinely refuses to appoint counsel to defendants who have made bail[.]" On this same topic, plaintiffs maintain that "[t]he Muskegon law firm holding the indigent defense contract advises its lawyers to move to be discharged from representing clients who have full-time jobs, regardless of how little those jobs pay." And "[o]ne attorney in Genesee County refuses to represent indigent defendants assigned to him if he considers them to be financially ineligible. Instead, he offers to represent them as a private attorney, at a discount from his normal rate." Plaintiffs further contend that, as a result of a failure to abide by national performance standards, class members are "constructively denied, or threatened with the constructive denial of counsel." These allegations concern the actual or

constructive denial of counsel, which would ordinarily give rise to a presumption of prejudice in a criminal appeal and which would constitute justiciable harm. *Strickland, supra* at 692; *Cronic, supra* at 659.

Plaintiffs also allege that "attorneys routinely represent clients in situations in which conflicts of interest exist." According to plaintiffs, "[m]any indigent defense counsel also serve as prosecutors, often in the same courtrooms before the same judges. Some are assigned to defend individuals they previously prosecuted." As an example, plaintiffs allege that "a Berrien County attorney does both felony defense work and abuse and neglect work. He has no system for screening conflicts despite the possibility of defending a parent under the felony contract who is also the subject of an abuse and neglect proceeding under the other contract." Prejudice is presumed when an attorney is burdened by an actual conflict of interest. *Strickland, supra* at 692.

(iv) WIDESPREAD HARM, CAUSATION, AND REDRESS OF INJURY

We first find that the allegations discussed in the preceding sections reflect widespread and systemic instances of violations of the constitutional right to counsel and the effective assistance of counsel.

Plaintiffs allege that an absence of standards, training,[20] programs, supervision, monitoring, guidelines, and independence from the judicial and prosecutorial functions has resulted in indigent counsel having too many cases,[21] insufficient support staff, insufficient or

---

[20] According to plaintiffs, "many indigent defense counsel are unable adequately to advise their clients because they are unaware of key aspects of criminal law and procedure, such as the notice requirement for the use of an alibi defense or appropriate objections."

[21] Plaintiffs claim:

no resources to hire experts and investigators,[22] and a lack of skills and experience to properly handle assigned cases. Plaintiffs further maintain that these problems have created severe obstacles in putting cases presented by the prosecution to the crucible of meaningful adversarial testing. They additionally contend:

> As a result of the[] systemic deficiencies, indigent defense counsel do not meet with clients prior to critical stages in their criminal proceedings;[23] investigate adequately the charges against their clients or hire investigators who can assist with case preparation and testify at trial; file necessary pre-trial motions; prepare properly for court appearances; provide meaningful representation at sentencings; or employ and consult with experts when necessary. In addition, the systemic deficiencies provide no method for ensuring that attorneys are representing clients free from conflicts of interest.

---

[I]n Berrien County, 6 of the 12 contract holders in 2004 received a collective total of 4,479 felony and misdemeanor cases, for an average of over 746 cases per attorney. One attorney doing contract work regularly had a caseload of 1,000 cases a year (700 misdemeanors and 300 felonies) in addition to 200 private cases. One attorney in Muskegon County handled 700 felony cases per year; another routinely handled 15 felonies per week.

[22] Plaintiffs allege that "[i]ndigent defense counsel are unable adequately to investigate the charges against their clients or to hire investigators who can assist with case preparation and testify at trial." They note that "[i]n 2004, the trial court administrator in Berrien County did not receive *a single request* for an expert or an investigator." (Emphasis added.)

[23] Plaintiffs allege:

Most indigent defense counsel do not speak with their clients before they arrive at the courthouse for the probable cause hearing. Attorneys in the Counties routinely enter into plea negotiations without clients' permission and before initial client interviews. One Genesee County attorney has stated that he only meets with incarcerated clients prior to a preliminary examination if they are charged with felonies punishable by more than five to ten years of imprisonment.

We have recited above the numerous harms claimed by plaintiffs and, ultimately, plaintiffs allege a nexus or causal connection between the widespread and systemic deficiencies and defendants, asserting:

> As a direct result of Defendants' failure to ensure that indigent defense providers have the tools necessary to provide constitutionally adequate indigent defense in the three Counties, indigent defense services in the Counties, and elsewhere in the State, are operated at the lowest cost possible and without regard to the constitutional adequacy of the services provided. The result is that the indigent defense provided in each of the three Counties does not meet — and does not attempt to meet — the [American Bar Association's] Ten Principles, Michigan's Eleven Principles, or commensurate safeguards; and does not meet or even attempt to meet the constitutional minimums required by the United States and Michigan Constitutions.[24]

---

[24] We note that the complaint contains numerous additional paragraphs alleging the necessary causal connection. The dissent, citing *Ashcroft v Iqbal*, 556 US __; 129 S Ct 1937; 173 L Ed 2d 868 (2009), argues that the causation allegations in plaintiffs' complaint fail because they constitute mere legal conclusions and because the allegations implausibly assert causation and are incapable of being proven or disproven. The dissent contends that it is impossible for plaintiffs to prove that the alleged inaction and failures by defendants caused the asserted constitutional violations. To the extent that *Ashcroft*, a case interpreting the Federal Rules of Civil Procedure and cases construing those rules, even has application to the case at bar, which is controlled by the Michigan Court Rules, it does not support summary dismissal of plaintiffs' complaint. With respect to the argument that the allegations of causation are legal conclusions, we first note that any allegation of causation, whatever the context, carries with it some tinge of a legal conclusion. Additionally, the extensive complaint sets forth numerous factual allegations that bear on the issue of causation, including those cited by us in this opinion. We initially reiterate the principle so long ago announced in *Gideon* that it is the state that ultimately has the affirmative constitutional obligation to implement a system that safeguards the right to counsel for indigent defendants, which right, under *Strickland* and *Cronic*, includes the right to the effective assistance of

This case involves indigent criminal defendants who

counsel. If a county system is constitutionally inadequate under the standards we have set today, i.e., a finding of widespread and systemic instances of deprivation of counsel and deficient performance resulting from a flawed county system of providing indigent representation, but the county is in full compliance with existing state law and mandates, the cause of the constitutional deficiencies will necessarily flow from failures by the state. The complaint alleges that the state has provided little or no funding or fiscal or administrative oversight, opting to continue a centuries-old practice of delegating to the counties the responsibility for funding and administering indigent defense services. It is alleged that defendants have done nothing to ensure that the counties have in place the necessary funding, policies, standards, qualifications, programs, training, guidelines, and other resources that would enable attorneys to provide constitutionally adequate representation. The complaint goes into particularized factual detail on each of these matters, e.g., "Neither the Berrien nor Muskegon County programs have written job descriptions or qualifications." It is further alleged that the lack of fiscal oversight, administrative oversight, funding, policies, standards, programs, qualifications, training, guidelines, and other resources results in defense providers who have too many cases, lack sufficient support staff, are unable to obtain investigators and experts, lack the tools necessary to do their jobs, are wanting in skills and experience to handle assigned cases, and essentially cannot put a prosecutor's case to the crucible of meaningful adversarial testing. As an example, plaintiffs allege that, as a result of inadequate training, "many indigent defense counsel are unable adequately to advise their clients because they are unaware of key aspects of criminal law and procedure, such as the notice requirement for the use of an alibi defense or appropriate objections." Plaintiffs then allege that these systemic problems result in the wrongful denial of counsel, deficient performance, wrongful convictions, unnecessary or prolonged pretrial detentions, inappropriate guilty pleas, and unwarranted harsh sentences. In other words, defendants have violated plaintiffs' constitutional rights. Well-pleaded factual allegations relative to causation have been presented and not solely mere legal conclusions. The paragraphs in the complaint that are conclusory form the framework of the complaint and are more than sufficiently supported by factual allegations. See *Ashcroft*, 556 US at ___; 129 S Ct at 1950; 173 L Ed 2d at 884 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity[.]"). Further, the allegations plausibly suggest unconstitutional conduct and practices by defendants and entitlement to relief, and while the causation allegations may be difficult to prove and establish, we cannot conclude that it is

were, are, and will be subjected to the court-appointed, indigent defense systems employed by the relevant. counties. And there are extensive allegations concerning detrimental and harmful effects on these criminal defendants, as they pass through the systems, caused by ineffective attorneys, which, in turn, is allegedly the result of the state's and the Governor's failure to protect the constitutional rights of indigent defendants. Accordingly, there are sufficient allegations of a causal connection between the injuries and the complained-of conduct, and plaintiffs have also indicated that the injuries would be redressed by a favorable court decision granting the prayed-for equitable relief. See *Michigan Citizens, supra* at 294-295. We hold that, on the basis of the pleadings and at this juncture in the lawsuit, plaintiffs have sufficiently alleged facts that, if true, establish standing, establish that the case is ripe for adjudication, and state claims upon which declaratory and injunctive relief can be awarded. Stated differently, the case is presently justiciable, because a case or controversy exists. Whether plaintiffs can ultimately prove their allegations and establish their case is a matter for another day.

### 6. CLASS CERTIFICATION

Defendants maintain that the trial court erred in granting plaintiffs' motion to certify the class. Defendants contend that plaintiffs failed to show that a class action is the superior way to litigate the claims. In support of the superiority argument, defendants assert that a "class action serves no useful purpose because the requested relief may be obtained from an individual action and would automatically accrue to the benefit of

---

impossible to prove causation. We, as an appellate court, should not engage in trying the case or deny plaintiffs the opportunity to present their proofs.

others similarly situated." As part of the superiority argument, defendants also argue that a class action suit is inconvenient, impractical, and unmanageable under the applicable *Strickland* standard, which requires examination of individual proofs. In further support of the superiority argument, defendants argue that the class is unmanageable because the three counties are too factually disparate, that the class creates practical problems in litigating the claims, that indigent criminal defendants will suffer no adverse effect if this Court decertifies the class, and that plaintiffs have adequate remedies at law. Finally, defendants maintain that plaintiffs failed to demonstrate commonality, where the alleged systemic violations will require individualized proof and the relief would not be the same for all class members. The trial court, on the basis of the pleadings, ruled contrary to each one of defendants' arguments, finding that plaintiffs established commonality, superiority, and typicality.

In *Neal v James*, 252 Mich App 12, 15-16; 651 NW2d 181 (2002), this Court articulated some general principles applicable in determining whether a class should be certified:

> Because there is limited case law in Michigan addressing class certifications, this Court may refer to federal cases construing the federal rules on class certification. When evaluating a motion for class certification, the trial court is required to accept the allegations made in support of the request for certification as true. The merits of the case are not examined. The burden is on the plaintiff to show that the requirements for class certification exist. [Citations omitted.]

"The five factors a court must consider when deciding whether to certify a class are found in MCR 3.501(A)(1), and a plaintiff seeking to certify a class must show that *all* five enumerated requirements are

satisfied." *Hill, supra* at 310, citing *A&M Supply Co v Microsoft Corp*, 252 Mich App 580, 597-598; 654 NW2d 572 (2002) (emphasis in original). MCR 3.501(A)(1) provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all members in a class action only if:
>
> (a) the class is so numerous that joinder of all members is impracticable;
>
> (b) there are questions of law or fact common to the members of the class that predominate over questions affecting only individual members;
>
> (c) the claims or defenses of the representative parties are typical of the claims or defenses of the class;
>
> (d) the representative parties will fairly and adequately assert and protect the interests of the class; and
>
> (e) the maintenance of the action as a class action will be superior to other available methods of adjudication in promoting the convenient administration of justice.

a. NUMBER OF CLASS MEMBERS AND PRACTICALITY OF JOINDER

The first requirement for class certification is that the class must be "so numerous that joinder of all members is impracticable[.]" MCR 3.501(A)(1)(a). In the complaint, plaintiffs indicate:

> The Class is defined as all indigent adult persons who have been charged with or will be charged with felonies in the District and Circuit Courts of Berrien, Genesee, and Muskegon Counties and who rely or will rely on the Counties to provide them with defense services. The Class includes all indigent adults against whom felony criminal charges will be brought in Berrien, Genesee, and Muskegon Counties during the pendency of this action.

We agree with plaintiffs that the class, as defined in the complaint, is sufficiently numerous to make joinder

of each class member impractical. We also reject the dissent's argument challenging this ruling under *Zine*, *supra*. In *Zine*, this Court was concerned with lemon-law booklets issued by Chrysler that were distributed to purchasers of new vehicles and that were allegedly misleading. We find *Zine* distinguishable because it did not entail the type of prospective, systemwide relief sought here, it did not involve a fluid class of plaintiffs such as exists in the case at bar, and because it did not present allegations of widespread and systemic instances of harm, as we have defined the term "harm" in this opinion.

### b. COMMONALITY OF LEGAL AND FACTUAL QUESTIONS

The second requirement for class certification is that there must be "questions of law or fact common to the members of the class that predominate over questions affecting only individual members[.]" MCR. 3.501(A)(1)(b). While this action will require contemplation of specific instances of deficient performance and instances of the actual or constructive denial of counsel, the ultimate broad factual questions common to all members in the class, given the type of relief sought, are whether there have been widespread and systemic constitutional violations, whether the violations were and are being caused by deficiencies in the county indigent defense systems, and whether the systemic deficiencies were and are attributable to or resulted from the action or inaction of defendants. Any evidence concerning individual prosecutions has no bearing on those particular criminal cases and the available appellate remedies, except to the extent of any effect on a pending case caused by a systemwide remedy resulting from an order or judgment rendered in this action. The evi-

dence pertaining to individual prosecutions merely constitutes a piece in the larger puzzle relative to establishing a basis for prospective, systemwide relief. In the context of this type of civil rights action, unlike the situation in *Zine*, the factual question *that will be of any relevance to all class members* revolves around the establishment of widespread and systemic instances of deficient performance and denial of counsel; the case's viability with regard to all members depends on an aggregation of harm that is pervasive and persistent.

The dissent's reliance on *Neal* is equally misplaced. That case involved claims of racial discrimination brought by a class of African-Americans who held or had sought employment with the city of Detroit's law department. The trial court certified the class, and this Court reversed for failure to satisfy the commonality requirement. The *Neal* panel reached its holding because "individual factual circumstances pertinent to each plaintiff will need to be reviewed, and individual, fact-specific inquiries will need to be made in evaluating why certain individuals were not hired or promoted, or why other individuals were discharged or not retained." *Neal, supra* at 20. Importantly, the Court thereafter stated that the plaintiffs had "simply not shown that there was any specific policy or practice followed by defendants to satisfy the 'commonality' requirement[.]" *Id.* Here, plaintiffs' case is built on defendants' and the counties' policies and practices, it requires proof of widespread and systemic constitutional violations before any relief is available, and it focuses on systemwide, prospective relief. *Neal* is simply inapposite.

Next, there is also commonality with respect to the legal questions, which all concern state and federal constitutional rights to due process and to counsel. We conclude that the allegations in the complaint satisfy the commonality requirement in regard to both the factual and legal questions presented.

### c. TYPICALITY OF CLAIMS

The third requirement for class certification is that there must be "claims . . . of the representative parties [that] are typical of the claims . . . of the class[.]" MCR 3.501(A)(1)(c). As reflected in our earlier review of the allegations in the complaint, the claims of the named plaintiffs, which pertained mostly to deficient performance of counsel at critical pretrial stages of the criminal proceedings, are typical of the allegations of the class members. We conclude that the allegations in the complaint satisfy the typicality requirement.

### d. PROTECTION OF INTERESTS BY REPRESENTATIVE PARTIES

The fourth requirement for class certification is that "the representative parties [must] fairly and adequately assert and protect the interests of the class[.]" MCR 3.501(A)(1)(d). Plaintiffs allege:

> [The] Class representatives will fairly and adequately protect the interests of the Plaintiffs. Plaintiffs' counsel know of no conflicts of interest between the class representatives and absent class members with respect to the matters at issue in this litigation; the class representatives will vigorously prosecute the suit on behalf of the Class; and the class representatives are represented by experienced counsel.

Given that "the trial court is required to accept the allegations made in support of the request for certification as true" when evaluating a class certification motion, *Neal, supra* at 15, and considering the quoted allegations, we conclude that MCR 3.501(A)(1)(d) has been satisfied.

### e. SUPERIORITY

With respect to the fifth factor, whether "the maintenance of the action as a class action will be superior to

other available methods of adjudication in promoting the convenient administration of justice," MCR 3.501(A)(1)(e), MCR 3.501(A)(2) provides:

In determining whether the maintenance of the action as a class action will be superior to other available methods of adjudication in promoting the convenient administration of justice, the court shall consider among other matters the following factors:

(a) whether the prosecution of separate actions by or against individual members of the class would create a risk of

(i) inconsistent or varying adjudications with respect to individual members of the class that would confront the party opposing the class with incompatible standards of conduct; or

(ii) adjudications with respect to individual members of the class that would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests;

(b) whether final equitable or declaratory relief might be appropriate with respect to the class;

(c) whether the action will be manageable as a class action;

(d) whether in view of the complexity of the issues or the expense of litigation the separate claims of individual class members are insufficient in amount to support separate actions;

(e) whether it is probable that the amount which may be recovered by individual class members will be large enough in relation to the expense and effort of administering the action to justify a class action; and

(f) whether members of the class have a significant interest in controlling the prosecution or defense of separate actions.

In *Edgcumbe v Cessna Aircraft Co*, 171 Mich App 573, 575; 430 NW2d 788 (1988), this Court explained

that "[t]he requirement of MCR 3.501(A)(1)(e), that the class action be superior to other methods of adjudication in promoting the convenient administration of justice, is an outgrowth of the equitable heritage of class actions and a recognition of the practical limitations on the judiciary's capability to resolve disputes." The relevant concern in determining the convenient administration of justice is whether the issues are so disparate as to make a class action suit unmanageable. *Dix v American Bankers Life Assurance Co of Florida*, 429 Mich 410, 419; 415 NW2d 206 (1987). "Matters such as diversity of defenses, counterclaims, et cetera may bear upon the determination of whether a class action suit will promote the convenient administration of justice." *Lee v Grand Rapids Bd of Ed*, 184 Mich App 502, 505; 459 NW2d 1 (1989).

On examination and consideration of the enumerated factors relative to superiority, MCR 3.501(A)(2), we conclude that they weigh in favor of certification of the class. It is vital to keep in mind the nature of plaintiffs' complaint in analyzing the class certification issue. Plaintiffs will need to establish widespread instances of ineffective assistance of counsel and denial of counsel. Because criminal prosecutions in the three counties are not being stayed during the pendency of this litigation, class members constitute a fluid class and the attendant criminal proceedings will continually be in flux. Indeed, the prosecutions of the named plaintiffs, to our knowledge, have been mostly resolved. Promoting the convenient administration of justice necessarily demands that this case proceed as a class action. In *Reynolds v Giuliani*, 118 F Supp 2d 352, 391-392 (SD NY, 2000), the federal district court commented:

> [C]lass certification is not a mere formality because it will insure against the danger of this action becoming

moot. This case involves a fluid class where the claims of the named plaintiffs may become moot prior to completion of this litigation. The danger of mootness is magnified by the fact that defendants have the ability to moot the claims of the named plaintiffs, thereby evading judicial review of their conduct. Thus, this Court, like other courts under these circumstances, believes that class certification is necessary. *See Greklek v. Toia*, 565 F.2d 1259, 1261 (2d Cir. 1977) (affirming district court's grant of class certification in action requesting declaratory and injunctive relief "since only class certification could avert the substantial possibility of the litigation becoming moot prior to the decision"); *Alston v. Coughlin*, 109 F.R.D. 609, 612 (S.D. N.Y. 1986) ("[t]he plaintiff's interest in averting the possibility of the action becoming moot, with the concomitant interest in judicial economy, makes class certification in this case more than an empty formality"); *Jane B. [v New York City Dep't of Social Services]* 117 F.R.D. [64, 72 (SD NY, 1987)] ("[a]n additional reason for granting the motion for certification lies in avoiding problems of mootness"); *Ashe [v Bd of Elections]* 124 F.R.D. [45, 51 (ED NY, 1989)] ("[a] further ground for finding class certification to be more than a 'formality' here is to avoid the danger of the individual plaintiffs' claims becoming moot before a final adjudication"); *Koster v. Perales*, 108 F.R.D. 46, 54 (E.D. N.Y. 1985) (class certification is necessary when "absent certification, there is a substantial danger of mootness"). Accordingly, plaintiffs' motion for class certification is granted.

We have the same mootness dangers if this case is not pursued through the vehicle of a class action lawsuit. This fact alone defeats most of defendants' arguments on the issue of class certification, e.g., the argument that a class action serves no useful purpose. Absent class certification, and even assuming that no mootness issue exists, the prosecution of separate actions would create a risk of inconsistent or varying adjudications. MCR 3.501(A)(2)(a). Furthermore, equitable and declaratory relief would not only be appropriate for the class on establishing its case, it is the only relief being

sought. MCR 3.501(A)(2)(b). Additionally, we find that the action would be manageable as a class action, that any claims by individual class members would be insufficient to support separate actions in view of the complexity of the issues or the expense in litigation, that recoverable dollar amounts are not at issue, and that individual class members do not have a significant interest in controlling separate actions. MCR 3.501(A)(2)(c) through (f). Defendants' arguments to the contrary, including those hinging on the now rejected two-part *Strickland* test, are unavailing.

### IV. SUMMARY

We respectfully disagree with our dissenting colleague's criticisms of this opinion and, to the extent not already addressed above, feel compelled to respond. This case certainly presents difficult issues, requiring us, in part, to tread in unchartered legal waters. There are, however, some fundamental principles at play here.

It is well accepted that part of the judiciary's role and function in our tripartite system of government is to interpret constitutional provisions, apply constitutional requirements to the facts at hand, and safeguard and protect constitutional rights, all through entry of orders and judgments as guided by stare decisis. That the judiciary can declare executive and legislative conduct unconstitutional, can prohibit continuing unconstitutional conduct by the two other branches of government, and can demand constitutional compliance, hardly seem to be foreign principles in the jurisprudence of this state and the country. For support, we need not look any further than the historic landmark case of *Marbury, supra* at 177-180, in which Chief Justice John Marshall so eloquently stated:

The constitution is either a superior paramount law, unchangeable by ordinary means, or it is on a level with ordinary legislative acts, and, like other acts, is alterable when the legislature shall please to alter it. If the former part of the alternative be true, then a legislative act, contrary to the constitution, is not law: if the latter part be true, then written constitutions are absurd attempts, on the part of the people, to limit a power, in its own nature illimitable. Certainly all those who have framed written constitutions contemplate them as forming the fundamental and paramount law of the nation, and consequently the theory of every such government must be, that an act of the legislature, repugnant to the constitution, is void. This theory is essentially attached to a written constitution, and is, consequently, to be considered, by this court, as one of the fundamental principles of our society. It is not, therefore, to be lost sight of, in the further consideration of this subject.

If an act of the legislature, repugnant to the constitution, is void, does it, notwithstanding its invalidity, bind the courts, and oblige them to give it effect? Or, in other words, though it be not law, does it constitute a rule as operative as if it was a law? This would be to overthrow, in fact, what was established in theory; and would seem, at first view, an absurdity too gross to be insisted on. It shall, however, receive a more attentive consideration. It is, emphatically, the province and duty of the judicial department, to say what the law is. Those who apply the rule to particular cases, must of necessity expound and interpret that rule. If two laws conflict with each other, the courts must decide on the operation of each.

So, if a law be in opposition to the constitution; if both the law and the constitution apply to a particular case, so that the court must either decide that case, conformable to the law, disregarding the constitution; or conformable to the constitution, disregarding the law; the court must determine which of these conflicting rules governs the case: this is of the very essence of judicial duty. If then, the courts are to regard the constitution, and the constitution is superior to any ordinary act of the legislature, the

constitution, and not such ordinary act, must govern the case to which they both apply. Those, then, who controvert the principle, that the constitution is to be considered, in court, as a paramount law, are reduced to the necessity of maintaining that courts must close their eyes on the constitution, and see only the law. This doctrine would subvert the very foundation of all written constitutions. It would declare that an act which, according to the principles and theory of our government, is entirely void, is yet, in practice, completely obligatory. It would declare, that if the legislature shall do what is expressly forbidden, such act, notwithstanding the express prohibition, is in reality effectual. It would be giving to the legislature a practical and real omnipotence, with the same breath which professes to restrict their powers within narrow limits. It is prescribing limits, and declaring that those limits may be passed as pleasure.

That it thus reduces to nothing, what we have deemed the greatest improvement on political institutions, a written constitution, would, of itself, be sufficient, in America, where written constitutions have been viewed with so much reverence, for rejecting the construction. But the peculiar expressions of the constitution of the United States furnish additional arguments in favour of its rejection. The judicial power of the United States is extended to all cases arising under the constitution. Could it be the intention of those who gave this power, to say, that in using it, the constitution should not be looked into? That a case arising under the constitution should be decided, without examining the instrument under which it arises? This is too extravagant to be maintained. In some cases, then, the constitution must be looked into by the judges. And if they can open it at all, what part of it are they forbidden to read, or to obey? There are many other parts of the constitution which serve to illustrate this subject.

\* \* \*

[I]t is apparent, that the framers of the constitution contemplated that instrument as a rule for the government

of *courts*, as well as of the legislature. Why otherwise does it direct the judges to take an oath to support it? This oath certainly applies in an especial manner, to their conduct in their official character. How immoral to impose it on them, if they were to be used as the instruments, and the knowing instruments, for violating what they swear to support! The oath of office, too, imposed by the legislature, is completely demonstrative of the legislative opinion on this subject. It is in these words: "I do solemnly swear, that I will administer justice, without respect to persons, and do equal right to the poor and to the rich; and that I will faithfully and impartially discharge all the duties incumbent on me as _____, according to the best of my abilities and understanding, agreeably to *the constitution*, and laws of the United States." Why does a judge swear to discharge his duties agreeably to the constitution of the United States, if that constitution forms no rule for his government? [I]f it is closed upon him, and cannot be inspected by him? If such be the real state of things, this is worse than solemn mockery. To prescribe, or to take this oath, becomes equally a crime. [Paragraphs reconfigured; emphasis added.]

Moving forward more than 200 years, the United States Supreme Court in *Boumediene, supra*, reiterated the principles from *Marbury*. The Court stated that abstaining from questions requiring political judgments reflects recognition that such matters are best left to the political branches and not the judiciary. *Boumediene*, 553 US at ___; 128 S Ct at 2259; 171 L Ed 2d at 77. *However*, "[t]o hold [that] the political branches have the power to switch the Constitution on or off at will is quite another [matter]." *Id.* This would unacceptably "permit a striking anomaly in our tripartite system of government, leading to a regime in which Congress and the President, not this Court, say 'what the law is.'" *Id.*, quoting *Marbury, supra* at 177.

Political judgments are involved in determining the manner and method by which a state proceeds in

providing representation for indigent criminal defendants, including, as in Michigan, delegation of representation matters to local counties and chief judges. But if the state has allegedly failed to satisfy its constitutional obligations with its chosen approach, i.e., switching off state and federal constitutions, it is up to the judiciary to judge whether the state has indeed acted consistently with constitutional requirements. From *Marbury* to *Boumediene*, this field has been defined as including the interpretation of constitutional language, the application of constitutional principles, the judging of constitutional compliance, and the safeguarding of constitutional rights. This is all that is occurring in this case. Without allowing for court examination and possible intervention, the Governor and the Legislature effectively determine "what the law is" with respect to the right to counsel and the right to the effective assistance of counsel.

We are not setting public policy. Rather, we are simply indicating that the judiciary can evaluate the constitutional compliance of policies implemented by the two political branches of government. We are not suggesting that the judiciary can dictate to the other branches of government the type of system to employ in providing representation for indigent defendants. The judiciary, however, can and must have a say with respect to whether a chosen system is constitutionally sound. The judiciary clearly cannot require the political branches to use a "better" system than a system currently in place, where the existing system sufficiently safeguards constitutional rights. See *Grand Traverse Co, supra* at 472 (it is for the Legislature to decide whether to implement a more desirable system).

Concerns have been expressed about expenses that may be incurred by state taxpayers and the state to

operate an indigent defense system. Assuming this were to occur, we first note that the taxpayers of this state are already bearing the burden of paying for the representation of indigent defendants; it is just being accomplished through different taxing authorities. Importantly, economic concerns did not dissuade the Supreme Court in *Gideon* from construing the United States Constitution in a manner that mandates effective assistance of counsel for indigent defendants. Further, during these economically challenging times, the judiciary, in addressing constitutional issues, must be reminded of the words of Chief Justice Warren Berger in *Bowsher v Synar*, 478 US 714, 736; 106 S Ct 3181; 92 L Ed 2d 583 (1986):

> No one can doubt that Congress and the President are confronted with fiscal and economic problems of unprecedented magnitude, but "the fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution. Convenience and efficiency are not the primary objectives—or the hallmarks—of democratic government . . . ." [Citation omitted.]

With respect to the expressed concerns about the possible prospect that the state will have to operate an indigent defense system at the trial level, we care not whether it is the state, administrative agencies, counties, municipalities, courts, or any other bodies, alone or in combination, that operate a system providing representation for indigent criminal defendants. Our *only* concern is that whatever system is adopted, regardless of what entity operates the system, it must safeguard the constitutional rights to counsel and the effective assistance of counsel. Plaintiffs have filed a complaint containing sufficient allegations that those constitutional rights are not currently being protected in the

three counties at issue under the systems employed by those counties, which can ultimately be blamed on defendants' constitutional failures. Plaintiffs are thus entitled to have their day in court.

## V. CONCLUSION

We hold that defendants are not shielded by governmental immunity, that defendants are proper parties, that the trial court, not the Court of Claims, has jurisdiction, and that the trial court has jurisdiction and authority to order declaratory relief, prohibitory injunctive relief, and some level of mandatory injunctive relief, the full extent of which we need not presently define. We further hold that, on the basis of the pleadings and at this juncture in the lawsuit, plaintiffs have sufficiently alleged facts that, if true, establish standing, establish that the case is ripe for adjudication, and state claims upon which declaratory and injunctive relief can be awarded. Finally, we hold that the trial court properly granted the motion for class certification.

Affirmed.

SAWYER, J., concurred.

WHITBECK, J. (*dissenting*). This case involves a sweeping and fundamental challenge to Michigan's system for operating and funding legal services for indigent criminal defendants. For decades, this system has, by statute, operated at the local level. But the indigent criminal defendants who are the plaintiffs here (the Duncan plaintiffs) seek to change that. They seek judicial intervention to require the state of Michigan and the Governor to override that statute and to both operate and fund legal services for indigent criminal defendants in Berrien, Genesee, and Muskegon counties, at the ex-

pense of state taxpayers and in violation of basic principles of separation of powers.

It is reasonably foreseeable that the final result of such judicial intervention inevitably will be state operation and funding of such legal services throughout Michigan. Indeed, the Duncan plaintiffs give us a preview of things to come when, in their complaint, they assert that the problems they describe "are by no means limited or unique to the three Counties." The Duncan plaintiffs go on to state that the alleged failures of the state and the Governor "have caused similar problems throughout the State." Rather obviously, then, the Duncan plaintiffs regard Berrien, Genesee, and Muskegon counties as simply staging areas in their overall effort to superimpose a centralized statewide state-funded[1] regime of legal services for indigent crimi-

---

[1] See, for example, Complaint, ¶ 10 ("Defendants' failure to take any steps to ensure that the indigent defense services in the Counties are *adequately funded* and administered, and that as a result, indigent defense providers have the resources and tools necessary to do their jobs, is an abdication of Defendants' constitutional obligations, and the result is the denial of constitutionally adequate defense to indigent criminal defendants.") (emphasis added); Complaint, ¶ 11 ("This Complaint focuses on how the Defendants failures to provide *funding* and fiscal and administrative oversight have created a broken indigent defense system in Berrien, Genesee, and Muskegon Counties; but the failings in those counties, and the types of harms suffered by these Plaintiffs, are by no means limited or unique to the three Counties. Defendants failure to provide *funding* or oversight to any of the State's counties have caused similar problems throughout the State.") (emphasis added); Complaint, ¶ 88 ("Michigan provides no *funding* specifically for the provision of indigent defense services in felony criminal actions at the trial stage in the three Counties or any other county in the State. To the extent that state *funding* is used by the Counties to pay for indigent defense services, Defendants do not ensure that such *funding* is spent appropriately. And to the extent that the Counties provide *funding* of their own, Defendants do not provide the Counties with any oversight or guidance to ensure that such *funding* produces an indigent defense system capable of providing constitutionally adequate indigent defense services.") (emphasis added); Complaint, ¶ 89 ("On an annual basis, Michigan allocates monies to

nal defendants upon the existing statutorily created and locally funded and operated system.

Moreover, the Duncan plaintiffs seek this relief *preconviction*: that is, at the time they filed their complaint, none of the Duncan plaintiffs had gone to trial or otherwise had their cases adjudicated. This peculiar procedural posture invites the judiciary to gaze into a preconviction crystal ball that the Duncan plaintiffs have devised and to speculate on the effect of events that have yet to occur. Unfortunately, the gift of clairvoyance is not one that routinely accompanies our judicial commissions, and I would decline the invitation.

The majority, however, is not deterred. It finds the Duncan plaintiffs' claims to be justiciable, and it gives the Ingham Circuit Court the widest latitude in granting both declaratory and injunctive relief. As the majority's opinion candidly admits, such relief could potentially entail a cessation of criminal prosecutions against indigent defendants in Berrien, Genesee, and Muskegon counties, absent constitutional compliance with the right to counsel.[2]

---

a Court Equity Fund, administered by the State Court Administrative Office, to help the Counties, and the other counties in Michigan, pay for trial court operations expenses [which include indigent defense expenses]. *The amount allocated is grossly insufficient.*") (emphasis added); Complaint, ¶ 103 ("[A]s a result of Defendants' failure to provide *funding* and to exercise fiscal and administrative oversight, the provision of indigent defense services at the trial court level in the three Counties is *inadequately funded* . . . .") (emphasis added); Complaint, ¶ 104 ("Because of Defendants' failure to ensure that indigent defense providers have the tools necessary to provide constitutionally adequate indigent defense, defense services in each of the three Counties *are not adequately financed.*") (emphasis added); Complaint, ¶ 141 ("Plaintiffs suffer irreparable harm or are at imminent and serious risk of suffering such harm because of Defendants' failure *to adequately fund* and oversee the Michigan's [sic] indigent defense system.") (emphasis added); see also similar allegations in the Complaint, ¶¶ 156, 157, 160, 163, 164, 167, 170, 171, 174, 177, 178, and 181.

[2] *Ante* at 273.

Obviously, such an approach implicates public policy and fiscal matters of the highest jurisprudential and fiscal importance. Because I believe that under basic separation of powers principles—and under the proper application of the concept of judicial modesty—the executive and legislative branches can and should address such matters, I respectfully dissent from the majority's holdings with respect to the justiciability of the Duncan plaintiffs' claims, the appropriateness of the relief that the Duncan plaintiffs have sought, and the necessity of certifying this matter as a class action.

I. INTRODUCTION

A. THE MICHIGAN APPROACH TO OPERATING AND FUNDING AN INDIGENT CRIMINAL DEFENSE SYSTEM AT THE LOCAL LEVEL

The Michigan system for providing counsel for indigent criminal defendants has been in effect for some time and, from its inception, it has been local in nature. Indeed, the Michigan Supreme Court over 100 years ago recognized that the procedure for compensating such counsel under a statute reasonably similar to the one currently in effect was "competent" under then-existing precedent.[3] The current statute (the indigent criminal defense act), as did its predecessor versions, divides the system for providing counsel to indigent criminal defendants who are unable to procure counsel into two categories:

> Upon proper showing [of indigency], the chief judge [of the circuit court] shall appoint . . . an attorney to conduct the accused's examination and to conduct the accused's defense. The attorney appointed by the court shall be entitled to receive from the county treasurer, on the certificate of the chief judge that services have been rendered, the amount which the chief judge considers to be reasonable compensation for the services performed.[4]

[3] *Withey v Osceola Circuit Judge*, 108 Mich 168, 169; 65 NW 668 (1895).

[4] MCL 775.16.

Thus, the duty to appoint counsel and to determine reasonable compensation for defense of the indigent at the local level rests with the judicial branch, in the person of the chief judge of the circuit court. The duty to fund such counsel, by way of reasonable compensation, rests with the executive branch, in the person of the county treasurer. And the responsibility of providing such funding lies with the legislative branch, usually the county board of commissioners.

Effective January 1, 2004, the Michigan Supreme Court established the procedure and record-keeping requirements at the local level for selecting, appointing, and compensating counsel who represent indigent parties in all trial courts (the indigent criminal defense court rule).[5] Subsection B of the indigent criminal defense court rule provides that each such trial court must adopt a local administrative order that describes its procedure for such selection, appointment, and compensation. Subsection C requires each such trial court to submit the local administrative order for review to the State Court Administrator who "shall approve a plan if its provisions will protect the integrity of the judiciary." Thus, the court rule adds a level of state judicial branch responsibility by requiring the State Court Administrator to approve local plans if they will "protect the integrity of the judiciary."

But even taking the indigent criminal defense court rule into account, there is no question that the primary responsibility for both operating and funding indigent criminal defense in Michigan remains local. The seminal case in this area is *In re Recorder's Court Bar Ass'n v Wayne Circuit Court.*[6] In that case, the

---

[5] MCR 8.123.

[6] *In re Recorder's Court Bar Ass'n v Wayne Circuit Court,* 443 Mich 110; 503 NW2d 885 (1993).

plaintiff challenged the "fixed fee" system for indigent
defense in place in Wayne County.[7] There, the Michigan
Supreme Court held that the Wayne County fixed fee
system systematically failed to provide " 'reasonable
compensation' " within the meaning of the indigent
criminal defense act.[8] The Court, however, declined to
direct the implementation of any specific system or
method of compensating counsel.[9] The Court elected
instead "to leave that determination to the sound
discretion of the chief judges of the respective courts."[10]
The Court went on to observe that, at the time of its
decision in 1993, there were

> fifty-six circuits plus the Detroit Recorder's Court in our
> state spread throughout eighty-three counties of varying
> financial means. Attorney population likewise varies from
> county to county. Indeed, there is a potential myriad of
> local considerations that will necessarily enter into the
> chief judge's determination of "reasonable compensation."
> Thus, what constitutes reasonable compensation may nec-
> essarily vary among circuits.[11]

The decision in *Recorder's Court Bar Ass'n* dealt
primarily with the *operation* of the fixed fee system for
indigent defense in Wayne County. The Court, both in
its direction to the affected chief judges to develop and
file with the Court a plan for a payment system "that
reasonably compensates assigned counsel for services
performed consistent with this opinion"[12] and its decli-

[7] *Id.* at 112-113.

[8] *Id.* at 116; see also *id.* at 131 ("We simply hold that, whatever the
system or method of compensation utilized, the compensation *actually*
paid must be reasonably related to the representational services that the
individual attorneys *actually* perform.") (emphasis in original).

[9] *Id.* at 116.

[10] *Id.*

[11] *Id.* at 129.

[12] *Id.* at 136.

nation to adopt any specific system or method, recognized the local, and varying, character of such payment systems.

The Supreme Court revisited this subject in 2003 in *Wayne Co Criminal Defense Bar Ass'n v Chief Judges of Wayne Circuit Court.*[13] In summary fashion, the Court declared:

> We are not persuaded by plaintiffs' complaints and supporting papers that the Chief Judges of the Wayne Circuit Court have adopted a fee schedule which, at this time, fails to provide assigned counsel reasonable compensation within the meaning of [the indigent criminal defense act].[14]

Then Chief Justice CORRIGAN concurred in the denial order, commenting:

> There have been increased efficiencies and new cost-saving technologies over the years, as well as increases in costs; and the overhead costs for attorneys assigned to indigent criminal defendants are sometimes lower than similar costs for attorneys performing other types of work. Nor have plaintiffs shown that the fees paid for an entire case or fees that an attorney receives over time are generally so low as to be unreasonable. Although plaintiffs have shown that fees paid under the Wayne Circuit Court fee schedule are frequently low, plaintiffs have not shown that the fee schedule generally results in unreasonable compensation. According to national compensation figures prepared by the Spangenberg Group for the American Bar Association Standing Committee on Legal Aid and Indigent Defendants, the average compensation paid to plaintiffs falls near the middle of the range of compensation nationwide.[15]

---

[13] *Wayne Co Criminal Defense Bar Ass'n v Chief Judges of Wayne Circuit Court*, 468 Mich 1244 (2003).

[14] *Id.*

[15] *Id.* (CORRIGAN, J., concurring) (citations omitted).

It is true that the state is involved in the funding of trial court operations to some extent. In 1996, for example, the Legislature established the Court Equity Fund, which provides limited funding for trial court operations.[16] But both the operational responsibility and the funding responsibility for providing for the defense of indigent criminal defendants remain primarily local. As the Michigan Supreme Court explained in *Frederick v Presque Isle Co Circuit Judge*:

> Traditionally, the county has been the primary unit in directing Michigan's criminal justice system.
>
> "[J]udicial circuits are drawn along county lines and counties are required by statute to bear the expenses of certain courtroom facilities, circuit court commissioner salaries, stenographer's salaries, juror's compensation, and *fees for attorneys appointed by the court to defend persons who cannot procure counsel for themselves.*"[17]

The Court in *Frederick* went on to find that, although all courts in the state are part of Michigan's one court of justice,[18] the "Legislature retains power over the county and may delegate to the local governments certain powers."[19] The Court held that in the indigent criminal defense act, the Legislature "did just that": "[i]t directed the chief judge of the circuit court to appoint an attorney to represent an indigent defendant's defense, and directed the county to pay for such services."[20] This is the system that remains in effect today. And this is the system that the Duncan plaintiffs challenge in this case.

---

[16] See MCL 600.151b.

[17] *Frederick v Presque Isle Co Circuit Judge*, 439 Mich 1, 6; 476 NW2d 142 (1991), quoting OAG, 1967-1968, No 4,588, pp 49-50 (June 12, 1967) (emphasis added; citations omitted).

[18] Const 1963, art 6, § 1.

[19] *Frederick, supra* at 15.

[20] *Id.*

### B. RIGHT TO COUNSEL

As the majority correctly notes, the Sixth Amendment of the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."[21] The Michigan Constitution articulates the same right.[22] In its landmark decision in *Gideon v Wainwright*,[23] the United States Supreme Court held that the Sixth Amendment right to counsel was "obligatory" with regard to the states through the operation of the Fourteenth Amendment. In that case, Gideon was charged in a Florida state court with breaking and entering a poolroom with intent to commit a misdemeanor.[24] This offense was a felony under Florida law.[25] Appearing in the trial court without funds and without a lawyer, Gideon asked the court to appoint counsel for him.[26] The trial court refused that request, and Gideon was ultimately convicted.[27] The Florida Supreme Court denied habeas corpus relief.[28] The United States Supreme Court then granted certiorari and overturned the Florida Supreme Court's decision.

In rendering its decision in *Gideon*, the United States Supreme Court explained the importance of providing counsel for indigent defendants:

---

[21] US Const, Am VI.

[22] Const 1963, art 1, § 20.

[23] *Gideon v Wainwright*, 372 US 335, 342; 83 S Ct 792; 9 L Ed 2d 799 (1963).

[24] *Id*. at 336.

[25] *Id*. at 336-337.

[26] *Id*. at 337.

[27] *Id*.

[28] *Id*.

[A]ny person haled into court, who is too poor to hire
a lawyer, cannot be assured a fair trial unless counsel is
provided for him. This seems to us to be an obvious
truth. Governments, both state and federal, quite prop-
erly spend vast sums of money to establish machinery to
try defendants accused of crime. Lawyers to prosecute
are everywhere deemed essential to protect the public's
interest in an orderly society. Similarly, there are few
defendants charged with crime, few indeed, who fail to
hire the best lawyers they can get to prepare and present
their defenses. That government hires lawyers to pros-
ecute and defendants who have the money hire lawyers
to defend are the strongest indications of the widespread
belief that lawyers in criminal courts are necessities, not
luxuries. The right of one charged with crime to counsel
may not be deemed fundamental and essential to fair
trials in some countries, but it is in ours. From the very
beginning, our state and national constitutions and laws
have laid great emphasis on procedural and substantive
safeguards designed to assure fair trials before impartial
tribunals in which every defendant stands equal before
the law. This noble ideal cannot be realized if the poor
man charged with crime has to face his accusers without
a lawyer to assist him.[29]

Thus, in our country and in our state, we deem the
right to counsel as being both fundamental and neces-
sary to a fair trial. And we accept the proposition that,
just as the public pays for prosecutors to prosecute
criminal defendants, the public should also pay for
counsel to represent such defendants who are too poor
to "hire the best lawyers they can get to prepare and
present their defenses."[30] But *Gideon* did not address,
or even allude to, the question of the *effectiveness* of
counsel who represent criminal defendants. The United
States Supreme Court did not directly address that

[29] *Id.* at 344.
[30] *Id.*

question until 20 years later, in *Strickland v Washington*.[31]

## C. EFFECTIVENESS OF COUNSEL

In *Strickland,* the United States Supreme Court determined that it was not enough that a person accused of a crime have a lawyer standing by his or her side.[32] Rather, the Court said that the accused is entitled to a lawyer who "plays the role necessary to ensure that the trial is fair":[33]

> That a person who happens to be a lawyer is present at trial alongside the accused, however, is not enough to satisfy the constitutional command. The Sixth Amendment recognizes the right to the assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results. An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair.[34]

The facts of the *Strickland* case were particularly egregious. As the Court indicated, during a 10-day period in 1976, Strickland planned and committed three sets of crimes, which included three brutal stabbing murders, torture, kidnapping, severe assaults, attempted murders, attempted extortion, and theft.[35] At trial, Strickland waived his right to a jury trial, against his counsel's advice, and pleaded guilty to all charges, including the three capital murder charges.[36] Thus, the

---

[31] *Strickland v Washington,* 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984).

[32] *Id.* at 684.

[33] *Id.* at 685.

[34] *Id.*

[35] *Id.* at 671-672.

[36] *Id.* at 672.

case revolved around the performance of Strickland's counsel at the sentencing phase of the case, a phase that culminated in the trial court's imposition of the death penalty. The Florida Supreme Court upheld the convictions.[37] Strickland sought postjudgment collateral relief on the basis, among other things, that his counsel had rendered ineffective assistance at the sentencing proceeding.[38] The trial court denied relief,[39] and the Florida Supreme Court affirmed the denial.[40] The case reached the United States Supreme Court through the habeas corpus process.[41]

The United States Supreme Court initially determined that, although Strickland challenged the effectiveness of counsel at the sentencing phase, in a capital case the sentencing phase was "sufficiently like a trial in its adversarial format and in the existence of standards for decision, that counsel's role in the proceeding is comparable to counsel's role at trial . . . ."[42] Making it doubly sure that there would be no misunderstanding, the Court said that "[f]or purposes of describing counsel's duties, . . . Florida's capital sentencing proceeding need not be distinguished from an ordinary trial."[43]

The Court went on to state that the "proper measure of attorney performance remains simply reasonableness under prevailing professional norms."[44] It enunciated a two-part standard for assessing counsel's assistance to a convicted defendant who claims that such assistance

---

[37] *Id.* at 675.

[38] *Id.*

[39] *Id.* at 676.

[40] *Id.* at 678.

[41] *Id.* at 678-683.

[42] *Id.* at 686-687 (citation omitted).

[43] *Id.* at 687.

[44] *Id.* at 688.

was "so defective as to require reversal of a conviction or death sentence . . . ."[45] The first component required a showing that counsel's performance was "deficient"; that is, that counsel made errors "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."[46] The second component required a showing that the deficient performance prejudiced the defense; that is, that counsel's errors "were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."[47] Applying these standards to the performance of Strickland's counsel, the Court held:

> Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim. Here there is a double failure. More generally, [Strickland] has made no showing that the justice of his sentence was rendered unreliable by a breakdown in the adversary process caused by deficiencies in counsel's assistance. [Strickland's] sentencing proceeding was not fundamentally unfair.[48]

Of considerable importance, when dealing with the prejudice component, the Court set out several situations in which to presume prejudice. Those situations are "[a]ctual or constructive denial of the assistance of counsel altogether" and "various kinds of state interference with counsel's assistance."[49] In such circumstances, "[p]rejudice . . . is so likely that case-by-case inquiry into prejudice is not worth the cost."[50] Other decisions have delineated those contexts in which prejudice can be presumed, including the right to have

[45] *Id.* at 687.
[46] *Id.*
[47] *Id.*
[48] *Id.* at 700.
[49] *Id.* at 692.
[50] *Id.*

counsel present for a pretrial lineup,[51] the right to a pretrial hearing,[52] and the right of those who do not require appointed counsel to secure counsel of their own choice.[53]

In *People v Pickens*,[54] the Michigan Supreme Court adopted the ineffective assistance standards that *Strickland* articulated. The Court held that the Michigan Constitution offers the same level of protection as the United States Constitution.[55] The United States Supreme Court has recognized that the right to counsel encompasses " 'every step in the proceeding against [a defendant].' "[56] That Court has also acknowledged that "to assure that the accused's interests will be protected consistently with our adversary theory of criminal prosecution," the accused must be guaranteed the presence of counsel at all "critical confrontations."[57]

D. THE DUNCAN PLAINTIFFS' CLAIMS AND THE REQUESTED RELIEF

Neither the United States Supreme Court nor the Michigan Supreme Court has addressed the threshold

---

[51] *Coleman v Alabama*, 399 US 1, 7; 90 S Ct 1999; 26 L Ed 2d 387 (1970).

[52] See *Pugh v Rainwater*, 483 F2d 778, 787 (CA 5, 1973), aff'd in part, rev'd in part, and remanded on other grounds *sub nom Gerstein v Pugh*, 420 US 103 (1975).

[53] *Moss v United States*, 323 F3d 445, 456 (CA 6, 2003).

[54] *People v Pickens*, 446 Mich 298; 521 NW2d 797 (1994).

[55] *Id.* at 302.

[56] *Coleman, supra* at 7 (citation omitted).

[57] *United States v Wade*, 388 US 218, 227; 87 S Ct 1926; 18 L Ed 2d 1149 (1967); see also *Rothgery v Gillespie Co, Texas*, 554 US ___, ___; 128 S Ct 2578, 2592; 171 L Ed 2d 366, 383 (2008) ("[A] criminal defendant's initial appearance before a judicial officer, where he learns the charge against him and his liberty is subject to restriction, marks the start of adversary judicial proceedings that trigger attachment of the Sixth Amendment right to counsel.").

question of how courts should approach a Sixth Amendment right to the effective assistance of counsel claim for declaratory and prospective injunctive relief concerning claimed *preconviction* systemic injuries resulting from the representation that indigent criminal defendants are receiving, or would receive, from their court-appointed attorneys. The United States Supreme Court in *Gideon* and *Strickland* was concerned with results, not process. It did not presume to tell the states *how* to ensure that indigent criminal defendants receive effective assistance of counsel.

But that is exactly what the indigent criminal defendants who are the plaintiffs in this case seek to have the judiciary do. In their complaint, the Duncan plaintiffs asserted that under *Gideon* and the Michigan Constitution the named defendants, the state of Michigan and the Governor, have a duty to ensure that indigent defense counsel have the tools necessary to mount a proper defense and to ensure that indigent defendants are not deprived of their right to constitutionally adequate representation. The Duncan plaintiffs further asserted that the defendants "have done essentially nothing to address the problems [of the current system of county responsibility for providing counsel to indigent criminal defendants] or their constitutional obligations."

Notably, at the time of the complaint, appointed attorneys represented each of the Duncan plaintiffs and criminal charges were pending. As the state and the Governor point out, at the time of the complaint none of the Duncan plaintiffs had gone to trial or otherwise had their cases adjudicated. Further, the state and the Governor assert that at the time of the complaint, none of the Duncan plaintiffs had attempted to have their assigned attorneys replaced. Finally, according to the

state and the Governor, since the filing of the complaint, seven of the eight Duncan plaintiffs have been sentenced. (The record is silent regarding whether any of these individuals have made postconviction claims of ineffective assistance of counsel.)

Despite the fact that none of the Duncan plaintiffs had been convicted of anything at the time they filed their complaint, in their prayer for relief, as the majority notes, the Duncan plaintiffs sought a court declaration that the defendants' conduct, failure to act, and practices are unconstitutional and unlawful and sought to enjoin the defendants from subjecting class members to continuing unconstitutional practices.[58] As the majority states, the Duncan plaintiffs requested an order requiring the defendants " 'to provide indigent defense programs and representation consistent with the requirements of the United States and Michigan Constitutions.' "[59]

In essence, then, the Duncan plaintiffs sought in their complaint to have the judiciary override the Michigan system of local control and funding of legal services for indigent criminal defendants. Clearly, if the judiciary orders the state and the Governor to provide for "indigent defense programs and representation," then the provisions of the indigent criminal defense act will, for all intents and purposes, become a dead letter. Without even the predicate of finding the indigent criminal defense act unconstitutional under *Gideon* and *Strickland*, the judiciary will, if it grants the relief that the Duncan plaintiffs sought in their complaint, inevitably superimpose a statewide and state-funded system for legal services to indigent criminal defendants upon

---

[58] *Ante* at 259.

[59] *Ante* at 259.

the provisions of that statute. And the people of the
state of Michigan will, of course, be called upon the fund
such a statewide system.

Of necessity, the judiciary will therefore have substi-
tuted its view of proper public policy for that of the
Legislature in enacting and amending the indigent
criminal defense act. While the majority consistently
refuses to directly address the issue of the relief that the
Duncan plaintiffs sought in this case,[60] in my view this
issue cannot be ignored, and I will return to it again
later in this opinion.

## II. *CLAIMS* UPON WHICH *RELIEF* CAN BE GRANTED

### A. OVERVIEW

On appeal, the state and the Governor defend against
the Duncan plaintiffs' claims on a number of grounds,
including three that are closely related. First, they
assert that the Duncan plaintiffs do not have *standing.*
Second, they assert that the Duncan plaintiffs' claims
are not *ripe for adjudication* because these claims are
too remote and abstract to warrant the issuance of

---

[60] See, for example, *ante* at 254-255 ("We affirm, holding that . . . the
trial court has jurisdiction and authority to order declaratory relief,
prohibitory injunctive relief, *and some level of mandatory injunctive
relief, the full extent of which we need not presently define.*") (emphasis
added); *ante* at 280-281 ("We can only speculate at this time regarding the
measures ultimately needed to be taken in order to come into compliance
with the state and federal constitutions, assuming plaintiffs establish
their case. Only when all other possibilities are exhausted and explored,
as already discussed, do there arise issues regarding appropriations and
legislation, the separation of powers, and the full extent of court
jurisdiction and authority. *Therefore, we find no need at this time for this
Court to conclusively address the questions posed.*") (emphasis added);
*ante* at 284 ("In sum, we reiterate that *we decline at this time to define the
full extent of the trial court's equitable authority and jurisdiction* beyond
that recognized and accepted earlier in this opinion.") (emphasis added).

declaratory and injunctive relief. Third, and more generally, they assert that the Duncan plaintiffs fail to state a claim on which relief can be granted because *declaratory judgment and injunctive relief* are inappropriate in this matter. The trial court rejected the standing and ripeness arguments of the state and the Governor, finding that the Duncan plaintiffs did not first have to be convicted or have a request for new counsel denied for standing and ripeness purposes. With respect to *Strickland* and its standards for assessing ineffective performance of counsel, the trial court made the following statement:

> Defendants have argued that the *Strickland* standards should apply to the case at hand. *Strickland* states that a convicted defendant's claim of ineffective assistance of counsel must show that counsel's performance was deficient, and that the deficient performance did prejudice the defense.

> It's not clear to the Court if the *Strickland* standard applies to the plaintiff's [sic] pre-conviction claims of inadequate representation, but the Court does—the Court does not believe that it would have to delve into the circumstances of each particular case as the defendant [sic] claims.

Here, the trial court was wrestling with a conceptual problem that plagues this case and others like it throughout the country. Rather obviously, this case differs from *Strickland* in two important respects. First, it is an appeal involving a civil case, not a criminal one, as was the case in *Strickland*. Second, *Strickland* involved a *post*conviction appeal, while the Duncan plaintiffs filed their complaint in this matter *pre*conviction. The trial court here dealt with this problem by indicating that it was not clear whether *Strickland* applied but, in any event, it did not believe it would have to go into the circumstances of each particular case.

In my view, without explicitly saying so, the trial court here was making a determination that the Duncan plaintiffs' allegations were sufficient to warrant a *presumption* of prejudice. Under such circumstances, according to *Strickland* and its progeny, prejudice is so likely that case-by-case inquiry is not worth the cost.[61]

Rather neatly, then, the trial court's approach avoids the conceptually impossible process in a preconviction case of assessing the performance of the indigent criminal defendant's counsel when, for the most part, that performance has yet to occur. And making something like a finding of prejudice per se and thereby forgoing a case-by-case inquiry would mean, in this case, that if the Duncan plaintiffs could substantiate their claims, then the sweeping declaratory and injunctive relief that they seek would be appropriate under the circumstances.

Thus, the trial court, if somewhat elliptically, but in essence, first found that the Duncan plaintiffs' *claims* were sufficient to create a presumption of prejudice. Then it found that those claims, if proved, would warrant both declaratory and injunctive *relief*. Of course, these are the exact elements with which MCR 2.116(C)(8) deals. That court rule succinctly states that a trial court may grant summary disposition if "[t]he opposing party has failed to state a *claim* on which *relief* can be granted."[62]

On appeal here, the majority cites[63] the patron saint of constitutional interpretation, Chief Justice John Marshall, writing for the Court in *Marbury v Madison*.[64] But Chief Justice Marshall never conceived of the idea of a mandatory injunction to compel legislative appro-

---

[61] *Strickland, supra* at 692.

[62] Emphasis added.

[63] *Ante* at 337-340.

[64] *Marbury v Madison*, 5 US (1 Cranch) 137; 2 L Ed 60 (1803).

priation of funds. *Marbury v Madison* involved the
constitutionality of executive branch *action*. Here, un-
der the approach the Duncan plaintiffs assert and the
majority implicitly accepts, the challenge is to legisla-
tive and executive branch *inaction*, through the alleged
failure to properly fund and administer the system for
providing legal services to indigent criminal defendants.

So, within what framework are we to analyze the
Duncan plaintiffs' challenge? My basic premise is that we
must first determine whether the Duncan plaintiffs'
*claims* amount to a violation per se of the Sixth Amend-
ment right to counsel. If so, we must then determine
whether the judiciary can grant the *relief* they seek within
existing standards for declaratory and injunctive relief.
And we must make these determinations with a proper
regard for the basic concept of separation of powers.

### B. STANDARD OF REVIEW UNDER MCR 2.116(C)(8)

Under MCR 2.116(C)(8), the legal basis of the com-
plaint is tested by the pleadings alone.[65] All factual
allegations are taken as true and any reasonable infer-
ences or conclusions that can be drawn from the acts
are construed in the light most favorable to the non-
moving party.[66] The motion should be denied unless the
claims are so clearly unenforceable as a matter of law
that no factual development can possibly justify a right
to recover.[67] This Court reviews de novo a trial court's
ruling on a motion for summary disposition.[68] This
Court also reviews de novo constitutional issues such as
standing and ripeness.[69]

---

[65] *Maiden v Rozwood*, 461 Mich 109, 119-120; 597 NW2d 817 (1999).

[66] *Id.* at 119.

[67] *Id.*

[68] *Id.* at 118.

[69] *Michigan Chiropractic Council v Comm'r of the Office of Financial
and Ins Services*, 475 Mich 363, 369; 716 NW2d 561 (2006).

Accordingly, under the standard of review for a motion under MCR 2.116(C)(8), this Court must take all the Duncan plaintiffs' allegations as true and this Court must construe any reasonable inferences and conclusions that this Court can draw from the acts in a light most favorable to the Duncan plaintiffs. The state, however, in something of an understatement, has conceded both at the trial level and the appellate level that the public defense systems in Michigan can be "improved." Therefore, as required, I accept the Duncan plaintiffs' allegations as true. The question, again, is twofold: did the Duncan plaintiffs assert justiciable *claims* and, if so, are they claims upon which *relief* can be granted? These inquiries, of necessity, require a consideration of standing, ripeness, and the appropriateness of declaratory and injunctive relief.

### C. STANDING

To have standing, a plaintiff must first have suffered an injury in fact, which is an invasion of a legally protected interest that is concrete and particularized, and actual or imminent, rather than conjectural or hypothetical.[70] Second, there must be a causal connection between the injury and the complained-of conduct.[71] And third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.[72]

### D. RIPENESS

The doctrine of ripeness is closely related to the doctrine of standing, as both justiciability doctrines assess pending claims for the presence of an actual or imminent injury in

---

[70] *Lee v Macomb Co Bd of Comm'rs*, 464 Mich 726, 739; 629 NW2d 900 (2001).

[71] *Id.*

[72] *Id.*

fact. However, standing and ripeness address different underlying concerns. The doctrine of standing is designed to determine whether a particular party may properly litigate the asserted claim for relief. The doctrine of ripeness, on the other hand, does not focus on the suitability of the party; rather, ripeness focuses on the *timing* of the action.[73]

A claim is not ripe, and there is no justiciable controversy, if " 'the harm asserted has [not] matured sufficiently to warrant judicial intervention,' " for instance, where the claim rests on contingent future events that may not occur.[74] A constitutional issue is not ripe for adjudication unless and until there is an encroachment upon a constitutional right.[75]

### E. MCR 2.605

By requiring that there be "a case of actual controversy" and that a party seeking a declaratory judgment be an "interested party," MCR 2.605, the court rule addressing declaratory judgments, incorporates traditional restrictions on justiciability, such as standing, ripeness, and mootness.[76] "The existence of an actual controversy is a condition precedent to invocation of declaratory relief and this requirement prevents a court from deciding hypothetical issues."[77]

---

[73] *Michigan Chiropractic Council, supra* at 378-379 (emphasis in original).

[74] *Id.* at 371 n 14, 381, quoting *Warth v Seldin*, 422 US 490, 499 n 10; 95 S Ct 2197; 45 L Ed 2d 343 (1975).

[75] *Straus v Governor*, 459 Mich 526, 544; 592 NW2d 53 (1999).

[76] *Associated Builders & Contractors v Dep't of Consumer & Industry Services Director*, 472 Mich 117, 125; 693 NW2d 374 (2005); *Moses, Inc v Southeast Michigan Council of Governments*, 270 Mich App 401, 416; 716 NW2d 278 (2006).

[77] *Huntington Woods v Detroit*, 279 Mich App 603, 616; 761 NW2d 127 (2008) (quotation marks and citation omitted).

### F. INJUNCTIVE RELIEF

"Injunctive relief is an extraordinary remedy that issues only when justice requires, there is no adequate remedy at law, and there exists a real and imminent danger of irreparable injury."[78] It is a longstanding principle that " 'a particularized showing of irreparable harm . . . is . . . an indispensable requirement to obtain a preliminary injunction.' "[79] "The mere apprehension of future injury or damage cannot be the basis for injunctive relief."[80]

### G. THE DUNCAN PLAINTIFFS' *CLAIMS*

#### (1) STANDING AND RIPENESS

The majority discusses standing principles to some extent.[81] And toward the end of its opinion it holds, "[O]n the basis of the pleadings and at this juncture in the lawsuit, plaintiffs have sufficiently alleged facts that, if true, establish standing . . . ."[82] In the body of its opinion and apparently in support of this and other determinations relating to justiciability, the majority engages in an extended discussion[83] of *Lewis v Casey*.[84] Ironically, *Lewis* was a case in which the United States Supreme Court found that the prison inmate plaintiffs *lacked* standing, although it did so not in the context of the federal counterpart to an MCR 2.116(C)(8) motion

---

[78] *Pontiac Fire Fighters Union Local 376 v City of Pontiac*, 482 Mich 1, 8; 753 NW2d 595 (2008) (quotation marks and citations omitted).

[79] *Id.* at 9, quoting *Michigan Coalition of State Employees Unions v Civil Service Comm*, 465 Mich 212, 225-226; 634 NW2d 692 (2001).

[80] *Pontiac Fire Fighters, supra* at 9.

[81] *Ante* at 292.

[82] *Ante* at 328.

[83] *Ante* at 294-301.

[84] *Lewis v Casey*, 518 US 343; 116 S Ct 2174; 135 L Ed 2d 606 (1996).

(failure to state a claim upon which relief can be granted), but rather in the context of an MCR 2.116(C)(10) motion (no genuine issue of material fact and the moving party is entitled to judgment as a matter of law).[85] In the course of its discussion, the majority makes the following statement:

> By analogy, here criminal defendants do not sustain harm, for purposes of justiciability analysis and the constitutional right to the effective assistance of counsel, simply because of their status as indigent defendants with court-appointed counsel subject to prosecutorial proceedings in a system with presumed existing deficiencies. *There needs to be an instance of deficient performance or inadequate representation, i.e., "representation [falling] below an objective standard of reasonableness." Strickland, supra* at 688; [*People v Toma*, 462 Mich 281, 302; 613 NW2d 694 (2000)].[86]

Here, the majority appears to accept the proposition that *Strickland* applies in this matter, at least to an extent that there must be "an instance of deficient performance or inadequate representation." Elsewhere it its opinion, the majority elaborates on this concept:

> We hold that, in the context of this class action civil suit seeking *prospective relief* for alleged widespread constitutional violations, injury or harm is shown when court-appointed counsel's representation *falls below an objective standard of reasonableness (deficient performance) and results in an unreliable verdict or unfair trial*, when a criminal defendant is *actually or constructively denied the assistance of counsel altogether at a critical stage in the proceedings*, or when *counsel's performance is deficient under circumstances in which prejudice would be presumed in a typical criminal case*. We further hold that injury or harm is shown when court-appointed counsel's performance or representation is *deficient relative to a critical*

---

[85] *Id.* at 357-358.

[86] *Ante* at 297 (emphasis added).

*stage in the proceedings and, absent a showing that it
affected the reliability of a verdict, the deficient performance
results in a detriment to a criminal defendant that is
relevant and meaningful in some fashion, e.g., unwar-
ranted pretrial detention.* Finally, we hold that, when it is
shown that court-appointed counsel's representation falls
below an *objective standard of reasonableness with respect
to a critical stage in the proceedings, there has been an
invasion of a legally protected interest and harm occurs.*
Plaintiffs must *additionally* show that instances of *defi-
cient performance* and denial of counsel are *widespread and
systemic* and that they are caused by weaknesses and
problems in the court-appointed, indigent defense systems
employed by the three counties, which are attributable to
and ultimately caused by defendants' constitutional fail-
ures."[87]

This paragraph is more than a little impenetrable
but, breaking it down, there are several remarkable
things about it. First, it is clearly a *Strickland* analysis
in its reference to both deficient performance and
prejudice:[88] these are the two prongs that *Strickland*
articulates. I grant that the majority, in this passage,
does not explicitly refer to *Strickland*. And elsewhere in
the opinion, the majority either completely or partially
disavows the applicability of *Strickland*.[89]

---

[87] *Ante* at 302-303 (emphasis added).

[88] See *ante* at 323 ("[The Duncan p]laintiffs do allege that wrongful
convictions have occurred, which suggests satisfaction of the *Strickland*
prejudice requirement typically applicable in criminal appeals.").

[89] See *ante* at 266 ("In our justiciability analysis, we will also explore
the circumstances in which the prejudice prong of the *Strickland* test is
inapplicable."); *ante* at 305 ("We reject the argument that the need to
show that this case is justiciable necessarily and solely equates to
showing widespread instances of deficient performance accompanied by
resulting prejudice in the form of an unreliable verdict that compromises
the right to a fair trial."); *ante* at 306 ("Applying the two-part test from
*Strickland* here as an absolute requirement defies logic, where the
allegations concern widespread, systemic instances of constitutionally
inadequate representation and where the requested remedy in the form
of prospective relief seeks to curb and halt continuing acts of deficient

But even when viewed in the most forgiving light, there is no discernable difference between the majority's formulation, requiring a showing of "representation [that] falls below an objective standard of reasonableness," and the *Strickland* standard, requiring a showing that counsel's performance was "deficient," that is, that counsel made errors "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment,"[90] particularly when "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms."[91] Nor is there any discernable difference between the majority's formulation of a showing of "a detriment to a criminal that is relevant and meaningful in some fashion" and the *Strickland* standard, which requires a showing that the deficient performance prejudiced the defense; that is, that counsel's errors "were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."[92] Much as the majority may disavow it elsewhere, in its central holding it is applying a *Strickland* analysis. Simply using different words, with essentially the same meaning, does not change the structure underlying the analysis.

But the majority's analysis is *Strickland* with a twist. Even though its entire analysis of justiciability relates to the Duncan plaintiffs' *claims*, the majority takes *Strickland* and applies it to those things that the Duncan plaintiffs must show *at a proceeding on the merits*, presumably before the trial court. Thus, the

performance."); *ante* at 310 ("Our conclusion that the two-part test in *Strickland* should not control this litigation is generally consistent with caselaw from other jurisdictions addressing comparable suits.").

[90] *Strickland, supra* at 687.

[91] *Id.* at 688.

[92] *Id.* at 687.

majority artfully avoids articulating a standard, whether it be *Strickland* or otherwise, by which this Court can evaluate the Duncan plaintiffs' *claims* in this case. Rather, it simply finds that "the allegations in [the Duncan] plaintiffs' complaint are sufficient to establish the existence of a genuine case or controversy between the parties, reflecting a dispute that is real, not hypothetical."[93] This, apparently, is a reference to the requirement that to have standing, a plaintiff must have suffered an injury in fact, which is an invasion of a legally protected interest that is concrete and particularized, and actual or imminent, rather than conjectural or hypothetical.[94]

The majority does outline the Duncan plaintiffs' claims,[95] and I contend that any fair and objective review of these claims requires the conclusion that the vast majority of those that involve a concrete, particularized interest can, and should, be resolved in *post*- rather than *pre*conviction proceedings. For these claims to be resolved *pre*conviction requires at least four basic assumptions:

• That the Duncan plaintiffs, and the class members they purport to represent, will in fact be convicted of the crimes with which they are charged or of some lesser offense;

• That inactions of the state and the Governor will have caused such convictions; that is, these inactions will have so prejudiced the defense that the Duncan plaintiffs and the class they purport to represent will have been denied their Sixth Amendment right to a fair trial;

---

[93] *Ante* at 304.

[94] *Lee, supra* at 739.

[95] *Ante* at 256-259.

• That the trial courts in the three named counties will be unable or unwilling to correct such results by ordering new trials on the basis of a finding of deficient performance and prejudice to the individual defendants; and

• That it is likely that if the Duncan plaintiffs are granted the preconviction declaratory and injunctive relief they seek, this will redress the situation for them and for the class they purport to represent.

The majority is obviously willing to make each of these assumptions, *preconviction*, in order to find a justiciable controversy in this case. I am not. Clearly, these assumptions are conjectural and hypothetical in nature. The Duncan plaintiffs' claims do not, and cannot, show that the inactions of the state and the Governor have caused or will cause a denial of their Sixth Amendment rights. They have not, and cannot, make a showing that the trial courts in the named counties are unwilling or unable to act upon postconviction claims of ineffective assistance of counsel. And, while the relief that the Duncan plaintiffs seek would certainly change, and perhaps even improve, the current system of providing legal services to indigent criminal defendants, they have not, and cannot, show that such relief, even if it were to be granted in its entirety, will bring that system to the level of constitutional adequacy that they deem necessary.

Equally clearly, there is no binding precedent that guarantees an indigent defendant a particular attorney, an attorney of a particular level of skill, or that a predetermined amount of outside resources be available to an attorney. Likewise, there is no Sixth Amendment right to a meaningful relationship with counsel.[96] Ab-

---

[96] *Morris v Slappy*, 461 US 1, 13; 103 S Ct 1610; 75 L Ed 2d 610 (1983).

sent certain blatant instances amounting to the denial of counsel, appointed counsel is presumed competent unless a defendant can meet his or her burden to demonstrate a constitutional violation.[97]

In this regard, I note that "[c]laims of ineffective assistance are generally to be resolved through an inquiry into the fairness of a particular prosecution, and not by per se rulemaking."[98] But in effect that is what the majority grants in this matter: a holding per se that, standing alone, the Duncan plaintiffs' claims—despite their conjectural and hypothetical nature, despite their lack of a showing of causation, despite their failure to show that a favorable decision will redress the situation they describe—are sufficient to establish standing and, therefore, justiciability. By contrast, I would find that the Duncan plaintiffs, because of the peculiar preconviction posture of this case, lack standing.

The majority takes much the same approach to the question of ripeness. After some discussion of the principles of ripeness,[99] toward the end of its opinion the majority holds that "on the basis of the pleadings and at this juncture in the lawsuit, plaintiffs have sufficiently alleged facts that, if true, . . . establish that the case is ripe for adjudication . . . ."[100]

Again, the underlying premises for such a holding, of necessity, are that the Duncan plaintiffs will be convicted; that the inactions of the state and the Governor will have caused such convictions; that the trial courts

---

[97] *United States v Cronic*, 466 US 648, 658; 104 S Ct 2039; 80 L Ed 2d 657 (1984).

[98] *In re Forfeiture Hearing as to Caplin & Drysdale, Chartered*, 837 F2d 637, 647 (CA 4, 1988).

[99] *Ante* at 292-293.

[100] *Ante* at 328.

in the affected counties will be unable or unwilling to correct such results by ordering new trials on the basis of a finding of deficient performance and prejudice to the individual defendants; and that it is likely that granting the Duncan plaintiffs the preconviction declaratory and injunctive relief they seek will redress the situation for them and for the class they purport to represent.

While each of these premises is important, the one concerning causation is critical. The majority states that throughout its opinion it has indicated that the Duncan plaintiffs will have to establish a "causal connection between the deficient performance and the indigent defense systems being employed."[101] That is simply not the causal connection that is relevant in this case. The Duncan plaintiffs have sued the state and the Governor. Therefore, the relevant causal connection must be between the alleged inaction of the state and the Governor and the alleged deficient performance at the local level.

Now, as if repeating a mantra, the Duncan plaintiffs repeatedly aver that there is such a causal connection.[102] But there is not a single fact that they allege in

---

[101] *Ante* at 303 n 13.

[102] See, for example, Complaint, ¶ 11 ("This Complaint focuses on how the Defendants' failures to provide funding and fiscal and administrative oversight have *created* a broken indigent defense system in Berrien, Genesee, and Muskegon Counties .... Defendants' failure to provide funding or oversight to any of the State's counties have *caused* similar problems throughout the State.") (emphasis added); Complaint, ¶ 28 ("As a *result* of Defendants' failures, [plaintiff Billy Joe Burr's] attorney is unable to put the prosecution's case to the crucible of meaningful adversarial testing.") (emphasis added); see also similar generalized allegations in Complaint, ¶¶ 35, 44, 51, 56, 63, and 67; Complaint, ¶ 99 ("As a direct *result* of Defendants' failure to ensure that indigent defense providers have the tools necessary to provide constitutionally adequate indigent defense in the three Counties, indigent defense services in the Counties, and elsewhere in the State, are operated at the lowest cost possible and without regard to the constitutional adequacy of the services provided.") (emphasis added); see also similar generalized allegations in Complaint,

their complaint that supports their generalized assertions that the alleged inaction of the state and the Governor has *caused* the deficient performance that the Duncan plaintiffs outline. Moreover, simply repeating the same words again and again does not change their character.

Undoubtedly, the complaint alleges causation. But it does not allege the *necessary* causation. Unsupported generalized allegations are just that, unsupported and generalized. With all due respect to the Duncan plaintiffs and the majority, there is no way it can possibly be proven that the failure of the state and the Governor to do an undefined something specifically *caused* the deficiencies they allege. Intuitively, one might guess that the something is correlated with the alleged deficiencies, even though that something remains undefined beyond mere generalized assertions of inaction. But correlation is not causation, and a hunch is not a basis upon which a court can grant declaratory or injunctive relief.

Indeed, in this regard, the recent opinion of the United States Supreme Court in *Ashcroft v Iqbal*[103] has considerable applicability. That case involved a *Biv-*

___

[103] 103, 104, 109, 113, 118, 120, 123, 125, 126, 130, and 141; Complaint, ¶ 156 ("As set forth herein, Defendant Granholm *fails* to provide funding and oversight to the County programs, and therefore *does nothing* to ensure that the State provides the necessary tools to indigent defense counsel in the Counties.") (emphasis added); Complaint, ¶ 157 ("*As a result* of [the Governor's] *failures* to provide funding and exercise guidance, Michigan's indigent defense system is under funded, poorly administered, and does not provide mandated constitutional protections.") (emphasis added); Complaint, ¶ 160 ("[The Governor's] *failure* to provide the funding and to exercise the oversight necessary for constitutionally adequate indigent defense during trial court felony criminal proceedings violates Plaintiffs' rights under the Sixth Amendment to the United States Constitution, including, but not limited to, their right to effect assistance of counsel.") (emphasis added); see also similar generalized allegations in Complaint, ¶¶ 163, 164, 167, 170, 171, 174, 177, 178, and 181.

[103] *Ashcroft v Iqbal*, 556 US ___; 129 S Ct 1937; 173 L Ed 2d 868 (2009).

*ens*[104] action that Javaid Iqbal, a Pakistani Muslim
arrested on criminal charges and detained by federal
officials following the September 11, 2001, terrorist
attacks, brought against former United States Attorney
General John Ashcroft and Federal Bureau of Investi-
gation Director Robert Mueller.[105] In *Ashcroft*, the ma-
jority of the Court held that, under the federal rules of
pleading, "the tenet that a court must accept as true all
of the allegations contained in a complaint is inappli-
cable to legal conclusions."[106] The majority also held
that "only a complaint that states a *plausible* claim for
relief survives a motion to dismiss."[107]

Admittedly, *Ashcroft* is different from this case in a
number of significant respects. First, the aspect of Iqbal's
complaint that the United States Supreme Court re-
viewed was his claim for damages, not declaratory or
injunctive relief. Second, there is no precise analog in the
Michigan Court Rules to FR Civ P 8(a)(2), which requires
that a pleading must contain a "short and plain statement
of the claim showing that the pleader is entitled to
relief[.]"[108] Third, the decision in *Ashcroft* was supported
only by a bare majority of the Court.

---

[104] See *Bivens v Six Unknown Named Agents of Fed Bureau of Narcotics*,
403 US 388; 91 S Ct 1999; 29 L Ed 2d 619 (1971), in which the United States
Supreme Court "recognized for the first time an implied private action for
damages against federal officers alleged to have violated a citizen's consti-
tutional rights." *Correctional Services Corp v Malesko*, 534 US 61, 66; 122
S Ct 515; 151 L Ed 2d 456 (2001).

[105] *Ashcroft*, 556 US at ___; 129 S Ct at 1942; 173 L Ed 2d at 876.

[106] *Id.*, 556 US at ___; 129 S Ct at 1949; 173 L Ed 2d at 884.

[107] *Id.*, 556 US at ___; 129 S Ct at 1950; 173 L Ed 2d at 884 (emphasis
added).

[108] But see MCR 2.111(A)(1), which requires that a pleading must be
"clear, concise, and direct"; MCR 2.111(B)(1), which requires a "statement of
the facts, without repetition, on which the pleader relies in stating the cause
of action, with the specific allegations necessary reasonably to inform the
adverse party of the nature of the claims the adverse party is called on to
defend"; and MCR 2.111(B)(2), which requires "[a] demand for judgment for

Nevertheless, it is instructive to consider the element of causation within the framework of the *Ashcroft* analysis. Consider the allegation in ¶ 160 of the complaint that "[d]efendant's failure to provide the funding and to exercise the oversight necessary for constitutionally adequate indigent defense during trial court felony criminal proceedings violates Plaintiffs' rights under the Sixth Amendment to the United States Constitution, including, but not limited to, their right to effective assistance of counsel." Rather obviously, this is a legal conclusion wrapped within a factual allegation. As such, under *Ashcroft*, the requirement that a court must accept this allegation as true would be inapplicable.[109] This is not to say that the assertion of causation is fanciful. Rather, "[i]t is the conclusory nature of [the] allegations . . . that disentitles them to the presumption of truth."[110]

And, secondly, if such allegations regarding causation were not entitled to the presumption of truth, then, under *Ashcroft*, we would examine them for plausibility. And it is here that the Duncan plaintiffs run into an absolute dead end. They cannot plausibly assert that the alleged failures by the state and the Governor have *caused* the alleged deficient performance at the local level for the simple reason, among others, that there is no way they can possibly *prove* such causation. It is conceivable that increased oversight and funding at the state level might improve the current system for providing legal services to indigent criminal defendants. But then again, it is equally conceivable that it might not. And just as I can conjure up no way by which the

---

the relief that the pleaders seeks" and that the "pleading must include allegations that show that the claim is within the jurisdiction of the court."

[109] *Ashcroft*, 556 US at ___; 129 S Ct at 1949; 173 L Ed 2d at 884.

[110] *Id.*, 556 US at ___; 129 S Ct at 1951; 173 L Ed 2d at 886.

Duncan plaintiffs can prove their assertion that *inaction* by the state and the Governor has caused the current situation, neither can I conceive of a way by which these defendants can *disprove* that assertion. Thus, we are left with legal conclusions that do not carry the presumption of truth and that are incapable of being proved or disproved. As in *Ashcroft*, there is nothing that nudges the Duncan plaintiffs' complaint " 'across the line from conceivable to plausible.' "[111]

In addition, all the allegations regarding causation in the Duncan plaintiffs' complaint are contingent on future events that may not occur.[112] And, given their contingent nature, I contend that the harm asserted has not matured sufficiently to warrant judicial intervention.[113] I would therefore find that the Duncan plaintiffs' claims are not ripe for adjudication.

### (2) THE *LUCKEY* CASES

The majority, in its justiciability discussion, refers to and relies on one of a series of cases familiarly known as the *Luckey* cases.[114] In *Luckey v Harris*,[115] the plaintiffs, preconviction indigent defendants, alleged deficiencies in the Georgia indigent defense system and sought an order requiring the state defendants to meet minimum constitutional standards in the provision of criminal defense services. As the state notes, but the majority fails to recognize, the underlying controversy in *Luckey* actually spawned five different appellate opinions.

---

[111] *Id.*, 556 US at ___; 129 S Ct at 1951; 173 L Ed 2d at 885, quoting *Bell Atlantic Corp v Twombly*, 550 US 544, 570; 127 S Ct 1955; 167 L Ed 2d 929 (2007).

[112] *Michigan Chiropractic Council, supra* at 371 n 14, 381.

[113] *Id.*

[114] *Ante* at 311-313.

[115] *Luckey v Harris*, 860 F2d 1012, 1013 (CA 11, 1988) (*Luckey I*).

In *Luckey I*, the plaintiffs claimed deficiencies that included inadequate resources, delays in the appointment of counsel, pressure on attorneys to hurry their clients to trial or to enter a guilty plea, and inadequate supervision.[116] The district court dismissed the suit, stating that the plaintiffs were inappropriately seeking an across-the-board ruling that the Georgia criminal defense scheme systematically denied or would inevitably deny effective assistance of counsel to the indigent accused, and holding that the plaintiffs' allegations were insufficient to meet the *Strickland* standard.[117]

But the United States Court of Appeals for the Eleventh Circuit reversed, holding that the plaintiffs' pretrial Sixth Amendment claims did state claims upon which systemic prospective relief could be granted.[118] According to the Eleventh Circuit, the *Strickland* standard was inapplicable to a civil suit seeking prospective relief, observing that "[p]rospective relief is designed to avoid future harm" and concluding that such relief "can protect constitutional rights, even if the violation of these rights would not affect the outcome of a trial."[119] The Eleventh Circuit stated that plaintiffs bringing such prospective claims satisfy their pleading burden when they show " 'the likelihood of substantial and immediate irreparable injury, and the inadequacy of remedies at law.' "[120] The Eleventh Circuit concluded that "the sixth amendment protects rights that do not affect the outcome of a trial. Thus, deficiencies that do

[116] *Id.*

[117] *Id.* at 1016.

[118] *Id.* at 1017-1018.

[119] *Id.* at 1017.

[120] *Id.*, quoting *O'Shea v Littleton*, 414 US 488, 502; 94 S Ct 669; 38 L Ed 2d 674 (1974).

not meet the 'ineffectiveness' standard may nonetheless violate a defendant's rights under the sixth amendment."[121]

It is upon this holding that the majority here relies, stating that the opinion of the Eleventh Circuit in *Luckey I* "mirror[s] our thoughts."[122]

However, in the denial of the defendants' petition for rehearing en banc, several judges dissented.[123] According to the dissent, the original *Luckey I* panel's view of the Sixth Amendment was completely inconsistent with the language and rationale of *Strickland*.[124] Quoting *Strickland* and *Cronic*,[125] the dissent in *Luckey II* explained:

> The sixth amendment is inextricably bound up with the fairness of a defendant's trial: "The right to the effective assistance of counsel is recognized *not for its own sake,* but because of the effect it has on the ability of the accused to receive a *fair trial.*" "The Sixth Amendment['s purpose] is not to improve the quality of legal representation . . . ." "The purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding. Accordingly, *any deficiencies* in counsel's performance *must be prejudicial* to the defense in order *to constitute ineffective assistance* under the Constitution." Thus, the sixth amendment right to counsel is not an abstract right to a particular level of representation; it is the right to the representation necessary for a fair trial. There can be no sixth amendment violation in the absence of prejudice at a particular trial. Put differently, if there is no prejudice, the alleged sixth amendment violation is not merely harmless; there is no violation at all.

---

[121] *Luckey I, supra* at 1017.

[122] *Ante* at 312.

[123] *Luckey v Harris,* 896 F2d 479 (CA 11, 1989) (*Luckey II*).

[124] *Id.* at 480 (Edmondson, J., dissenting).

[125] *United States v Cronic, supra.*

> Because prejudice is an essential element of any sixth amendment violation, sixth amendment claims cannot be adjudicated apart from the circumstances of a particular case. Put differently, no claim for relief can be stated in general terms as was attempted here.[126]

On remand from the decision in *Luckey II*, the federal district court determined that, but for its belief that the law of the case bound the court, abstention would be appropriate.[127] (Under the abstention doctrine, "courts of equity should not act, and particularly should not act to restrain a criminal prosecution, when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief."[128] Abstention from interference in state criminal proceedings serves the vital consideration of comity between the state and national governments.[129]) The district court certified the question for appellate review and in *Luckey III*,[130] the Eleventh Circuit granted the defendants' petition for permission to appeal. In *Luckey IV*,[131] the Eleventh Circuit held that the law of the case did not preclude the district court on remand from dismissing the complaint on the basis of the abstention doctrine. Finally, in *Luckey V*,[132] the Eleventh Circuit affirmed the district court's order, which granted dismissal on abstention grounds and cited with approval the dissent in *Luckey II*. In dismissing the case on abstention grounds, the district court stated that "plaintiff's [sic]

---

[126] *Luckey II, supra* at 480 (Edmondson, J., dissenting) (citations omitted; emphasis added by *Luckey II*).

[127] See *Harris v Luckey*, 918 F2d 888, 891 (CA 11, 1990) (*Luckey III*).

[128] *Younger v Harris*, 401 US 37, 43-44; 91 S Ct 746; 27 L Ed 2d 669 (1971); see 28 USC 2283.

[129] *Younger, supra* at 44.

[130] *Luckey III, supra* at 894.

[131] *Luckey v Miller*, 929 F2d 618, 622 (CA 11, 1991) (*Luckey IV*).

[132] *Luckey v Miller*, 976 F2d 673, 678-679 (CA 11, 1992) (*Luckey V*).

intend to restrain every indigent prosecution and contest every indigent conviction until the systemic improvements they seek are in place."[133]

The majority basically ignores the dissent in *Luckey II*. But I find that dissent to be both persuasive and applicable here. As in *Luckey*, absent a showing here that their attorneys' claimed deficiencies prejudicially affected their right to receive a fair trial as opposed to merely claiming violation of an abstract right to a particular level of representation, the Duncan plaintiffs cannot show that the state has violated their Sixth Amendment right to a fair trial.[134] In my view and using the language of *Luckey II*, there can be no Sixth Amendment violation in the absence of prejudice at a particular trial. And because prejudice is an essential element of any Sixth Amendment violation, Sixth Amendment claims cannot be adjudicated apart from the circumstances of a particular case. In a nutshell, the Duncan plaintiffs have not stated justiciable claims and neither the trial court nor this Court can appropriately make a finding of prejudice per se. For this reason, as I elaborated earlier in this opinion, the Duncan plaintiffs' Sixth Amendment claims should fail because they are not justiciable as a matter of law.

### H. THE *RELIEF* THAT THE DUNCAN PLAINTIFFS SEEK

As I have already noted, the Duncan plaintiffs' complaint sought extensive declaratory and injunctive relief in this case. But, again as I have noted, the majority ostensibly declines throughout its opinion to address the issue of that relief. Rather, the majority holds that "on the basis of the pleadings and at this juncture in the

---

[133] *Id.* at 677.

[134] See *Luckey II*, *supra* at 480 (Edmondson, J., dissenting).

lawsuit, plaintiffs have sufficiently alleged facts that, if true, . . . establish that the case . . . state[s] claims upon which declaratory and injunctive relief can be awarded."[135] Beyond that, the majority simply leaves it—perhaps a better phraseology would be, issues an open invitation—to the trial court to "determine the parameters of what constitutes 'widespread', 'systemic,' or 'pervasive' constitutional violations or harm [actual or imminent][.]"[136]

This is not to say, however, that the majority does not give some very overt indications of the type of relief that might be appropriate. Early in its opinion, noting that the Duncan plaintiffs seek prohibitory injunctive relief, the majority observes, "Such a remedy could potentially entail a cessation of criminal prosecutions against indigent defendants absent constitutional compliance with the right to counsel."[137] Having dropped this bombshell, the majority later states:

> We acknowledge that [the Duncan] plaintiffs allege that the systemic constitutional deficiencies have been caused by inadequate state funding and the lack of fiscal and administrative oversight. We further recognize that, should plaintiffs prevail, funding and legislation would seemingly appear to be the measures needed to be taken to correct constitutional violations. However, we are not prepared to rule on the issue whether the trial court has the authority to order appropriations, legislation, or comparable steps. It is unnecessary to do so at this juncture in the proceedings.[138]

But the majority then begins to disclaim its disclaimers. It states:

---

[135] *Ante* at 255.

[136] *Ante* at 303-304.

[137] *Ante* at 273.

[138] *Ante* at 278-279.

We can only speculate at this time regarding the measures ultimately needed to be taken in order to come into compliance with the state and federal constitutions, assuming [the Duncan] plaintiffs establish their case. Only when all other possibilities are exhausted and explored, as already discussed, do there arise issues regarding appropriations and legislation, the separation of powers, and the full extent of court jurisdiction and authority. Therefore, we find no need at this time for this Court to conclusively address the questions posed. *That being said, we wish to make clear that nothing in this opinion should be read as foreclosing entry of an order granting the type of relief so vigorously challenged by defendants.*[139]

The majority then elaborates. First, in the context of federal law and an action under 42 USC 1983, it observes[140] that under *Edelman v Jordan*:

But the fiscal consequences to state treasuries in these cases [in which officials were enjoined from taking certain actions under circumstances that might lead to impacts on such state treasuries] were the necessary result of compliance with decrees which by their terms were prospective in nature. State officials, in order to shape their official conduct to the mandate of the Court's decrees, would more likely have to spend money from the state treasury than if they had been left free to pursue their previous course of conduct. Such an ancillary effect on the state treasury is a permissible and often an inevitable consequence of the principle announced in *Ex parte Young*, [209 US 123; 28 S Ct 441; 52 L Ed 714 (1908)].[141]

And, as if that were not sufficient, the majority goes on to discuss *46th Circuit Trial Court v Crawford Co*[142] and concludes:

---

[139] *Ante* at 280-281 (emphasis added).

[140] *Ante* at 281.

[141] *Edelman v Jordan*, 415 US 651, 667-668; 94 S Ct 1347; 39 L Ed 2d 662 (1974).

[142] *46th Circuit Trial Court v Crawford Co*, 476 Mich 131; 719 NW2d 553 (2006).

If indeed there exist systemic constitutional deficiencies in regard to the right to counsel and the right to the effective assistance of counsel, it is certainly arguable that *46th Circuit Trial Court* lends authority for a court to order defendants to provide funding at a level that is constitutionally satisfactory. The state of Michigan has an obligation under *Gideon* to provide indigent defendants with court-appointed counsel, and the "state" is comprised of three branches, including the judiciary. Const 1963, art 3, § 2. Ultimately, it is the judiciary, on a daily basis, that is integrally involved with ensuring that, before prosecutions go forward, indigent defendants are provided counsel, without which the court could not carry out its constitutional responsibilities. *Musselman*[143] did not entail the constitutional implications that arise here, which include the ability of the judicial branch to carry out its functions in a constitutionally sound manner.[144]

And there, at the risk of being colloquial, you have it. In the starkest terms possible, the majority has issued an open invitation to the trial court to assume ongoing operational control over the systems for providing defense counsel to indigent criminal defendants in Berrien, Genesee, and Muskegon counties. And with that invitation comes a blank check, to force sufficient state level legislative appropriations and executive branch acquiescence to bring those operations to a point—if such a point could ever be achieved—that satisfies the trial court's determination of the judiciary's responsibilities to carry out its functions in a "constitutionally sound manner."

The policy implications of such an approach are staggering. First, such operational control would override the explicit provisions of the indigent criminal defense act. Second, such operational control would give

---

[143] *Musselman v Governor*, 448 Mich 503; 533 NW2d 237 (1995).

[144] *Ante* at 283-284.

the trial court the opportunity, and perhaps even the obligation, to nullify the provisions of the indigent criminal defense court rule, thereby superseding the authority of the Supreme Court and the State Court Administrator. Third, vesting such operational control in one circuit court creates the anomaly of giving that circuit court the power to direct some of the operations of three other, theoretically coequal, circuit courts. Fourth, the record of judicial operational control of executive branch operations, such as prisons[145] and schools,[146] has been, to be charitable, decidedly mixed. Fifth, and finally, such operational control is in direct contravention of the basic concept of separation of powers.

Moreover, as I have noted earlier in this opinion, injunctive relief may issue only when there is no adequate remedy at law. In their complaint, the Duncan plaintiffs baldly asserted that no such remedy exists[147] and the majority scarcely touches upon the adequacy of existing legal remedies other than to disclaim the effectiveness of postconviction review. But, self-evidently, such a remedy does exist. Under *Strickland,* a criminal defendant whose counsel's performance at critical stages of the proceeding was so deficient as to cause prejudice to that criminal defendant can, postconviction, seek judicial intervention and, upon a proper showing, redress. The Duncan plaintiffs, however, seek preconviction intervention and redress without a particularized showing of irreparable harm, based upon the apprehension of future injury or damage. Under such circumstances, declaratory and injunctive relief is not only unwise as a

---

[145] *Cain v Dep't of Corrections No 1,* 468 Mich 866 (2003); *Cain v Dep't of Corrections,* 254 Mich App 600; 657 NW2d 799 (2002).

[146] *Milliken v Bradley,* 433 US 267; 97 S Ct 2749; 53 L Ed 2d 745 (1977); *Milliken v Bradley,* 418 US 717; 94 S Ct 3112; 41 L Ed 2d 1069 (1974).

[147] See Complaint, ¶ 153 ("Plaintiffs have no adequate remedy at law.").

policy matter, it is inappropriate as a matter of law. Thus, the Duncan plaintiffs' claims are not justiciable, and the judiciary cannot and should not grant the relief they seek.

### III. SEPARATION OF POWERS

The majority invokes a sweeping judicial power to intervene in and determine matters of public policy.[148] It asserts that, lacking such intervention, the Legislature and the Governor would have the power to switch the constitution on and off at will[149] and that this would usher in a regime in which the Legislature and the Governor, not the judiciary, say "what the law is."[150]

There is no question that under separation of powers principles, it is the ultimate responsibility of the judiciary to "say what the law is."[151] But first, those seeking judicial intervention must establish that their claimed injury is personal, particularized, concrete, and otherwise judicially cognizable.[152] As Chief Justice Rehnquist said in *Raines v Byrd*:

> In the light of th[e] overriding and time-honored concern about keeping the Judiciary's power within its proper constitutional sphere, we must put aside the natural urge to proceed directly to the merits of this important dispute and to "settle" it for the sake of convenience and efficiency. Instead, we must carefully inquire as to whether appellees have met their burden of establishing that their claimed injury is personal, particularized, concrete, and otherwise judicially cognizable.[153]

---

[148] *Ante* at 255-256.

[149] *Ante* at 255-256, citing *Boumediene v Bush*, 553 US___; 128 S Ct 2229, 2259; 171 L Ed 2d 41, 77 (2008).

[150] *Ante* at 256.

[151] *Marbury, supra* at 177.

[152] *Raines v Byrd*, 521 US 811, 820; 117 S Ct 2312; 138 L Ed 2d 849 (1997).

[153] *Id.*

Here, the Duncan plaintiffs would have the judiciary rush in and "settle" their claims using the swift swords of declaratory and injunctive relief, without a particularized showing of irreparable harm and without *any* showing that there is no adequate remedy at law. And they would have the judiciary grant such relief despite their failure to show that they have standing. In *Lee v Macomb Co Bd of Comm'rs*,[154] the Michigan Supreme Court discussed at length the magnitude of the relationship between the standing doctrine and the separation of powers principles:

> [I]n Michigan, as in the federal system, standing is of great consequence so that neglect of it would imperil the constitutional architecture whereby governmental powers are divided between the three branches of government.
>
> Standing, as a requirement to enter the courts, is a venerable doctrine in the federal system that derives from US Const, art III, § 1, which confers only "judicial power" on the courts and from US Const, art III, § 2's limitation of the judicial power to "Cases" and "Controversies." In several recent cases, the United States Supreme Court has discussed the close relationship between standing and separation of powers. In *Lewis v Casey*, 518 US 343, 349; 116 S Ct 2174; 135 L Ed 2d 606 (1996), Justice Scalia, writing for the majority, said:
>
> "The doctrine of standing [is] a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches. It is the role of courts to provide relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm; *it is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution.* [Citations omitted.]"[155]

---

[154] *Lee, supra* at 735-741.

[155] *Lee, supra* at 735-736 (emphasis added).

The indigent criminal defense act indisputably "shape[s] the institutions of government." But the Duncan plaintiffs do not challenge the constitutionality of that act, either facially or "as applied."[156] Rather, they simply seek to override it, to "switch it off" as it were. The Duncan plaintiffs do not ask the judiciary to "say what the law is" with respect to the indigent criminal defense act. Nor do they challenge the Legislature's enactment of that statute. Rather, they seek to reshape the indigent criminal defense act in a way that they find more desirable. In essence, they seek to have the judiciary *make* the law rather than say what the law is.

It is precisely to such an approach that the doctrine of separation of powers directly applies. Early on, the great constitutional scholar Justice THOMAS M. COOLEY discussed the concept of separation of powers in the context of declining to issue a mandamus against the Governor:

> Our government is one whose powers have been carefully apportioned between three distinct departments, which emanate alike from the people, have their powers alike limited and defined by the constitution, are of equal dignity, and within their respective spheres of action equally independent. One makes the laws, another applies the laws in contested cases, while the third must see that the laws are executed. This division is accepted as a necessity in all free governments, and the very apportionment of power to one department is understood to be a prohibition of its exercise by either of the others.[157]

Thus, it is the Legislature—where matters of public policy are openly debated and openly decided—whose responsibility it is to make the law. And, by enactment

---

[156] See *In re Request for Advisory Opinion Regarding Constitutionality of 2005 PA 71*, 479 Mich 1, 11 n 20; 740 NW2d 444 (2007).

[157] *Sutherland v Governor*, 29 Mich 320, 324 (1874).

of the indigent criminal defense act, the Legislature has done just that, it has made the law. It may now be advisable to change the law. Indeed, the majority recognizes that there are efforts underway to do so.[158] But, to date, those efforts—whether for good reasons or bad— have been unsuccessful. The Duncan plaintiffs invite the judiciary to impose changes that, to date, their advocates have been unable to secure through the legislative process. Again, I would decline the invitation.

But does this mean that there is no role for the judiciary within the framework of the indigent criminal defense act? Of course not. The Michigan Supreme Court has set out that role in the indigent criminal defense court rule: the State Court Administrator is to review local plans to provide legal services to indigent criminal defendants. That review is to "protect the integrity of the judiciary." I grant that such a role is clearly less glamorous, considerably more circumspect, certainly more modest, and conceivably less noble in expression than the role the majority espouses. But within the context of the indigent criminal defense act and applying the principle of separation of powers, it is the judiciary's proper role nonetheless.

### IV. CLASS CERTIFICATION

I also disagree with the majority's conclusion that the Duncan plaintiffs have properly pleaded a class action suit.

A member of a class may maintain a suit as a representative of all purported members of the class only if each of the following five requirements is met:

---

[158] *Ante* at 280 n 7.

(a) the class is so numerous that joinder of all members is impracticable;

(b) there are questions of law or fact common to the members of the class that predominate over questions affecting only individual members;

(c) the claims or defenses of the representative parties are typical of the claims or defenses of the class;

(d) the representative parties will fairly and adequately assert and protect the interests of the class; and

(e) the maintenance of the action as a class action will be superior to other available methods of adjudication in promoting the convenient administration of justice.[159]

The party requesting class certification bears the initial burden of demonstrating that the criteria for certifying a class action are satisfied.[160]

### A. NUMEROSITY

The numerosity factor—that the class is so numerous that joinder of all members is impracticable—does not require a specific minimum number of members, "and the exact number of members need not be known as long as general knowledge and common sense indicate that the class is large."[161] But the plaintiff must at least "present some evidence of the number of class members or otherwise establish by reasonable estimate the number of class members."[162]

In *Zine v Chrysler Corp*, the plaintiffs, purchasers of new Chrysler vehicles, filed proposed class action suits,

---

[159] MCR 3.501(A)(1); see *Hill v City of Warren*, 276 Mich App 299, 310; 740 NW2d 706 (2007); *Zine v Chrysler Corp*, 236 Mich App 261, 286-287; 600 NW2d 384 (1999).

[160] *Tinman v Blue Cross & Blue Shield of Michigan*, 264 Mich App 546, 562; 692 NW2d 58 (2004); *Zine, supra* at 287 n 12.

[161] *Zine, supra* at 287-288.

[162] *Id.* at 288.

alleging that Chrysler violated the Michigan Consumer Protection Act (MCPA)[163] by providing "misleading" information regarding Michigan vehicle purchasers' rights under the state's lemon laws.[164] In analyzing whether the plaintiffs met the class action certification requirements, this Court noted that, while not identifying a specific number of class members, the plaintiffs indicated that the class potentially included "all 522,658 purchasers of new Chrysler products from February 1, 1990, onward."[165] Although seemingly sufficient to satisfy the minimal requirement of "present-[ing] some evidence of the number of class members or otherwise establish[ing] by reasonable estimate the number of class members," this Court held that the plaintiffs failed to satisfy the numerosity requirement because in order to be a class member, the new car buyers must have suffered actual injury to have standing to sue.[166] Accordingly, the plaintiffs were required, but failed, to show that "there [was] a sizable number of new car buyers who had seriously defective vehicles and lost their right to recovery under Michigan's lemon law because they were misled by the documents supplied by Chrysler."[167]

Here, as stated by the majority, the Duncan plaintiffs allege that the purported class that they seek to represent is

> all indigent adult persons who have been charged with or will be charged with felonies in the District and Circuit Courts of Berrien, Genesee, and Muskegon Counties and who rely or will rely on the Counties to provide them with

---

[163] MCL 445.901 *et seq.*

[164] *Zine, supra* at 263, 265.

[165] *Id.* at 288.

[166] *Id.*

[167] *Id.* at 288-289.

defense services. The Class includes all indigent adults against whom felony criminal charges will be brought in Berrien, Genesee, and Muskegon Counties during the pendency of this action.[168]

The majority summarily concludes that this purported class "is sufficiently numerous to make joinder of each class member impractical."[169] But, in keeping with the *Zine* analysis, I disagree. As I have concluded earlier in this opinion, the Duncan plaintiffs have failed to show that they themselves have suffered or imminently will suffer an actual injury, by failing to show that the actions or inactions of the state and the Governor have caused or will cause a denial of their Sixth Amendment rights. Therefore, concomitantly, the purported class that they seek to represent—all indigent adult persons who rely or will rely on the counties to provide them with defense services in felony cases—also fails to adequately identify a sufficiently numerous class, by failing to identify class members who have suffered actual injury and therefore have standing to sue. Accordingly, I would conclude that the trial court erred in granting the Duncan plaintiffs' motion for class certification.

### B. COMMONALITY AND SUPERIORITY

Because a plaintiff must satisfy each factor of the class action certification analysis, and failure on one factor mandates overall failure of certification, I need not continue to address the remaining factors. However, I comment on these factors to stress the impropriety and impracticality of allowing a class action for the claims alleged.

---

[168] See *ante* at 330.

[169] *Ante* at 330-331.

The commonality factor—that there are questions of law or fact common to the members of the class that predominate over questions affecting only individual members—"requires that 'the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized proof.' "[170] Notably, the commonality factor ties in with the superiority factor—the maintenance of the action as a class action will be superior to other available methods of adjudication in promoting the convenient administration of justice—"in that if individual questions of fact predominate over common questions, the case will be unmanageable as a class action."[171]

In *Zine*, the common question was whether Chrysler's new car documents violated the MCPA.[172] However, this Court explained that, even assuming that the plaintiffs prevailed on that question, "the trial court would have to determine for each class member who had purchased a new vehicle whether the vehicle was bought primarily for personal, family, or household use[;] whether the plaintiff had a defective vehicle and reported the defect to the manufacturer or dealer, had the vehicle in for a reasonable number or repairs, was unaware of Michigan's lemon law, read the documents supplied by Chrysler, and was led to believe that Michigan did not have a lemon law, and chose not to pursue

---

[170] *Zine, supra* at 289, quoting *Kerr v West Palm Beach*, 875 F2d 1546, 1557-1558 (CA 11, 1989).

[171] *Zine, supra* at 289 n 14, citing MCR 3.501(A)(2)(c) (stating that to determine whether the maintenance of the action as a class action will be superior to other available methods of adjudication in promoting the convenient administration of justice, the court must consider "whether the action will be manageable as a class action").

[172] *Zine, supra* at 289.

a remedy under the lemon law because of that belief."[173] According to the *Zine* panel, "[t]hese factual inquiries, all of which were subject to only individualized proof, predominate over the one common question and would render the case unmanageable as a class action."[174]

Here, as the majority presents it, the common questions are "whether there have been widespread and systemic constitutional violations, whether the violations were and are being caused by deficiencies in the county indigent defense systems, and whether the systemic deficiencies were and are attributable to or resulted from the action or inaction of defendants."[175] And the majority concedes that "this action will require contemplation of specific instances of deficient performance and instances of the actual or constructive denial of counsel . . . ."[176] The majority then inexplicably goes on to conclude that "[a]ny evidence concerning individual prosecutions has no bearing on those particular criminal cases and the available appellate remedies, except to the extent of any effect on a pending case caused by a systemwide remedy resulting from an order or judgment rendered in this action. The evidence pertaining to individual prosecutions merely constitutes a piece in the larger puzzle relative to establishing a basis for prospective, systemwide relief."[177] Candidly, I do not follow this line of logic.

Nevertheless, in attempting to understand the majority's reasoning, I note that I agree the common question here is "whether the systemic deficiencies were and are attributable to or resulted from the action or

---

[173] *Id.* at 290 (citations omitted).

[174] *Id.*

[175] *Ante* at 331.

[176] *Ante* at 331.

[177] *Ante* at 331-332.

inaction of defendants." However, unlike the majority, I
do not see the question "whether there have been
widespread and systemic constitutional violations" as
being a "broad factual question[] common to all mem-
bers in the class."[178] To the contrary, the determination
whether there have been such widespread and systemic
constitutional violations will necessarily require the
trial court to look at countless cases from each of the
three counties to examine whether and how individual
indigent defendants have suffered violations of their
constitutional rights. Likewise, determining "whether
the violations were and are being caused by deficiencies
in the county indigent defense systems" will require the
trial court to look at untold numbers of individual cases
to examine the cause for the purported violations.
Unlike the majority, I am unwilling to presume that
every alleged deficiency in every indigent criminal de-
fendant's case is the result of the alleged deficiencies in
the county indigent defense systems. Indeed, it is con-
ceivable that even attorneys with the best available
resources could, for a myriad of reasons, fail to provide
adequate representation. Moreover, unlike the majority,
I cannot overlook the significance of the fact that this
action will require consideration of potentially thou-
sands of specific instances of deficient performance and
actual or constructive denial of counsel.[179]

---

[178] *Ante* at 331.

[179] See also, for example, *Neal v James*, 252 Mich App 12, 20; 651 NW2d
181 (2002):

In reviewing the claims of each of the class representatives in
the present case, it is apparent that the only common question
presented is whether the individuals involved were discriminated
against because of their race. How these individuals may have
been discriminated against does not involve common issues of fact
or law, but highly individualized questions. The individual factual
circumstances pertinent to each plaintiff will need to be reviewed,
and individual, fact-specific inquires will need to be made in

In sum, as in *Zine*, the potentially necessary individual factual inquiries here predominate over the common question and render the case unmanageable as a class action. And, as in *Neal*, the Duncan plaintiffs have not shown, and cannot conceivably show, a *"specific"* policy or practice that the state and the Governor follow in order to satisfy the commonality requirement. Again, this is so because the Duncan plaintiffs based their entire case against the state and the Governor on generalized assertions of *inaction*. By definition, such inaction cannot be an actionable, specific policy or practice. I would therefore conclude that the trial court erred in determining that the Duncan plaintiffs satisfied the requirements of MCR 3.501 for the certification of a class action.

## V. CONCLUSION

I fundamentally disagree with the majority's conclusions, and the rationale supporting those conclusions, with respect to the justiciability of the Duncan plaintiffs' claims and the appropriateness of the declaratory and injunctive relief that the Duncan plaintiffs seek. I further disagree with the majority's conclusions, and the rationale supporting those conclusions, concerning class action certification.

The majority concludes that the Duncan plaintiffs' claims are justiciable. To reach that conclusion, the majority, while ostensibly disavowing *Strickland*, implicitly adopts the square peg of the *Strickland* postconviction analytical framework and then twists it sufficiently to force it into the round hole of the Duncan

---

evaluating why certain individuals were not hired or promoted, or why other individuals were discharged or not retained. Plaintiffs have simply not shown that there was any specific policy or practice followed by defendants to satisfy the "commonality" requirement under MCR 3.501.

plaintiffs' preconviction claims of ineffective assistance of counsel. In essence, and without using the word, the majority renders a holding that, standing alone, the Duncan plaintiffs' claims—despite their conjectural and hypothetical nature, despite their lack of a showing that the inaction of the state and the Governor has caused the situation they describe, and despite their failure to show that a favorable decision will redress that situation—are sufficient per se to establish standing, ripeness, and, therefore, justiciability. I disagree. As I noted earlier in this opinion, the Duncan plaintiffs cannot plausibly assert that the alleged failures by the state and the Governor have *caused* the alleged deficient performance at the local level because there is no way they can possibly *prove* such causation. In sum, we are left solely with generalized legal conclusions regarding causation that should not carry the presumption of truth and that are incapable of being proved or disproved.

And, as the *Luckey II* dissent stated, there can be no Sixth Amendment violation in the absence of prejudice at a particular trial. And because prejudice is an essential element of any Sixth Amendment violation, Sixth Amendment claims cannot be adjudicated apart from the circumstances of a particular case. Here, the Duncan plaintiffs have not stated justiciable claims and neither the trial court nor this Court can appropriately make a finding of prejudice per se.

With respect to the relief that the Duncan plaintiffs seek, the majority repeatedly declines to address this issue directly. But the broad implications of the majority's opinion are clear. The majority's opinion admits that such relief could potentially entail a cessation of criminal prosecutions against indigent defendants in Berrien, Genesee, and Muskegon counties, absent con-

stitutional compliance with the right to counsel. The majority's opinion invites the trial court to assume ongoing operational control over the current systems for providing counsel to indigent criminal defendants in Berrien, Genesee, and Muskegon counties and, if necessary, to force sufficient state level legislative appropriations and executive branch acquiescence to bring those operations to a point—if such a point could ever be achieved—that satisfies the trial court's determination of the judiciary's responsibilities to carry out its functions in a "constitutionally sound manner."

And we should not be deceived. State operation and funding of legal services in Berrien, Genesee, and Muskegon counties will inevitably lead to the operation and funding of such services throughout the state, overriding the provisions of the indigent criminal defense act and the indigent criminal defense court rule. Indeed, this is the ultimate relief that the Duncan plaintiffs seek.

Not only are the policy and fiscal implications of such a situation staggering, it is blackletter law that injunctive relief may issue only when there is no adequate remedy at law. Self-evidently, such a remedy exists here. Under *Strickland*, if the Duncan plaintiffs can show, postconviction, that their counsel's performance at critical stages of the proceeding was so deficient as to cause prejudice to them, they can seek judicial intervention and redress. The sweeping preconviction declaratory and injunctive relief that the Duncan plaintiffs seek is simply inappropriate, and a proper respect for the basic concept of separation of powers requires that the judiciary decline to issue such relief.

I should note that were I a member of the Legislature, I might well vote for a system that would have the state assume some or all of the expense of defending

poor persons accused of crimes. I would do so because I am well aware of the constitutional right to counsel that *Gideon* enunciated in 1963 and the constitutional right to effective counsel that *Strickland* enunciated in 1984. There is little question in my mind that our state has not fully met its obligations under these landmark decisions. I have so stated publicly, as have other members of the judiciary.[180]

But I am not a member of the Legislature. I am a member of an intermediate error-correcting court, not a policy-setting one. And I firmly believe that the reach of the judiciary should not exceed its grasp; that is, the concept of judicial modesty requires us to refrain from assuming functions that the legislative and executive branches are best equipped, and constitutionally required, to undertake. I conclude that—even though the

---

[180] In 1986, Chief Justice G. MENNEN WILLIAMS, in his State of the Judiciary speech, called for a statewide system of equal justice, saying that such a system "remains to be fully implemented . . . and it only can be fully implemented through state financing." National Legal Aid & Defender Association, Evaluation of Trial Level Indigent Defense Systems in Michigan: A Race to the Bottom: Speed and Savings Over Due Process: A Constitutional Crisis (June 2008), p 11. Similarly, Chief Justice DOROTHY COMSTOCK RILEY urged the state to "step in and relieve the counties of a burden they could not afford to meet," a point she made again in her 1988 and 1990 State of the Judiciary speeches. *Id.* In 1992, Chief Justice MICHAEL CAVANAGH in his forward to the Michigan Bar Journal's edition on Michigan's indigent defense system, stated, "[I]t is unfortunate that as we mark the 200th Anniversary of the *Bill of Rights* and extol its important guarantees, we at the same time witness the failure to secure those guarantees, adequately or at all, to significant segments of society." *Id.* at 12. And in 1995, Chief Justice JAMES BRICKLEY released the Supreme Court's report entitled *Justice in Michigan: A Report to the People of Michigan from the Justices of the Michigan Supreme Court,* in which the Court declared, among other things: "The state should assume the core costs of the court system, including judicial salaries and benefits, the salaries and benefits of court staff, due process costs *including the cost of indigent representation,* and the cost of statewide information technology." *Id.* at 11-12 (emphasis added).

state and the Governor virtually concede the inadequacies of the current Michigan system for indigent criminal defense—the trial court erred when it denied the state and the Governor's motion for summary disposition under MCR 2.116(C)(8) and, consequently, when it granted the Duncan plaintiffs' motion for class certification. I would therefore reverse and remand for the entry of summary disposition in favor of the state and the Governor.